## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>      **Plaintiff,**<br><br>  **v.**<br><br>**JAMES A. TORCHIA,**<br>**CREDIT NATION CAPITAL, LLC,**<br>**CREDIT NATION ACCEPTANCE, LLC,**<br>**CREDIT NATION AUTO SALES, LLC,**<br>**AMERICAN MOTOR CREDIT, LLC,**<br>**SPAGHETTI JUNCTION, LLC,**<br><br>      **Defendants.** | **Civil Action File No.** |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission

("Commission" or "SEC") alleges the following:

## OVERVIEW

1. This matter involves an ongoing offering fraud and Ponzi scheme by

James A. Torchia and various entities that he operates under the "Credit Nation"

umbrella.  Defendants Credit Nation Capital LLC ("CN Capital") and its corporate affiliates, Credit Nation Acceptance, LLC ("CN Acceptance"), Credit Nation Auto Sales, LLC ("CN Auto"), American Motor Credit, LLC ("AMC"), and Spaghetti Junction, LLC (collectively "Credit Nation) are all involved in Torchia's fraudulent scheme.  The fraud involves two separate investment schemes, and it is being accomplished through unregistered offerings of securities that Credit Nation advertises to unsophisticated investors on the radio and in newspapers.

2.     Since 2009, Torchia, through CN Capital (formerly known as Credit Nation Lending Services, LLC), has raised tens of millions of dollars from investors who purchased unregistered promissory notes, most of which promised a 9% return.   CN Capital touts the safety of the promissory notes, describing them to investors as "100% asset backed" and "backed by hard assets dollar for dollar."

3.     CN Capital has generated substantial losses each year since at least 2011, it has liabilities that dwarf its assets, and it generates insufficient returns on its investments to cover its cash flow needs.  Contrary to representations made to investors portraying the Notes as a secure investment capable of generating reliable investment returns, CN Capital basically operates as an ongoing Ponzi

-2-

scheme through which the promised investment returns are paid using new investor money.  Neither CN Capital's multi-million dollar per year operating losses nor its massive insolvency have ever been disclosed to investors.

4.     The second investment scheme perpetrated by Credit Nation involves unregistered fractional interests in life settlement contracts ("LS Interests") sold by a separate Credit Nation entity, CN Acceptance,[1] which is also controlled by Torchia.  Unlike the investors who hold CN Capital Notes, purchasers of LS Interests are assigned fractional interests in specific life insurance policies.  CN Acceptance sells investors a share of a life insurance policy owned by CN Capital, and the investors receive a pro rata distribution from the policy proceeds when the insured dies.  CN Acceptance is required to pay the policy premiums for up to two years beyond the insured's projected life expectancy.

5.     LS Interests are sold as stand-alone investments, separate from CN Capital and the Notes.  LS Interest purchase documents make no reference to CN Capital, and state that CN Acceptance will pay the policy premiums using a portion of the purchase price.  But in practice, Torchia disregards corporate formalities and

---

[1]     Prior to August 2013, LS Interests were sold through CN Capital rather than CN Acceptance.

commingles CN Acceptance's funds with CN Capital's, such that the LS Interests are now threatened by CN Capital's insolvency. Because Torchia routinely directs the transfer of CN Acceptance's cash to CN Capital, CN Acceptance lacks the funds needed to pay the premiums for policies sold to LS Interest holders.

6.     Torchia treats Credit Nation as his personal piggy bank, and he has transferred millions of dollars to entities he controls to support his and his family's other businesses. He also pays his personal expenses and those of his other businesses with Credit Nation funds.

7.     Torchia has transferred hundreds of thousands of dollars directly to himself. In other words, he has stolen investor money. For instance, between January 1, 2014 and March 31, 2015, Torchia caused Credit Nation to make net transfers of more than $750,000 to Spaghetti Junction, LLC, an entity under Torchia's control that he uses strictly as a conduit of funds. In turn, Spaghetti Junction transferred approximately $259,000 to Torchia and another $139,000 to Torchia's wife during that same period.

8.     Emergency relief is important in this case. Credit Nation, on average, raised in excess of $2 million per month through the sale of Notes and LS Interests in the first six months of 2015. The Commission believes that additional victims

are being defrauded on a daily basis.  With Torchia's history of misappropriating funds and the company's massive ongoing operating losses, an asset freeze and receiver are necessary to gather, preserve and protect whatever assets still exist for the benefit of the victims of Torchia's schemes.

9.    Moreover, Credit Nation has conceded that the books and records of the company are "just a mess" and "mind-boggling," so a receiver is needed to unravel the complicated knot that Torchia has woven and to perform a full, independent accounting of the use and disposition of investor funds.  A receiver will also need to administer and maintain the insurance-policy assets to avoid policy lapses and maintain their value while the case proceeds.

## VIOLATIONS

10.   The Defendants have engaged in acts or practices or aided, abetted and caused, and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute or will aid abet and cause violations of Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the

Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)].

11.   The Defendants have engaged in acts or practices or aided, abetted and caused, and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute or will aid abet and cause violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and subsections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5 (a), (b), and (c)].

12.   The Defendants have engaged in acts or practices or aided, abetted and caused, and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute or will aid abet and cause violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

## JURISDICTION AND VENUE

13.   The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v  and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin Defendants from engaging in the transactions, acts, practices, and courses of business alleged in this

complaint, and transactions, acts, practices, and courses of business of similar purport and object, for civil penalties and for other equitable relief.

14.    This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

15.    Defendants, directly and indirectly, made use of the mails, and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

16.    Certain of the transactions, acts, practices, and courses of business constituting violations of the Securities Act and the Exchange Act occurred in the Northern District of Georgia.

17.    Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this complaint, and in transactions, acts, practices, and courses of business of similar purport and object.

## THE DEFENDANTS

18.    **James A. Torchia**, age 57, is a resident of Canton, Georgia.  Torchia has been the CEO of Credit Nation Capital, LLC (f/k/a Credit Nation Lending,

LLC) since its inception in 2008.   Torchia is also the CEO and principal of Credit Nation's corporate affiliates.  In 2006, the State of Florida issued a cease-and-desist order against Torchia in connection with the sale of viatical settlements.  The states of Alabama, Georgia and Tennessee have previously ordered Torchia to stop selling unregistered viatical securities, although Alabama and Georgia subsequently vacated their respective orders.  Torchia claims to have sold a prior viatical business for $19 million, but a bankruptcy trustee of one of the entities involved in the transaction, and the conservator of another, have each alleged that the transaction was actually a fraud by Torchia.  *See In re Synergy Acceptance Corp.*, Case No. 11-31712,  *Schoenmann v. Torchia*, Adversary Proceeding No. 12-3156 (Bankr. N.D. Cal.); *American Pegasus SPC v. Clear Skies Holding Co.*, 1:13-cv-03035 (N.D. Ga.).

19.  **Credit Nation Capital, LLC ("CN Capital")** (formerly known as Credit Nation Lending, LLC) is a Georgia limited liability company with its principal place of business in Woodstock, Georgia.  CN Capital is not registered with the Commission in any capacity, and has offered and sold tens of millions of dollars' worth of promissory notes to investors since shortly after the company's formation in August 2008.  On September 17, 2014, Credit Nation

Lending Services, LLC changed its name to Credit Nation Capital, LLC. Torchia is CN Capital's CEO and he owns 72% of the membership units jointly with his son, Jason.

20. **Credit Nation Acceptance, LLC ("CN Acceptance")** is a Texas limited liability company with its principal place of business in Midland, Texas. CN Acceptance, which is not registered with the Commission in any capacity, offers and sells to investors fractional interests in viatical and life settlement contracts. Torchia is CN Acceptance's CEO. CN Acceptance is 100% owned by CN Capital.

21. **Credit Nation Auto Sales, LLC ("CN Auto")** is a Georgia limited liability company with its principal place of business in Woodstock, Georgia that was formed in August 2008. CN Auto operated a used automobile dealership, which is now closed. As of December 31, 2014, CN Auto had received roughly $6.4 million in purported "loans" from CN Capital, which are deemed by CN Capital to be uncollectable. Torchia is the CEO of CN Auto, and he owns 70% of the membership units jointly with his son, Jason.

22. **American Motor Credit, LLC ("AMC")** is a Georgia limited liability company with its principal place of business in Woodstock, Georgia that was

formed in April 2013.  AMC is the entity through which CN Capital makes

subprime automobile loans to customers.  AMC also services the loans.

Torchia is the CEO of AMC.  AMC is 100% owned by CN Capital.

23.  **Spaghetti Junction, LLC ("Spaghetti Junction")** is a Nevada limited

liability company that was formed in July 2008.  Torchia owns and controls

Spaghetti Junction, and from time to time, he transfers money from CN Capital

and its affiliates to Spaghetti Junction, which he ultimately uses to benefit

himself and family members.  Torchia is listed as the manager of Spaghetti

Junction by the Nevada Secretary of State.

## THE FRAUDULENT SCHEME

*The Credit Nation Entities and Investments*

24.  Credit Nation raises money from investors through two entities, CN

Capital and CN Acceptance.  Torchia controls both entities.

25.  Torchia runs CN Capital's affairs from its offices in Woodstock,

Georgia.  CN Acceptance has an office in Midland, Texas.

26.  CN Acceptance offers and sells LS Interests to investors.

27.   CN Capital offers and sells promissory notes to investors.

-10-

28.   The companies use multiple bank accounts, which are managed by three of Torchia's employees, Amberly Green, Catrina Tipton and Kim Kruse.

29.   Torchia directed his employees as to how and when to transfer money from and between accounts.

***CN Capital Offers and Sells Unregistered Promissory Notes to Investors***

30.   Since at least January 2009, CN Capital has been offering and selling unregistered promissory notes to investors in a series of private placements, purportedly pursuant to Regulation D.  17 C.F.R. § 230.501 *et seq.*  Many of the investors are elderly and/or retired.

31.   Prior to the effective date of the JOBS Act at the end of September 2013, CN Capital raised in excess of $20.5 million in its Regulation D offerings.  These notes were not sold through radio and newspaper offerings.

32.   After the effective date of the JOBS Act, in late 2013, CN Capital began advertising the notes and offering them pursuant to a purported exemption from registration under Rule 506(c) under the Securities Act. 17 C.F.R. § 230.506(c).  Since it began advertising the notes, CN Capital has raised more than $20 million as a result of additional unregistered note sales.

33.   CN Capital advertised and sold three- and five-year notes bearing interest at 9% per annum, compounded and payable quarterly. As of November 2014, CN Capital also began offering five-year, zero-coupon notes bearing interest at 9% per annum, compounded semi-annually.

34.   The minimum investment amount for the notes is $50,000, which can be waived or reduced at the discretion of the company.   The notes automatically renew for an additional term unless the investor notifies the company in writing, at least ninety days before the scheduled maturity date of the note, of his or her desire to receive payment on the maturity date.

35.   Most investors renew their notes at maturity.

36.   No additional disclosures are provided to investors in advance of their decision whether or not to let the notes renew.

37.   In addition, investors in the quarterly notes have an optional early repayment right, subject to a prepayment penalty.   Investors who hold the zero-coupon notes do not have an early repayment option.

38.   CN Capital uses a custodian for investors who wish to invest through Individual Retirement Accounts.

39.  CN Capital informs investors that substantially all of the proceeds of the notes are used to purchase subprime automobile loans and life settlement and viatical settlement contracts and to pay related expenses.

40.  The 2013 offering memorandum, which was used from September 2013 through November 2014, states that CN Capital may use its funds to (i) make floor plan loans to affiliated auto dealerships on competitive market terms, (ii) purchase real estate in connection with its business, and (iii) pursue other investments and strategies that are focused on the car loans and life settlements.

41.  The Novemeber 2014 Offering Memorandum, which is still in use, contains similar statements, but it additionally states that the company may engage in credit transactions with affiliates.

42.  CN Capital's offering circular boasts that by investing with it, note holders are "accessing the experience of the managers who have a proven track record originating, procuring and managing these specialized categories of assets."

43.  According to its offering memoranda, CN Capital "expects to generate interest income and long-term capital gains from its investment in the Auto

Loans and Life Settlements in excess of the interest rate payable on the promissory notes."

44. The memoranda also state that the company "expects the pool of Life Settlements will generally yield about 15% per annum."

45. The 2013 Offering Memorandum portrays the Auto Loans as highly profitable, claiming that the company anticipated that "less than one month's collection of payments on Auto Loans will be sufficient to meet one year's premiums on Life Settlements held by the Company."

46. Credit Nation's newspaper advertisements, which have appeared in Georgia, South Carolina, Texas and California,  generally state, among other things, that the investment: (i) generates a 9% fixed return with interest paid quarterly; (ii) is 100% asset backed; (iii) is unaffected by stock market volatility; and (iv) is suitable for cash or IRA investments.

47. The radio advertisements have been broadcast in Texas, Georgia and South Carolina.   According to Torchia, many of the advertisements are played on the Rush Limbaugh show on AM radio.

48. The text of one of the radio advertisements is as follows:

Attention investors.  My name is Bob Guess.  I'm with Credit Nation and I'm here to help.  Don't get blindsided by the next stock market correction.  Remember the correction in 2008; some investors lost 40 to 50 percent of the money that they had in brokerage and retirement accounts.  Well, history tends to repeat itself.  It's not too late to lock in your gains and take the stock market risk out of your portfolio.  If you need income, we have a blended asset investment that'll pay you nine percent annual return.  Your investment is backed dollar for dollar with hard assets and is non-correlated to the stock market.  For those who don't need additional income but are looking for growth, we have investments that have historically produced double-digit returns that are also non-correlated to the stock market.  Give us a call at 1-800-542-9513, that's 1-800-542-9513.  Don't gamble with your financial future.  Call us today for an appointment.  1-800-542-9513.

49.   Another radio advertisement stated as follows:

Hello, I'm Bob Guess with Credit Nation.  You know, most Americans are tired of bank returns, they're afraid of the run-up in Wall Street, and fed up with misleading claims of returns on annuities and insurance companies.  If you're looking for sound investments and security of principal where your money works as hard as you do, give Credit Nation a call.  Because of the new JOBS Act passed by Congress there is now a level playing field for investors.  With Credit Nation you can earn a nine percent return on your money backed by hard assets dollar for dollar.  If you prefer growth over income we have an asset-based product thats averaged double digits historically.  Don't put all your eggs in one basket.  Call Credit Nation for a free consultation today.  It's never been harder to stay ahead of inflation than it is today, so diversify your portfolio.  That's the answer.  Call us at 1-800-542-9513, that's 1-800-542-9513.  Don't gamble with your financial future.  Call us today.  1-800-542-9513.

50.   The asset-backed product that averaged double digit returns, referenced in both radio advertisements, pertain to the LS Interests sold by CN Acceptance, which are described in more detail below.

***CN Acceptance Offers and Sells Unregistered LS Interests to Investors***

51.   CN Acceptance offers and sells fractional interests in life insurance policies originally acquired by CN Capital. LS Interest investors sometimes invest through Individual Retirement Accounts.

52.   Investors who purchase LS Interests through CN Acceptance do not receive an offering memorandum or subscription application.

53.   Instead, CN Acceptance provides purchasers of LS Interests with an investment packet.  The packet contains, among other things, a list of services that CN Acceptance provides and a purchase contract.

54.    From the documents produced in response to Commission subpoenas, it does not appear that CN Acceptance requires investors to certify that they are accredited before purchasing an LS Interest.

55.   In the list of services, CN Acceptance states that it will "monitor when premium payments are due and make premium payments to the insurer."

56.   Likewise, the purchase contract states that "Purchaser acknowledges and agrees that the funds shall be used to purchase the life insurance polic[y], to pay costs and expenses related to such purchase and maintenance of each policy…and to pay the premiums on such life insurance polic[y]."  Neither CN Capital nor the Notes are mentioned anywhere in the investment packet.

57.   For each life insurance policy, CN Acceptance establishes a projected life expectancy for the insured.  CN Acceptance agrees to pay the premiums on the policy for up to two years after the projected life expectancy.  If, at that time, the insured is still alive, then CN Acceptance has the right to require LS Interest investors to make the future premium payments on a pro rata basis (or to have their interest sold "to the highest bidder" by CN Acceptance if they refuse).

***CN Acceptance Commingled Its Assets with CN Capital and Used Funds to Pay Expenses Unrelated to the LS Interests.***

58.    Although CN Capital and CN Acceptance each have had their own bank accounts, Torchia commingles their cash by routinely transferring large amounts among the accounts.

59.   As a result of this commingling, CN Acceptance lacks an independent source of funds with which to continue to pay insurance premiums.

60.   Because of the extensive commingling, CN Acceptance's ability to pay premiums is jeopardized by CN Capital's insolvency, and CN Acceptance has become reliant upon Torchia's ability to raise new money from investors in order to make premium payments.

61.   In other words, money that should be retained by CN Acceptance to cover future premium payments for investors is instead diverted to CN Capital, where it is used, in part, to cover CN Capital's operating deficits.

***CN Capital Sold Promissory Notes and LS Interests to Unaccredited Investors and Failed to Take Reasonable Steps to Verify that Investors were Accredited***

62.   In order to purchase a Credit Nation promissory note, a prospective investor must complete a Subscription Application and Subscription Agreement.   The Subscription Application asks the investor to indicate, among other things, whether he or she is an accredited investor.

63.   Specifically, the investor is asked to check a box indicating that he or she is either  (i) "any natural person whose individual net worth, or joint net worth with that person's spouse, at the time of such investor's purchase,

exceeds US$1,000,000 (excluding the value of your primary residence)"; or (ii) "any natural person who had an individual income in excess of US$200,000 in each of the two most recent years or joint income with that person's spouse in excess of US$300,000 in each of those years and has a reasonable expectation of reaching the same level in the current year."

64.   After advertising the promissory notes and LS Interests to the public, CN Capital failed to take reasonable steps to verify that investors were accredited.  CN Capital essentially allowed investors to self-certify their status by checking a box on a subscription application.  It appears that CN Acceptance did not take even that meager step.

65.   CN Capital and CN Acceptance sold promissory notes and LS Interests to unaccredited investors after the companies began generally soliciting investors.

66.   One such investor ("Investor A"), is a 78 year old retiree and resident of South Carolina.  After seeing a Credit Nation advertisement in his local newspaper in late 2013, he called the telephone number listed in the advertisement.

67.   Thereafter, a Credit Nation representative came to his home and met with him and his wife.  The representative ultimately persuaded him to invest $50,000 in a CN Capital promissory note and an additional $50,000 in a CN Acceptance LS Interest.

68.   At the time of those investments, Investor A and his wife had a joint income of approximately $35,000 or $40,000.   Including the two houses owned by Investor A and his wife, their net worth was approximately $900,000 in late 2013.  When the primary residence was excluded, the net worth fell to approximately $400,000.

69.   Investor A communicated all of these facts about his income and net worth to the Credit Nation representative prior to investing.   Nevertheless, his subscription application has a box checked that says that his net worth exceeds $1,000,000 excluding the value of his primary residence.

70.   Investor A never provided the Credit Nation representative with any documentation regarding his net worth or income, and he was not required to do so before investing.

***Torchia, CN Capital and CN Acceptance Misrepresented the Safety of the Investments***

71.   CN Capital and CN Acceptance have continuously led investors to believe the investments are secure and that Credit Nation is profitable.

72.   Despite the representations made to investors, Credit Nation's investment strategy has never been profitable.

73.   The promissory notes are not fully secured by assets.

74.    In early September 2015, outside counsel for Credit Nation produced to the Commission staff non-GAAP financial reports for the company for 2014 (the "2014 Financial Packet") prepared by an independent forensic accountant.

75.   In mid-October 2015, Credit Nation produced a similar set of reports for the first six-months of 2015 (the "2015 Financial Packet").

76.   The 2014 Financial Packet and 2015 Financial Packet confirm that the representations made by the company regarding the safety of the investments and the profitability of its investment strategy are false.

77.   Instead of the notes being "100% asset backed" or "backed by hard assets dollar for dollar," the company's liabilities dwarf its assets and the company has sustained multi-million dollar per year operating losses.  Neither

the financial condition of the company nor its operating losses were ever disclosed to investors.

78.   As of December 31, 2014, the company had only about $9 million in assets to pay the then-outstanding roughly $30 million in promissory notes.

79.   That insolvency is no better today, and in fact, Credit Nation's losses accelerated during the first six months of 2015.

80.   In 2014, the company suffered a net loss of more than $6.1 million.

81.   Credit Nation suffered operating losses of more than $4.2 million in the first six months of 2015.

82.   During 2014, the company collected an average of $108,472 per month in auto loan proceeds, which was nowhere near enough to pay the more than $2 million in policy premiums for the year, contrary to the claims in the offering memorandum used for most of that year.

83.   In short, Credit Nation is staying afloat only because it continues to raise more money from investors, but its precarious financial condition has never been disclosed to those investors and investors have been affirmatively misled about the safety and profitability of Credit Nation's investment strategies.

84.   Torchia had no reasonable basis in fact to believe the statements in the offering memoranda and advertisements.

85.   Torchia knew or was reckless in not knowing that statements in the offering memoranda and advertisements were false.

86.   Torchia knew or was reckless in not knowing that the offering memoranda and advertisements omitted material information about Credit Nation's financial condition that was necessary to make the statements contained therein not misleading.

87.   Torchia had the ultimate authority over the statements made in the offering memoranda and advertisements.

### *Torchia Misappropriated and Misused Investor Funds*

Credit Nation Cannot Make Interest Payments to Existing Note Holders Without Raising More Money from New Investors.

88.   The offering memoranda represent that substantially all of the note proceeds will be used to purchase sub-prime auto loans and life insurance policies and to pay related expenses.  The LS Interest investment packet

represents that funds would be held to make premium payments on the underlying policies.

89. Torchia, however, has misused investor funds by paying various expenses to keep the fraudulent scheme afloat, and by transferring funds to affiliated entities for the benefit of Torchia, his other businesses and his family members.

90. As described above, the company is unprofitable and losing money. According to the 2014 Financial Packet, in 2014, CN Capital raised $10,100,914 from the sale of investor notes and CN Acceptance raised another $8,919,629 from the sale of fractional interests in Life Settlements, for a total of $19,020,543.

91. Only $7,613,144 of that amount, however, was used to fund new auto loans or to purchase new life insurance policies.

92. A significant amount of the remaining new investor funds was used to cover the ongoing expenses that otherwise could not have been paid because of the company's $6.1 million operating loss during 2014.   Among those expenses was more than $2.7 million in interest and maturity payments made to note investors.

93.   Moreover, Credit Nation's investments did not produce sufficient revenue to cover interest and maturity payments to existing noteholders during either 2014 or the first six months of 2015.

Torchia Treated Credit Nation as His Personal Piggy Bank.

94.   Torchia has used a significant amount of CN Capital funds to benefit himself, his other businesses and family members.

95.   In 2014, CN Capital and AMC made net transfers to CN Auto (the now defunct auto dealership owned by Torchia) in excess of $800,000.

96.   Over time, CN Capital has made purported "loans" to CN Auto, of which more than $6.4 million remains outstanding.  CN Capital deems those loans to be uncollectable.

97.   Although the Offering Memoranda state that CN Capital may make floor-plan loans on competitive market terms to auto dealerships, it does not appear that these "loans" to CN Auto were made pursuant to any such floor-plan financing arrangement.

98.  From January 1, 2014, through March 31, 2015 CN Capital made approximately $777,000 in net transfers to Spaghetti Junction, another Torchia-

controlled entity.  Spaghetti Junction has no business operations and serves strictly as a conduit of funds.

99.   During the same time period, Spaghetti Junction transferred approximately $259,000 to Torchia and $139,000 to Marianne Torchia. Spaghetti Junction also transferred $46,500 to casinos during the period, for unknown reasons.

100. In 2014, Torchia transferred $195,842 of CN Capital funds to Willie's West, LLC ("Willie's West"), which used the funds to purchase a residential home in Canton, Georgia in which Torchia lives.  Spaghetti Junction also transferred hundreds of thousands of dollars to Willie's West.

101. The 2014 Financial Packet described CN Capital's purported "loan" to Willie's West as uncollectable.

102. After Commission staff questioned the purported loan to Willie's West, the 2015 Financial Packet described the Willie's West loan as having been "offset against the Spaghetti Junction loan payable" (*i.e.*, money that Credit Nation purportedly owes to Spaghetti Junction for old loans).

103. CN Capital also has made approximately $140,000 in purported "loans" to an auto dealership owned by Torchia's son.  Spaghetti Junction also transferred hundreds of thousands of dollars to that dealership.

104. Over the years, Spaghetti Junction and/or CN Capital have transferred hundreds of thousands of dollars to Sixes Tavern, a restaurant controlled by Torchia.

105. The entities under Torchia's control have extensively commingled funds, and Torchia routinely directed the transfer of funds between the various entities under his control.

106. For many of the transfers between entities under his control, there was no apparent legitimate corporate purpose.

107. Torchia and the entities under his control disregarded corporate formalities.

108.  There is no contemporaneous documentation for the vast majority of the purported "loans" between entities under Torchia's control.

109. Torchia used a corporate American Express card to pay tens of thousands of dollars' worth of personal expenses each year.  The bill was paid by Credit Nation.

110. Torchia claims personally to have "loaned" large sums to Credit Nation in the past, for which transfers to himself and his other businesses are purportedly repayment. These purported loans are largely undocumented.

111. The offering memoranda describe the notes as "a senior obligation" of CN Capital and prohibit CN Capital from taking on any indebtedness that would be senior to the note holders.

112. None of the millions of dollars' worth of purported related-party "loan" obligations incurred by Credit Nation prior to 2013 were ever disclosed to investors.

## COUNT I—FRAUD

### Violations of Section 17(a)(1) of the Securities Act

### [15 U.S.C. § 77q(a)(1)]

113. Paragraphs 1 through 112 are hereby realleged and incorporated herein by reference.

114. Between in or around 2013 and the present, Torchia, CN Capital and CN Acceptance (the "Offering Defendants"), in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and

indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

115. The Offering Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

116. While engaging in the course of conduct described above, the Offering Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

117. By reason of the foregoing, the Offering Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II—FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act

### [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

118. Paragraphs 1 through 112 are hereby realleged and incorporated herein by reference.

119. Between in or around 2013 and the present, the Offering Defendants, in the offer and sale of the securities described herein, by use of means and

instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

   a. obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

   b. engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities; all as more particularly described above.

120. By reason of the foregoing, Offering Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III – FRAUD

### Violations of Section 10(b) of the Exchange Act
### [15 U.S.C. § 78j(b)]and Sections (a), (b), and (c) of Rule 10b-5
### thereunder [17 C.F.R. § 240.10b-5 (a), (b), and (c)]

121. Paragraphs 1 through 112 are hereby re-alleged and are incorporated herein by reference.

122. Between in or around 2013 and the present, Offering Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

     a.   employed devices, schemes, and artifices to defraud;

     b.   made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

     c.   engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities;

all as more particularly described above.

123. Offering Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.  In engaging in such conduct, Offering Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

124. By reason of the foregoing, Offering Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Sections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a), (b), and (c)].

## COUNT IV – UNREGISTERED OFFERING SECURITIES

### Violations of Sections 5(a) and 5(c) of the Securities Act
### [15 U.S.C. §§ 77e(a), 77e(c)]

125. Paragraphs 1 through 112 are hereby realleged and are incorporated herein by reference.

126. Offering Defendants offered and sold securities, including promissory notes and LS Interests.

127. Offering Defendants used interstate transportation, communication or mails in connection with the sale of securities.

128. At the time of the offer and sale of securities, no registration statement was in effect as to the securities offered and sold.

129. By reason of the foregoing, Offering Defendants have violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT V – AIDING, ABETTING AND CAUSING

130.　　Paragraphs 1 through 117 are hereby restated and incorporated herein by reference.

131.　　Torchia, CN Auto, AMC and Spaghetti Junction substantially assisted the violations set forth in Count I above.

132.　　Torchia, CN Auto, AMC and Spaghetti Junction knew they were participating in securities law violations when assisting and engaging in transactions with the Offering Defendants.

133.　　Torchia, CN Auto, AMC and Spaghetti Junction aided, abetted and/or caused the violations in Count I above.

## COUNT VI – AIDING, ABETTING AND CAUSING

134.　　Paragraphs 1 through 112 and 118 through 120 are hereby restated and incorporated herein by reference.

135.　　Torchia, CN Auto, AMC and Spaghetti Junction substantially assisted the violations set forth in Count II above.

136.　　Torchia, CN Auto, AMC and Spaghetti Junction knew they were participating in securities law violations when assisting and engaging in transactions with the Offering Defendants.

137.    Torchia, CN Auto, AMC and Spaghetti Junction aided, abetted and/or caused the violations in Count II above.

## COUNT VII – AIDING, ABETTING AND CAUSING

138.    Paragraphs 1 through 112 and 121 through 124 are hereby restated and incorporated herein by reference.

139.    Torchia, CN Auto, AMC and Spaghetti Junction substantially assisted the violations set forth in Count III above.

140.    Torchia, CN Auto, AMC and Spaghetti Junction knew they were participating in securities law violations when assisting and engaging in transactions with the Offering Defendants.

141.    Torchia, CN Auto, AMC and Spaghetti Junction aided, abetted and/or caused the violations in Count III above.

## COUNT VIII – AIDING, ABETTING AND CAUSING

142.    Paragraphs 1 through 108 and 125 through 129 are hereby restated and incorporated herein by reference.

143.    Torchia substantially assisted the violations set forth in Count IV above.

144.     Torchia knew he was participating in securities law violations when assisting and engaging in transactions with the Offering Defendants.

145.     Torchia aided, abetted and/or caused the violations in Count IV above.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays for:

### I.

A temporary restraining order, preliminary and permanent injunctions enjoining Defendants, their officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5] and Sections 5(a), 5(c), 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e, 77q].

### II.

An order requiring an accounting by Defendants of the use of proceeds of the fraudulent conduct described in this Complaint and the disgorgement by Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

## III.

An order pursuant to Section 21(d) of the Exchange Act [15 U.S.C. §78u(d)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] imposing civil penalties against Defendants.

## IV.

An order freezing the assets of Defendants pending further order of the Court.

## V.

An order preventing Defendants from destroying or concealing documents until further order of this Court.

## VI.

The appointment of a receiver to take charge of Credit Nation and its affiliates to preserve the value of the Defendants' remaining assets for the benefit of the Defendants' victims.

## VII.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

**JURY TRIAL DEMAND**

The Commission hereby demands a trial by jury as to all issues that may be so tried.

This 10th day of November, 2015.

Respectfully submitted,

/s/ Walter Jospin
Walter Jospin
Regional Director
Georgia Bar No. 405450
jospinw@sec.gov

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
loomism@sec.gov

/s/Joshua A. Mayes
Joshua A. Mayes
Senior Trial Counsel
Georgia Bar No. 143107
mayesj@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
Tel:(404) 842-7600
Facsimile:  (404) 842-7679