# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br>     Plaintiff, <br><br> v. <br><br> JAMES A. TORCHIA, <br> CREDIT NATION CAPITAL, LLC, <br> CREDIT NATION ACCEPTANCE, LLC, <br> CREDIT NATION AUTO SALES, LLC, <br> AMERICAN MOTOR CREDIT, LLC, and <br> SPAGHETTI JUNCTION, LLC, <br><br>     Defendants. | CIVIL ACTION FILE <br> NO.  1:15-cv-03904-WSD |

## MOTION TO DISQUALIFY M. BRYAN FREEMAN AS SEC'S EXPERT VALUATION WITNESS AND BRIEF IN SUPPORT

## I. INTRODUCTION

"We adjourned before I intended to adjourn because I'm frankly getting a little fed up with all of this . . . . You've got something figured out for everything, Mr. Freeman, and you can make all the faces you want to . . . . This business of manipulating answers to questions on an insurance policy to me is just as dishonest and just as immoral as if you answered the question flat out no when you know the answer should have been yes."

". . . If I were the defendant I'd be mad as hell.  I probably would have taken a gun and gone after [Freeman] because I think is conduct, really, even though it may not be criminal, I think his conduct was

reprehensible . . . . and if I were the Insurance Commissioner in the State of Georgia, I would do what I could to get rid of this man in the insurance business."

*The Honorable Robert Cameron Freeman to Bryan Freeman, 1996.*

" . . . I've heard about all I want to hear today. And if he continues to do this, I don't know what I'm going to do, but I'm going to do something. He's not going to like it, and you're not going to like it . . . . You don't have a problem with [Freeman], changing his testimony, always giving an explanation?

*The Honorable Robert Cameron Freeman to Bryan Freeman's Legal Counsel, 1996*

The SEC has paid M. Bryan Freeman, a buyer, seller and broker of viatical insurance policies and a competitor of Defendant Credit Nation Capital ("CNC"), more than $70,000 since November 2015 to testify about the value of a portion of CNC's life insurance portfolio. The SEC desperately wants to prove that the value CNC's portfolio is low; from the SEC's perspective, asking a competitor of CNC (and somebody who has a direct financial interest in seeing CNC removed from the industry) to testify to that fact is a no-brainer. And $70,000 (and increasing daily) for this testimony is apparently no big deal to SEC leadership—after all, Walter Jospin, the Regional Director of the SEC's Atlanta Office, is Mr. Freeman's former attorney.

These facts are troubling in and of themselves, but they get worse. At the November 13, 2015 TRO hearing in this action, this Court pondered "why is it that

in this industry we have had the problems we have had in the past, and they have been significant."  Insurance agents and brokers like Mr. Freeman caused those problems.  Mr. Freeman openly admits that, in the late 1990s and early 2000s, he helped people with terminal illnesses (particularly, those who had been diagnosed with HIV) obtain life insurance coverage by directing them to companies he knew to have "loopholes" in their applications.  For instance, Mr. Freeman would advise an HIV-positive individual to apply for life insurance from a company whose application asked only "do you have AIDS" and tell them to answer the question "No."  Mr. Freeman knew how to exploit these "loopholes" because he was a licensed agent for many of the insurance companies he was exploiting.  He felt comfortable exploiting this loophole because his attorneys at Paul Hastings— where Mr. Jospin, his former attorney, was a partner—told him it was ok.  Mr. Freeman was not helping the underprivileged and sick obtain life insurance coverage out of the kindness of his own heart, or so that those individuals could leave a little money for their family, however.  He was helping them procure life insurance so that he could immediately broker the sale of that new policy to a viatical company and earn a handsome commission.

Mr. Freeman's conduct did not go unnoticed.  His office was raided and his documents were seized by the FBI. He was the subject of an extensive FBI

investigation into "clean-sheeting"—the practice of procuring life insurance without disclosing a pre-existing terminal illness or disease.  The companies to whom he sold policies were shut down and their principals indicted and imprisoned for insurance fraud.  The Florida Department of Financial Services accused Mr. Freeman's firm of "[engaging] in fraudulent or dishonest practices" and of "being untrustworthy or incompetent to act as a viatical settlement broker"—charges settled by the firm by paying a significant fine.  And, perhaps most importantly, a former Senior Judge of the Northern District of Georgia grew tired of Mr. Freeman's cavalier attitude about "manipulating answers to questions on an insurance policy" and called Mr. Freeman's "dishonest," "immoral," "reprehensible" and stated that, if he were the Insurance Commissioner, " I would do what I could to get rid of this man in the insurance business."

The SEC may not like Defendants or their business, but they owe Defendants a duty of fairness and integrity in these proceedings.  The SEC's hiring of a former client of SEC leadership and a competitor of Defendants—and someone whose checkered past in this Court and in this industry is presumably well-known to SEC leadership—is simply unfair.  For the reasons set forth below, this Court should disqualify Mr. Freeman from testifying against Defendants.

## II.  BACKGROUND AND STATEMENT OF FACTS

**A.    Mr. Freeman's Connection to "Clean-Sheeting" Activities and the FBI's Investigation of His Brokerage Company**

In the early part of his career, Mr. Freeman was a simple insurance broker offering traditional life insurance policies.  [January 4, 2016 Deposition of Bryan Freeman ("Freeman Dep.") at 87-88.][1]  By 1989, Mr. Freeman was involved in the viatical settlement brokerage business.  [Id. at 90.]  He originally got involved in the business by helping an HIV-positive friend sell his life insurance policy to a professional investor.  [Id. at 91.]  By the early 1990s, as the nascent viatical settlement business grew, Mr. Freeman realized he could profit from brokering sales of policies to investors and grew that portion of his business.  [Id. at 92-93.]

Mr. Freeman soon grew skilled at helping individuals with terminal illnesses procure life insurance policies that he could flip and sell to investors for cash, earning a brokerage fee in the process.  One of the ways he would assist HIV-positive individuals obtain insurance that could be quickly sold was to identify carriers who had "loopholes" in their applications:

Q.    You knew you were selling the policies of HIV-people; correct?

---

[1] Defendants took Mr. Freeman's deposition on Monday and only have a rough transcript that does not include line numbers.  Defendants cite only to relevant page numbers in this brief but, if necessary, will supplement this brief to include line numbers of testimony when they receive the finished transcript.

A.     Yes.

Q.     And you knew that sometimes those sales occurred because the application asked, do you have AIDS?   And those people answered no, right?

A.     Yes.

Q.     Okay.   And your belief was that there is a clear delineation between HIV and AIDS as to make that answer truthful, right?

A.     They both have a legal definition.  Yes.

Q.     Okay.  And this is the legalistic kind of approach that pissed off Judge Freeman in the Universal Guaranty case, right?

A.     Yes.

[Id. at 43-44.]

Q.     So in other words, you would say to somebody, go with this insurance company because they only ask if you have AIDS; they don't ask if you have HIV, and, therefore, you can answer no to that question?  You told people that, right?

A.     I have told people that.

Q.     Okay.  And you don't see anything wrong with that?

A.     No.

[Id. at 48.]  Mr. Freeman testified that he owed a contractual duty to the investors to whom he sold policies obtained by exploiting this loophole.   [Id. at 46-47.] However, despite having personal knowledge that people with HIV or other serious health problems owned the policies he was selling, Mr. Freeman admits

that he never provided this information to the potential purchasers.  [Id. at 21.]  Mr. Freeman testified that he did not do so because, among other reasons, he obtained legal advice from attorneys at Paul Hastings that he could broker sales in this manner.  [Id. at 19-21, 35-36.]  Mr. Freeman also helped individuals with serious health problems obtain life insurance policies that could be flipped for cash by, among other things, directing them to insurers who did not require blood tests or whose insurance applications only asked very cursory questions about the applicant's health.  [Id. at 6-7, 74.]

Many of the companies to whom Mr. Freeman sold insurance policies—like Liberte Capital Group—were shut down by the government and their principals indicted and imprisoned for offering fraudulently-obtained insurance policies to investors.  [Id. at 15, 78-79.]  Mr. Freeman admits that his insurance brokerage company, Benefits America, was investigated by the FBI and had its records and files seized by the FBI and the Georgia Department of Insurance.  [Id. at 12-13, 63.]

FBI files related to this investigation[2] reveal that agents interviewed a number of Mr. Freeman's employees and insurance customers about his business

---

[2] Defendants obtained these FBI files through an Open Records Act request to the Georgia Department of Insurance (the "DOI").  Documents produced by the DOI appear to show that the DOI requested that the FBI produce files from its

practices.  Witnesses in those interviews testified that, among other things: (a) Mr. Freeman constantly expressed his concern that his business would be investigated by the FBI; (b) Mr. Freeman terminated their employment when they raised concerns that some of the life insurance policies Mr. Freeman was selling were procured by fraud; (c) Mr. Freeman coached them how to fill out insurance policy forms; (d) Mr. Freeman advised them not to identify their physician on insurance applications so that the insurance company could not obtain medical records from the applicant; and (e) Mr. Freeman told a witness that it did not matter if he lied on his insurance application because he would be dead in 18 months anyway.  [Id. at 27-29, 53, 55-56, 62, 70.]

## B.    The Universal Guaranty Litigation And Senior Judge Freeman's Conclusions About Mr. Freeman's Credibility

Mr. Freeman was an agent for Universal Guaranty Life Insurance Company, who offered life insurance using an application form that only asked two questions: (a) whether the applicant had heart trouble, diabetes, or high blood pressure; and (b) whether the applicant had been hospitalized in the last five years.  [Id. at 6.] Naturally, Mr. Freeman steered patients with HIV and AIDS diagnoses to

---

investigation of Mr. Freeman as part of the DOI's own investigation of Mr. Freeman.  The DOI has represented to Defendants' counsel that it is in the process of producing another 1,300 pages of documents relating to its investigation of Mr. Freeman.  Defendants have not yet received those documents.

Universal Guaranty's life insurance because the patients did not have to disclose these diseases:

> Q.    You marketed life insurance to people whom you knew had serious health issues like HIV, AIDS, cancer?
>
> A.    I marketed, yes, to people who could answer the questions correct.

[Id. at 6.]  When Universal Guaranty discovered what Mr. Freeman was doing, it sent a letter to Mr. Freeman's insureds notifying them that Mr. Freeman had perpetuated a fraud on the company. Mr. Freeman sued Universal Guaranty for defamation in the Northern District of Georgia as a result of that letter.  See M. Bryan Freeman v. Universal Guaranty Life Insurance Company, U.S. District Court for the Northern District of Georgia, Case No.1:94-CV-2593.

In that litigation, Mr. Freeman took the position that he was not required to disclose applicants' HIV, AIDS and other serious health diagnoses to Universal Guaranty because its application did not ask those questions.  [Freeman Dep. at 7-8.]  Senior Judge Robert Cameron Freeman, who presided over the trial in that action, grew increasingly irritated at what he perceived to be Mr. Freeman's cavalier attitude, his constantly changing testimony and his unwillingness to concede that exploiting a loophole in Universal Guaranty's application form was unethical, until he could take no more:

We adjourned before I intended to adjourn because I'm frankly getting a little fed up with all of this . . . . You've got something figured out for everything, Mr. Freeman, and you can make all the faces you want to . . . . This business of manipulating answers to questions on an insurance policy to me is just as dishonest and just as immoral as if you answered the question flat out no when you know the answer should have been yes.

. . . If I were the defendant I'd be mad as hell.  I probably would have taken a gun and gone after this fellow because I think is conduct, really, even though it may not be criminal, I think his conduct was reprehensible . . . . and if I were the Insurance Commissioner in the State of Georgia, I would do what I could to get rid of this man in the insurance business.

. . . I've heard about all I want to hear today.  And if he continues to do this, I don't know what I'm going to do, but I'm going to do something.  He's not going to like it, and you're not going to like it . . . You don't have a problem with [Freeman], changing his testimony, always giving an explanation?

Senior Judge Freeman's trial comments about Mr. Freeman's veracity and credibility are quoted in a post-trial[3] brief filed by Universal Guaranty.  A true and correct copy of this brief is attached hereto as **Exhibit A.**[4]

---

[3]  Remarkably, Mr. Freeman won at trial.

[4]  This brief was contained in the DOI's production of documents pursuant to Defendants' Open Records Act Request.  The files from this action have been archived and Defendants were unable to order the files prior to the filing of this Motion.

**C.     The Florida Department of Financial Services Initiates Administrative Proceedings Against Mr. Freeman's Brokerage Company**

In March 2005, the Florida Department of Financial Services ("FDFS") initiated an administrative action against Mr. Freeman's insurance brokerage company.  A true and correct copy of FDFS's Administrative Complaint (with what are presumably DOI redactions) is attached hereto as **Exhibit B.**[5]  In its Administrative Complaint, FDFS accused Mr. Freeman's brokerage company of knowing (or having the ability to discover) that insurance policies Mr. Freeman sold to investors were procured by fraud, and also accused Mr. Freeman of failing to disclose these facts.  FDFS concluded that Mr. Freeman's company "has engaged in fraudulent or dishonest practices, or otherwise has been shown to be untrustworthy or incompetent to act as a viatical settlement broker."

In August 2006, Mr. Freeman's company and the FDFS entered into a Settlement Stipulation for Consent Order whereby the company agreed to pay FDFS $10,000.00 and agreed to cooperate in future investigations.  A true and correct copy of the Settlement Stipulation for Consent Order is attached hereto as **Exhibit C.**  The Settlement Stipulation does not contain a statement by Mr. Freeman's company denying FDFS's allegations.

---

[5]  The FDFS Administrative Complaint and Consent Order were produced by the DOI in response to Defendants' Open Records Act Request.

**D.     Mr. Freeman's Current Viatical Company, Habersham Funding, LLC, Competes With CN**

In the early 2000s, Mr. Freeman created a new company, Habersham Funding, LLC ("Habersham") to operate as a full-fledged viatical company—that is, rather than just brokering sales of policies like Benefits America did, Habersham would purchase and sell viatical and life settlement contracts for its own account.  [Freeman Dep. at 115.]  Mr. Freeman acknowledges that CN works in the same industry as Habersham.  [Id. at 121-22.]  Mr. Freeman also admits the possibility that Habersham and CN have competed to purchase the same insurance policies.  [Id. at 122]

Tellingly, Mr. Freeman admitted that his valuation of CN's insurance portfolio was affected by Habersham's marketplace competition with CN.  Mr. Freeman testified that Habersham markets a proprietary software, Habersham Analytics, that values insurance policies based on a number of statistical valuations methodologies and that utilizes a wide variety of variables that impact insurance policy pricing.  Specifically, the software uses three different valuation methods—deterministic, probabilistic and stochastic—to value insurance policies. Habersham uses this software to value its own policies and policies it attempts to purchase.  [Id. at 153.]

Mr. Freeman declined to use his proprietary software Habersham Analytics software to value CN's policies for the SEC, however.  Instead, he claims to have performed a separate and independent probabilistic valuation (only one of the three valuation methods that his own Habersham Analytics software uses) using the "MAPS" valuation tool developed by Milliman.  [Id. at 154, 161-62.]  In other words, Mr. Freeman did not value CN's policies the same way he values his own policies, a fact that raises serious doubts about the fairness of Mr. Freeman's valuation.

When Mr. Freeman was asked why he didn't use his proprietary valuation software to value CN's portfolio, he initially testified that "we wanted to use something that a lot of people use."  [Id. at 162.]  However, after a break in the proceedings (and, presumably, a consultation with SEC counsel), Mr. Freeman changed his testimony about why he did not use the Habersham Analytics software to value CN's policy:

| | |
|---|---|
| SEC Counsel: | Before we go back over Mr. Johnson's questioning, is there anything you want to clarify on part of your earlier testimony? |
| Mr. Freeman: | Yes.  The biggest reason I didn't use our analytics software is I didn't want it to be out of our hands, in other people's hands, or in the public domain in any way.  So that's the biggest reason. |
| Q: | How would using your software put it in the public domain? |

\* \* \*

Mr. Freeman:    Well, if there's more questions about it and you want to come in and go through the software or anything like that, I don't want to be giving copies of my software out.  That's what I'm trying to say.

Q.    That's fair.  Why is that?

A.    I just want to do that.  I don't want to find it anywhere else.

Q.    You've spent time and money on that software, right?

A.    Absolutely.

**Q.    It's not something that you just want to give to somebody who competes in the field with you; correct?**

**A.    That's correct.**

[Id. at 173-74] (emphasis added).

## E.    The SEC's Regional Director, Walter Jospin, Was Mr. Freeman's Attorney

Mr. Freeman noted during his deposition that he attended the November 13, 2015 TRO hearing in this action and that he "just decided to come, given that I had already talked to the SEC."  [Id. at 163.]  Finding it odd that a potential expert would show up unannounced at a hearing without being formally retained by the SEC, Defendants' counsel asked Mr. Freeman how he became involved in the case.  Mr. Freeman's response:

A.    I know Walter Jospin.

Q.    How do you know him?

**A.    He was a partner at Paul Hastings and actually did work for us at Paul Hastings.**

[Id. at 164] (emphasis added).

## III.  ARGUMENT AND CITATION TO AUTHORITY

"Federal courts have the inherent power to disqualify expert witnesses in certain circumstances to protect the integrity of the adversary process and to promote public confidence in the legal system."  Green, Tweed of Delaware, Inc. v. DuPont Dow Elastomers, LLC, 202 F.R.D. 426, 428 (E.D. Pa. 2001).  Mr. Freeman's involvement as an expert witness for the government in this action is deeply unfair and compromises the integrity of the adversary process in this action for at least three reasons: (a) the SEC is aware that the Northern District has already concluded that Mr. Freeman lacks veracity and credibility; (b) the SEC is aware that Mr. Freeman competes with CN in the life settlement industry and stands to profit if CN is precluded from operating its business; and (c) the SEC is aware of the attorney-client relationship between Mr. Freeman and Walter Jospin and the inherent bias that relationship creates.

**A.    The SEC's Use of Mr. Freeman As a Expert Witness in Light of His Prior Conduct and The Northern District's Criticism of His Honesty**

**and Veracity Compromises The Integrity of the Adversary Process in This Action**

The SEC accuses Defendants of running a "Ponzi scheme" and lying to and misleading its investors.  This Court has already expressed its discomfort with the life settlements industry as a result of the "significant problems" the industry has experienced.  It is patently unfair for the SEC to support its harsh allegations against Defendants through the testimony of an expert witness who the SEC knows: (a) was investigated by the FBI and fined by FDFA for his alleged involvement in "clean-sheeting" fraud in the early 2000s; and (b) has been called "dishonest" and "immoral" by a former Northern District Senior Judge.

As noted above, Mr. Freeman does not deny exploiting loopholes in insurance applications so that extremely unhealthy individuals could procure—and then sell—life insurance policies.  His attitude about his conduct is remarkably cavalier, and this is precisely why Senior Judge Freeman accused Mr. Freeman of engaging in "immoral," "dishonest" and "reprehensible" conduct and stated that, if he were the Insurance Commissioner, he would "do what I could to get rid of this man in the insurance business."[6]  Mr. Freeman paid a steep fine to resolve FDFA

---

[6]  Senior Judge Freeman's criticisms of Mr. Freeman are admissible at trial under Fed. R. Evid. 608(b) as probative evidence of Mr. Freeman's past dishonesty. See U.S. v. White, 692 F.3d 235, 248 (2nd Cir. 2012):

accusations that his company committed "fraudulent or dishonest practices."  And Mr. Freeman's conduct may have been a lot worse—according to FBI interview files, witnesses accused Mr. Freeman of directing them to lie on insurance policies, of repeatedly predicting that he would be the subject of an FBI raid, and firing those who identified fraud in the policies he brokered.  In any event, Mr. Freeman concedes that his offices were raided by the FBI and the DOI and that his files were seized.

The government's conduct in civil adversarial proceedings is held to a higher standard than that applied to private litigants, and for good reason—to promote public confidence in the legal system.  The SEC's use of Mr. Freeman in

---

> We have long held that a witness can be cross-examined based on prior occasions when his testimony in other cases had been criticized by a court as unworthy of belief . . . . A finding that a witness is not credible is not fundamentally different from a finding that the witness lied.  It often just reflects a fact finder's desire to use more gentle language.

(Internal quotations omitted); see also U.S. v. Woodard, 699 F.3d 1188, 1195 (10th Cir. 2012):

> Although we have not addressed the issue of whether past judicial credibility determinations are admissible under Rule 608(b), several of our sister circuits have done so and held that they are.  The decision whether to allow a witness to be cross-examined about a judicial determination finding him not to be credible is confided to the discretion of the trial judge; it is not barred by Rule 608(b), which, to repeat, is a rule about presenting extrinsic evidence, not about asking questions.

(Internal quotations and citations omitted).

this litigation undermines such confidence.  It is the height of impropriety for the SEC to accuse Defendants of running a "Ponzi scheme" and defrauding their investors in an industry disliked by the SEC and then attempt to prove its unfounded accusations using an expert it knows to have been engaged in past inappropriate conduct in that industry and who has been called "dishonest" by a federal judge.  The SEC's use of Mr. Freeman is not reflective of the high standards applied to the government.  This Court should not condone the SEC's use of Mr. Freeman and should disqualify him from testifying in this action.

**B.**     **The SEC Should Not Be Allowed To Attack CN Via The Expert Testimony of a Competitor Who Stands to Benefit if CN's Operations Are Suspended**

The SEC seeks to shut down CN based on its thin allegation that CN lacks sufficient assets to cover obligations to its investors.  It intends to use Mr. Freeman's expert valuation testimony to support this allegation.  It is undisputed that Mr. Freeman and Habersham are competitors of CN—they operate in the same life settlements industry and they compete with each other to purchase the same insurance policies (which both seek to resell or hold for a profit).  More importantly, Mr. Freeman admits that he did not value CN's insurance policy portfolio using the same valuation software he uses to value his own portfolio because he did not want to give CN—his competitor—and its attorneys access to

that software for competitive reasons.  If CN's operations are suspended as a result of this action, Mr. Freeman will have one less competitor to battle over purchases and sales of insurance policies.

The high standards to which the SEC is held require the SEC to obtain unbiased, neutral testimony for use against CN in this action.  Mr. Freeman is hardly an unbiased, neutral expert in this case.  The SEC's use of Mr. Freeman's testimony in this action seems to show that the SEC cares less about protecting the integrity of the adversarial process and more about winning by using the testimony of the most biased and one-sided expert around—its adversary's competitor.  This hardly inspires public confidence in the legal system.  This Court should not allow CN's ability to defend itself in this action to be dictated by the testimony of its competitor.

**B.     The Regional Director of the SEC's Hand-Picking of His Former Client as the SEC's Expert Witness Does Not Inspire Public Confidence in The Legal System**

The best expert witness is one that will never let his friend and client down. In this case, Mr. Freeman was selected as the SEC's expert witness in this action simply because he "know[s] Walter Jospin"—his former attorney.  This selection reeks of bad faith for several reasons.  If the SEC wants to promote a sense of fairness and integrity in this litigation, hiring a former client of its Atlanta Regional

Director is not the way to do so.  The SEC's selection of Mr. Freeman as its expert is even more suspect because, according to Mr. Freeman, the Regional Director's former firm, Paul Hastings, gave Mr. Freeman legal advice on how to exploit loopholes in insurance applications so that he could procure (and then sell for a healthy commission) life insurance policies for individuals with significant health problems.  If the SEC aspires to live up to the high standards necessary to promote public confidence in the legal system, it simply cannot rely on testimony from the former client of its Regional Director, and this Court should uphold those high standards by disqualifying Mr. Freeman from testifying as an expert here.

## IV.  CONCLUSION

For the foregoing reasons, this Court should disqualify Bryan Freeman from providing expert testimony on the SEC's behalf in this action.

Respectfully submitted this 7th day of January, 2016.

> */s/ James M. Johnson*
> James M. Johnson
> Georgia Bar No. 394615
> jjohnson@knightjohnson.com
> Sherri G. Buda
> Georgia Bar No. 093399
> sbuda@knightjohnson.com

**KNIGHT JOHNSON, LLC**
One Midtown Plaza
1360 Peachtree Street, NE
Suite 1201
Atlanta, Georgia 30309
Phone: (404) 228-4822
Fax:   (404) 228-4821

*/s/ Katherine S. Addleman*
Katherine S. Addleman
(Admitted *Pro Hac Vice*)
Texas Bar No. 00905400
kit.addleman@haynesboone.com
Stephen L. Corso
Georgia Bar No. 188747
steve.corso@haynesboone.com
Timothy A. Newman
(Admitted *Pro Hac Vice*)
Texas Bar No. 24070326
timothy.newman@haynesboone.com

**HAYNES AND BOONE, LLP**
2323 Victory Avenue, Suite 700
Dallas, Texas 75219
Tel: (214) 651-5000
Fax: (214) 651-5940

1221 McKinney Street, Suite 2100
Houston, Texas 77010
Tel: (713) 547-2000
Fax: (713) 547-2600

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>v.<br><br>JAMES A. TORCHIA,<br>CREDIT NATION CAPITAL, LLC,<br>CREDIT NATION ACCEPTANCE, LLC,<br>CREDIT NATION AUTO SALES, LLC,<br>AMERICAN MOTOR CREDIT, LLC, and<br>SPAGHETTI JUNCTION, LLC,<br><br>     Defendants. | CIVIL ACTION FILE<br>NO.  1:15-cv-03904-WSD |

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULES AND SERVICE

In accordance with L.R. 7.1(D), I certify that the foregoing Motion was prepared in Times New Roman, 14-point font, one of the fonts specified in L.R. 5.1(C). This brief was prepared with a margin of one and one-half inches (1 ½) on the top of the page and a margin of one (1) inch on the left side of the page, and the motion is proportionately spaced and no longer than 25 pages in length. I hereby certify that I have served the foregoing by filing through the Court's CM/ECF system which will deliver electronic notice of such filing to the following attorneys

of record:

Walter Jospin
Regional Director

M. Graham Loomis
Regional Trial Counsel

Joshua A. Mayes
Senior Trial Counsel

Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326

    This 7th day of January, 2016.


                           */s/ James M. Johnson*
                           James M. Johnson
                           Georgia Bar No. 394615