**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | |
| **v.** | **1:15-cv-3904-WSD** |
| **JAMES A. TORCHIA, CREDIT NATION CAPITAL, LLC, CREDIT NATION ACCEPTANCE, LLC, CREDIT NATION AUTO SALES, LLC, AMERICAN MOTOR CREDIT, LLC, and SPAGHETTI JUNCTION, LLC,** | |
| **Defendants.** | |

## OPINION AND ORDER

This matter is before the Court on Plaintiff United States Securities and

Exchange Commission's ("SEC") Second Motion for Preliminary Injunction [20]

("Preliminary Injunction Motion") and Emergency Motion for Temporary

Restraining Order, Asset Freeze, Receiver, and Other Equitable Relief [2] ("TRO

Motion").  Also before the Court is Defendants James A. Torchia, Credit Nation

Capital, LLC ("CN Capital"), Credit Nation Acceptance, LLC ("CN Acceptance"),

Credit Nation Auto Sales, LLC ("CN Auto"), American Motor Credit, LLC

("AMC"), and Spaghetti Junction, LLC's ("Spaghetti Junction") (collectively, "Defendants") Motion to Dismiss [21].

## I.   BACKGROUND AND FINDINGS OF FACT

### A.   Introduction

This action involves alleged fraudulent schemes operated by Mr. Torchia and the Defendant entities he controls.  The alleged fraud involves two separate investment schemes.  In the first, CN Capital raises money to invest in sub-prime auto loans and life insurance settlements.  ([20.1] at 4).  CN Capital raises the funds by selling unregistered promissory notes to investors, who are told that they will receive a 9% "fixed" return and that their promissory notes are "100% asset backed."  (Compl. ¶ 2).  CN Capital tells promissory note investors that it expects to generate returns from its investments in excess of the 9% interest payable on the notes.  ([20.1] at 5).  The second involves CN Acceptance, which sells unregistered fractional interests in life settlement contracts ("LS Interests") to investors. (Compl. ¶ 4).

The SEC contends that Defendants' own forensic accounting analysis reveals that their financial situation is dire, CN Capital is insolvent and has been for years, and that Defendants are attempting to obscure CN Capital's financial condition.  The SEC argues that Defendants did not disclose CN Capital's

insolvency to investors, in violation of federal securities laws.  (See Compl. ¶¶ 10-12).  The Complaint alleges that Defendants violated Sections 5(a), 5(c), 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act of 1933, 15 U.S.C. §§ 77a, et seq. ("Securities Act"), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, et seq. ("Exchange Act"), and subsections (a), (b), and (c) of Rule 10b-5 under the Exchange Act, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").  (Id. ¶¶ 10-12).  The SEC asks the Court to "shut down this fraudulent scheme and appoint a receiver to marshal and liquidate the assets to prevent investors from losing any more money than they already have as a result of the Defendants['] fraud."  ([20.1] at 18-19).

Defendants argue that the SEC's allegations are based on a misunderstanding of Defendants' business model and operations.  ([61] at 6). They argue that the SEC's allegation that CN Capital is insolvent relies on a "non-GAAP,[1] preliminary, cash flow analysis[.]"  ([26] at 2).  Defendants claim that the fair market value of life settlements owned by Credit Nation exceeds $40 million, (Defs.' Initial Disclosures [19] at 4), and that taking the fair market value of these assets into account shows that CN Capital is solvent.  Defendants seek dismissal of this action and oppose an injunction, including because the life

---

[1]     Generally Accepted Accounting Principles.

insurance settlements it sells to investors are not securities, the SEC has not made a prima facie case that Defendants violated registration requirements or the antifraud provisions of the federal securities laws, and the SEC failed to provide evidence of scienter or intent to defraud.  (See, e.g., [26] at 4-13).

B.    Defendants' Business

1.    Overview

Defendant James Torchia is the CEO of CN Capital, CN Acceptance, and AMC (collectively, "Credit Nation").  ([21.1] at 2).  Although the Credit Nation entities are separate, they function as a unit.  (Id. at 4).  Mr. Torchia is also the CEO of CN Auto, a used car dealership that is no longer in operation.  (Id.). Mr. Torchia owns Spaghetti Junction, through which he loaned Credit Nation millions of dollars in start-up capital between 2008 and 2011.  (Id. at 3).  The ownership structure of the various entities under Mr. Torchia's control is depicted in the following chart provided by the SEC:



([20.1] at 23).

Credit Nation raises money to invest in (i) sub-prime auto loans and (ii) life insurance settlements. ([20.1] at 4; [21.1] at 3). Credit Nation raises the investment capital by selling three- and five-year promissory notes to investors. ([21.1] at 3). Credit Nation tells promissory note investors that they will receive a 9% fixed return and that their promissory notes are "100% asset backed." ([20.1] at 4-5). Credit Nation tells promissory note investors that Credit Nation expects to generate returns from its investments in excess of the 9% interest payable on the

notes.  (Id. at 5).  Credit Nation's advertisements for its promissory notes included

the following newspaper advertisements:



([2.10] at CN-SEC-000550, -000553).[2]

---

[2]    Credit Nation also ran radio advertisements containing the following
language:
> Hello, I'm Bob Guess with Credit Nation.  You know, most
> Americans are tired of bank returns, they're afraid of the run-up in
> Wall Street, and fed up with misleading claims of returns on annuities
> and insurance companies.  If you're looking for sound investments

Defendants' sub-prime auto loan and life insurance settlement operations are represented in the following chart provided by the SEC:

## CREDIT NATION OPERATIONS



and security of principal where your money works as hard as you do, give Credit Nation a call. Because of the new JOBS Act passed by Congress there is now a level playing field for investors. With Credit Nation you can earn a nine percent return on your money backed by hard assets dollar for dollar. If you prefer growth over income we have an asset-backed product thats [sic] averaged double digits historically. Don't put all your eggs in one basket. Call Credit Nation for a free consultation today. It's never been harder to stay ahead of inflation than it is today, so diversify your portfolio. That's the answer. Call us at 1-800-542-9513, that's 1-800-542-9513. Don't gamble with your financial future. Call us today. 1-800-542-9513. ([2.9] at 2).

([20.1] at 24).  These operations are explained in further detail below.

###### 2.    Defendants' Investments in Sub-Prime Auto Loans

Credit Nation provides automobile loans (the "Sub-Prime Auto Loans") at high interest rates to individuals with credit problems.  (Id. at 5).  The Sub-Prime Auto Loans are secured by the automobiles purchased with the loan proceeds. (Id.).  Credit Nation's offering materials and advertising circulars describe the steps that it takes to ensure that its Sub-Prime Auto Loans are profitable, such as requiring high down payments and attaching a GPS tracker to each vehicle.  (See, e.g., [2.13] at CN-SEC-000599-560).  Credit Nation tells investors that, in its discretion, it will keep the Sub-Prime Auto Loans and profit from the interest or that it will resell the loans at a profit.  ([20.1] at 5).

AMC, a subsidiary of CN Capital, makes the investments in Sub-Prime Auto Loans.  (Id.).  AMC originates loans directly from automobile dealerships and also purchases loans.  (Id.).  Many of the Sub-Prime Auto Loans that AMC purchased were from the now-defunct CN Auto, a car dealership controlled by Mr. Torchia. (Id. at 5-6).

The SEC contends that Credit Nation's investments in Sub-Prime Auto Loans "have never been profitable," (id. at 6), and that it never disclosed its millions of dollars in losses to promissory note investors, (id.).

8

3.    Defendants' Investments in Life Insurance Settlements

Credit Nation also invests in life insurance settlements at a discount to their maturity value—that is, the death benefit of the underlying policy.  Credit Nation buys life insurance policies, either from an insured or from a settlement company that acts as a broker, hoping that the combination of the purchase price and the premiums paid over time will be less than the death benefits that Credit Nation ultimately receives upon the death of the insured.  (Id. at 6-7).

Credit Nation told buyers of its promissory notes that it planned to focus on buying policies with life expectancies in the three-to-four year range, ([2.13] at CN-SEC-000561), and that it expects to receive a 15% return on its portfolio of life insurance settlements, ([2.12] at CN-SEC-042943).

After it purchases a life insurance policy, CN Capital either holds the policy or sells it, in whole or in part, at a markup.  It sells LS Interests through its affiliate, CN Acceptance.  CN Acceptance tells LS Interest investors that it will pay premiums for the life expectancy of the insured, plus two years if the insured lives that long.  (Compl. ¶ 4).  In return, LS Interest investors receive a portion of the death benefit when the insured dies.  (Id.).

The SEC contends that Credit Nation's investments in life insurance settlements have not been profitable, and that Credit Nation has suffered

9

multi-million dollar operating losses.  (<u>Id.</u> ¶¶ 72, 77).  The SEC alleges that Defendants are insolvent and have liabilities that greatly exceed their assets, and that this financial situation has never been disclosed to investors.  (<u>Id.</u> ¶ 77).  The SEC also alleges that Mr. Torchia has misappropriated and misused investor money through "loans" and transfers between him and the Defendant entities.  (<u>Id.</u> ¶¶ 88-112).

Defendants argue that the fair market value of life settlements owned by Credit Nation exceeds $40 million, (Defs.' Initial Disclosures [19] at 4), and that their life settlement business is profitable.  Their theory is that when an insurance policy is purchased, its value is its face value minus the premiums it expects to pay until the insured dies.  Put another way, if a policy with a face value of $1 million is purchased for $600,000, its value is $1 million minus estimated premiums required to be paid to keep the policy in force.  They reject that the value is what they paid or what a willing purchaser would pay for the policy in an arm's length purchase.

C.    <u>Procedural History</u>

On November 10, 2015, the SEC filed its TRO Motion.  On November 13, 2015, the Court held a hearing on the motion.  (Minute Entry [13]).  Counsel for both the SEC and Defendants participated in the hearing.

(Nov. 13, 2016, Hr'g Tr. [16]).  At the hearing, the Court determined that it required more information from the parties—and more time—to decide whether injunctive relief and a receiver were required.  The Court requested the parties to negotiate a consent order that would preserve the status quo to allow the Court the opportunity to analyze the parties' positions in more depth.  (See id. at 57:6-10; 57:22-58:1; 59:2-20; 64:12-65:5).  The parties agreed to the Court's request.  (Id. at 65:10-66:4).

On November 18, 2015, the parties submitted their proposed consent order [15] ("Consent Order").  The Consent Order provided for, among other things: (i) a preliminary injunction briefing schedule; (ii) a preliminary injunction evidentiary hearing; (iii) expedited discovery; (iv) a freeze, pending the Court's determination of the SEC's preliminary injunction motion, on advertising, offering, or selling additional promissory notes and on Defendants' transfers of assets or funds.  On November 20, 2015, the Court entered the Consent Order [17].[3]

On December 1, 2015, the SEC filed its Preliminary Injunction Motion.  The same day, Defendants filed their Motion to Dismiss.  Defendants move, under

---

[3]     On January 13, 2016, the parties submitted to the Court a second Proposed Consent Order [53], which extended the terms of their initial Consent Order until the Court's ruling on the SEC's Preliminary Injunction Motion.  On January 14, 2016, the Court entered the parties' second Proposed Consent Order as an order of the Court [55].

Federal Rule of Civil Procedure 12(b)(1), to dismiss the SEC's claims related to the sale of LS Interests, arguing that the LS Interests are not securities.  ([21.1] at 2, 8).  Defendants move, under Federal Rule of Civil Procedure 12(b)(6), to dismiss the SEC's other claims.  (Id. at 2).

On January 8 and 9, 2016, the Court held its hearing on the SEC's Preliminary Injunction Motion.  (Minute Entries [51], [52]).  The testimony provided at the hearing is discussed in detail below.  On February 1, 2016, the parties filed their respective post-hearing briefs.  ([60], [61]).

D.     Preliminary Injunction Hearing

On January 8 and 9, 2016, the Court held its hearing on the SEC's Preliminary Injunction Motion.  The following individuals testified at the hearing: Susan Hartman, an accountant hired by Credit Nation to conduct a forensic accounting of its finances; M. Bryan Freeman, the SEC's life settlement valuation expert; Defendant James Torchia; Amberly Green, Mr. Torchia's manager of his personal financial matters and a policy underwriter at Credit Nation; and Jessica Hardie, Credit Nation's manager of operations.  (Tr. of Prelim. Inj. Hr'g [56], [57] ("Tr.")).

1.  <u>Susan Hartman's Testimony and Financial Snapshots</u>

Ms. Hartman was hired by Credit Nation in 2015 in response to the SEC's investigation into Credit Nation's financial dealings.  (<u>See</u> Tr. at 8:18-9:2).  As part of her responsibilities, she created financial snapshots (the "Financial Snapshots") of Credit Nation's finances for 2014 and the first six months of 2015.  (<u>Id.</u> at 8:19-23; Pl.'s Ex. 1; Pl.'s Ex. 2).

Ms. Hartman testified that the individuals responsible for accounting at Credit Nation "were not trained accountants," and that this was unusual for a company the size of Credit Nation.  (<u>See</u> Tr. at 13:19-22, 14:5-20).  Partly for this reason, the Financial Snapshots she created are not in accordance with GAAP.  (<u>See</u> <u>id.</u> at 13:7-12; 64:5-21).

Ms. Hartman created the Financial Snapshots using Credit Nation's bank statements and its internal accounting records.  (Pl.'s Ex. 1 at 1; Pl.'s Ex. 2 at 3-4).  The Financial Snapshots include, for 2014 and 2015:  CN Capital Sources and Uses, AMC Sources and Uses, Consolidated Sources and Uses (CN Capital and AMC), CN Auto Sales Sources and Uses, CN Capital Profit and Loss,[4] AMC Profit and Loss, Consolidated Profit and Loss (CN Capital and AMC), CN Capital

---

[4]     Ms. Hartman testified that the CN Auto Sales Sources and Uses analysis was not included in the CN Capital and AMC Consolidated Sources and Uses because CN Auto Sales is not a fully owned subsidiary of CN Capital.  (Tr. at 63:4-8).

Assets and Liabilities, AMC Assets and Liabilities, Consolidated Assets and Liabilities (CN Capital and AMC), and Consolidated Related Party Assets and Liabilities (CN Capital and AMC).  (Pl.'s Ex. 1; Pl.'s Ex. 2).

Ms. Hartman testified that, as of December 31, 2014, the face value of all the life insurance settlements that Credit Nation owned, or in which it had an interest—$12,541,372—was less than Credit Nation's total liability on investor notes payable—$29,387,719.  (Tr. at 79:25-80:10; see also Pl.'s Ex. 2 at 31).  Thus, if all of those life insurance settlement policies matured as of December 31, 2014—well before many of them were expected to mature—Credit Nation still would not have sufficient funds to satisfy its obligations to promissory note holders.  (See Tr. at 80:11-17; Pl.'s Ex. 2 at 31).

Ms. Hartman testified that, based on her forensic analysis, the consolidated liabilities of CN Capital and AMC for 2014 were $32,478,510 and its assets were $8,897,858.  (Tr. at 79:13-21).  The companies had, based on her cash flow analysis, a net loss of $6,164,051 in 2014.  (Pl.'s Ex. 2 at 28).  Ms. Hartman testified that, for the period January 1, 2015, through June 30, 2015, CN Capital and AMC, on a cash flow basis, had a consolidated net loss of $4,230,251.  (Tr. at 94:10-25; see also Pl.'s Ex. 1 at 11).  Assuming losses would accumulate at the same rate as they did in the first six months of 2015, CN Capital and AMC would

14

have had, on an annualized basis, a net loss in 2015 of over $8 million—about $2 million more than its losses in 2014.  As of June 30, 2015, CN Capital and AMC had total liabilities of $41,902,589 and assets of only $14,996,245.  (Tr. at 98:1-22; Pl.'s Ex. 1 at 15).  The Financial Snapshots show that, as of June 30, 2015, CN Capital and AMC had a negative total cash flow, and net income.  (Pl.'s Ex. 1 at 1-11).

Ms. Hartman testified that one significant difference between the 2015 analysis and the 2014 analysis is that the maturity value of life settlements increased after December 31, 2014.  (See Tr. at 96:4-13).  This increase was due to Credit Nation's purchase of additional life insurance policies.  (Id. at 96:14-15).

Ms. Hartman testified that, based on the analysis she conducted, Credit Nation was operating at a loss in 2014 and 2015, (id. at 125:21-25), that it was not profitable, (id. at 126:6), and that, based on her analysis of Credit Nation's profits and losses from 2014 to 2015, its losses were accelerating, (id. at 126:8-15).

Ms. Hartman noted that, while her Financial Snapshots were not GAAP compliant, a GAAP compliant balance sheet would record "unearned revenue" for policies that Credit Nation sold to investors in the past.  (Id. at 67:4-23, 75:10-25, 95:14-25).  On a GAAP compliant balance sheet, unearned revenue is a liability. (Id. at 95:19-21).

15

Ms. Hartman's Financial Snapshots also contain information regarding transfers between Mr. Torchia and the Defendant entities, or other entities he or his relatives control.  For instance, Mr. Torchia directed the transfer of hundreds of thousands of dollars to CN Auto, Spaghetti Junction, National Viatical, RiverGreen, Willie West, Jason's Automotive, and Sixes Tavern.[5]  (Pl.'s Ex. 1 at 5-6; Pl.'s Ex. 2 at 17-19).  Ms. Hartman testified that these kinds of transfers are "not a best practice" and that generally transfers of this sort are done "out of convenience" and because of "cash flow issues."  (Tr. at 31:17-33:2).

Further examples of transfers between Mr. Torchia and Torchia-related entities include CN Capital and AMC's 2014 transfers of approximately $1.1 million to CN Auto, Mr. Torchia's now-defunct dealership.  (Pl.'s Ex. 2 at 21).  At the time of this transfer, CN Auto owed Credit Nation more than $5 million, (Id. at 39 (non-collectable loan to CN Auto of $6.4 million at the end of 2014)), and, as of June 30, 2015, CN Auto owed CN Capital $6,405,593 in loans categorized as "non-collectible."  (Pl.'s Ex. 1 at 17).  Ms. Hartman testified that, for part of 2014, CN Auto paid the payroll of both CN Auto and AMC.  (Tr. 40:14-16).  Money also flowed back and forth between Credit Nation and RiverGreen, and Mr. Torchia's

---

[5]     National Viatical, RiverGreen, Sixes Tavern, and Willie West are all Torchia-related entities.  (See Tr. at 15:11-13; 23:1-7; 55:20-23; 221:12-15; 224:19-22).

untrained employees "kept track of who owes who for what on [a] spreadsheet." (See id. at 54:9-15). Ms. Hartman also testified that Credit Nation purchased a life settlement policy from Mr. Torchia and then sold the policy to a third party. (Id. at 61:20-25).

2.      M. Bryan Freeman's Testimony

Mr. Freeman testified as the SEC's life settlement[6] valuation expert.[7] He performed an analysis of the ten policies that make up the majority of the death benefits owned by Credit Nation ($67.5 million out of a total $75.1 million) to determine the fair market value of the policies. (Pl.'s Ex. 20; see also Tr. at 159-65). Mr. Freeman testified and provided an analysis showing that the total fair market value of these policies is between $1.5 million and $2.2 million. (Tr. at 164:12-22; Pl.'s Ex. 20). He testified that this analysis does not include overhead costs to manage the policies. (Tr. at 192:6-11). Mr. Freeman also suggested that Credit Nation may not have the ability to pay the premiums on the life insurance policies it owned. (See id. at 188:11-18).

---

[6]     Mr. Freeman explained that life settlements technically differ from "viatical settlements," but that, under Georgia law and in common parlance, the two terms are used interchangeably. (See Tr. at 135:13-136:1).

[7]     On January 7, 2016—the day before the preliminary injunction hearing—Defendants filed their motion to disqualify Mr. Freeman as an expert. ([50]). At the hearing, the Court denied the motion, allowing Defendants to address, on cross-examination, the matters set forth in their motion. (Tr. at 4:8-16).

3.   <u>James Torchia's Testimony</u>

When asked whether he had reviewed Ms. Hartman's Financial Snapshots, Mr. Torchia stated that he is "not an accountant." (<u>Id.</u> at 270:13-14).  He also deferred to his "CPAs" when asked whether AMC, which operates the Sub-Prime Auto Loan portion of Credit Nation's business, was profitable. (<u>See</u> <u>id.</u> at 270:10-17).[8]

Mr. Torchia believes that he and his company are "the best in the world" at valuing insurance policies. (<u>Id.</u> at 211:20-22).  When asked how he determined the purchase price for life insurance policies, Mr. Torchia struggled to provide a coherent explanation of his process, and his answers were often evasive and not responsive. (<u>See</u> <u>id.</u> at 210:13-211:19; 233:22-239:23).  He stated he buys certain policies "[b]ecause we feel that the life expectancies in certain areas are off," and that he is "looking for homeruns and . . . for potential." (<u>Id.</u> at 214:3-20).  He ultimately explained that his methodology involves applying a factor of 10% to the policy to determine the cost of insurance. (<u>See</u> <u>id.</u> at 239:2-23).  He testified that

---

[8]     Mr. Torchia was called by Defendants as a witness in Defendant's case-in-chief.  The evidence presented by the SEC was sufficient to show that Defendants did not have a viable motion to dismiss at the end of the SEC's case-in-chief and Defendants thus were allowed to present evidence on their behalf for the Court's consideration.

Credit Nation has its "own doctors . . . who are better than the life expectancy doctors." (Id. at 214:8-14).

Mr. Torchia was questioned regarding three specific life insurance policies in which he sold or pledged LS Interests to investors, and he was questioned regarding Mr. Freeman's valuation analysis on those three policies. For the first policy, Mr. Torchia sold approximately 70% of the death benefit from a policy issued to an insured named Kahan. The revenue generated by the sale of the LS Interests in the Kahan policy was $977,475.37. (Id. at 246:4-8; Pl.'s Ex. 31). Mr. Freeman calculated that Credit Nation would be required to pay premiums of $1,860,837 on the Kahan policy to keep it in force until the life expectancy estimated by Credit Nation. (Tr. at 250:17-22). Mr. Torchia was asked to multiply the percentage of the death benefit sold by the total premiums required to be paid, and the result was approximately $1,302,000. (Id. at 251:3-18). Mr. Torchia was then asked to subtract $977,475.37—the revenue generated by the sale of approximately 70% of Kahan's death benefit—from the premiums required to be paid on those sold death benefits, and the result was a loss for Credit Nation of approximately $325,000, assuming Kahan lived to the life expectancy Credit Nation estimated. (See id. at 251:3-23). Put another way, assuming Kahan lived to life expectancy, Credit Nation would lose, through paying the required

premiums, $325,000 on its sale of approximately 70% of Kahan's death benefit. Mr. Torchia attempted to dispute this figure by claiming that Credit Nation "inherited along with that [Kahan] portfolio . . . 14 million dollars' worth of death benefit on top of it for free on people that were older."  (Id. at 251:24-252:2). Mr. Torchia, however, could not explain the source of these purported profits, and he could not identify any policy he claimed was a part of the $14 million four-policy deal that included the Kahan portfolio.  (Id. at 252:3-254:2).

Next, Mr. Torchia sold 41% of the death benefit on a policy issued to an insured named Sneider.  The total revenue generated by the sale of LS Interests in the Sneider policy was $2,050,000.  (Id. at 255:2-6; Pl.'s Ex. 43).  Mr. Freeman's calculations showed that the anticipated premiums on the Sneider policy totaled $6,699,648.  (Tr. at 255:19-24).  Mr. Torchia performed the same calculations as above, and the result showed that, if Sneider lived to the life expectancy Credit Nation calculated, Credit Nation would lose approximately $700,000 on the sale of those LS Interests.  (Id. at 258:9-21).  Mr. Torchia again struggled to explain this loss estimate, claiming, confusingly, that "we inherited 24 million dollars in death benefit for free.  Just pay the premiums."  (Id. at 258:24-259:3).  Mr. Torchia conceded that, in numerous cases, life expectancies for policies Credit Nation

owned exceeded Credit Nation's estimated life expectancies for those policies. (See id. at 265:24-267:7).

Mr. Torchia testified that Mr. Freeman's valuation of the value of Credit Nation's life settlements is incorrect, noting that Mr. Freeman's expertise is in a different life settlement market than the one in which Credit Nation operates. (Id. at 219:3-13). Mr. Torchia claimed that he could sell Credit Nation's life settlement policies "in under three months for at least [$]35 million." (Id. at 219:10-13). He did not provide any criteria, process, or methodology by which he reached this valuation.

On cross examination, Mr. Torchia testified that there is an outstanding $5 million judgment against an entity called National Viatical, for which judgment Mr. Torchia is jointly liable. (Id. at 272:12-14). When asked how he would satisfy the judgment, Mr. Torchia stated he would not take money from Credit Nation to pay the judgment, and that he "intend[s] to fight it to the death." (Id. at 272:21-273:10). Mr. Torchia also offered testimony to the effect that he maintains discretion to decide how Credit Nation operates financially, including by loaning money to related entities and engaging in a variety of transactions Mr. Torchia decides are appropriate. (See id. at 216:17-217:2; 221:16-25; 222:9-23; 272:1-16).

When questioned about Credit Nation's representations to investors that life settlements and Sub-Prime Auto Loans would generate sufficient revenue to pay 9% interest on the promissory notes, Mr. Torchia stated "we didn't represent that. . . .  We represented that we are going to enter into the auto loans and policies . . . [b]ut we also have other revenue streams."  (Id. at 275:25-276:6).  He stated that "[w]e will get there.  We have generated [a] lot in buying and selling loans.  We just, you know, we haven't—we haven't had as much money to do the auto loans as we would like to.  But we are just about there right now."  (Id. at 276:7-10).

Mr. Torchia testified that Credit Nation reported losses in 2011, 2012, and 2013.  (Id. at 271:2-8).  He testified that Defendants "told [investors] we could run at a loss.  And I don't think it's my duty to tell [investors] that we are running at a loss."  (Id. at 277:23-278:3).

When questioned whether he sometimes used the company credit card to pay for Sixes Tavern's expenses, he stated that, "if it's used by the Sixes Tavern, it gets paid back by Sixes Tavern, or it gets reduced off of my deficit, but it gets paid back."  (Id. at 221:16-23).  When asked whether these transactions were accounted for, he answered "[y]eah, I believe so."  (Id. at 221:24-25).  When asked a similar question regarding whether "Credit Nation accounts for monies flowing back and

forth from Credit nation to RiverGreen," he stated that his "bookkeepers do that, bookkeepers and the people that handle the account."  (Id. at 223:20-23).  He reiterated that he is "just not a very good accountant.  We have outside CPAs that were brought in to set up the systems that were in place . . . .  Accounting is not my strong suit."  (Id. 223:25-224:6).  He did not testify that trained or certified accountants are usually employed by Credit Nation.[9]

### 4.   Amberly Green's Testimony

Ms. Green, Mr. Torchia's manager of his personal financial matters and a policy underwriter at Credit Nation, testified that, based on her understanding of Mr. Torchia's bank accounts and finances, a $5 million judgment against Mr. Torchia would "significantly impact his ability to loan money" to Credit Nation.  (Id. at 317:8-22).

Regarding Mr. Torchia's loans to Credit Nation and other entities, Ms. Green testified that there were no loan agreements in place.  (Id. at 304:24-305:5).  Ms. Green testified that Mr. Torchia loaned $2,964,000 to CN Auto between 2007 and 2013 "in order for it to operate."  (Id. at 315:18-316:9).

---

[9]     Despite Credit Nation's mass media advertisements to the public, Mr. Torchia claims he allows only "high-net-worth individuals" to invest in life settlements.  (Tr. at 219:10-13).  The evidence is undisputed that life settlements are part of the two investments intended to fund notes owned by investors.

When asked to clarify the purpose of the $2,964,000 loan, she testified that she did

not know the exact purpose of Mr. Torchia's loans to CN Auto.  (Id. at

316:16-20).[10, 11]

## II.   DEFENDANTS' MOTION TO DISMISS

The SEC's Complaint alleges that Defendants violated Sections 5(a), 5(c),

17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, Section 10(b) of the

Exchange Act, and SEC Rule 10b-5.  Defendants move, under Federal Rule of

Civil Procedure 12(b)(1), to dismiss the SEC's claims related to the sale of

LS Interests, arguing that the LS Interests are not securities.  ([21.1] at 2, 8).

Defendants move under Federal Rule of Civil Procedure 12(b)(6) to dismiss the

SEC's other claims.  (Id. at 2).

   A.   Legal Standards

      1.   Federal Rule of Civil Procedure 12(b)(1)

"Attacks on subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) come

in two forms.  'Facial attacks' on the complaint require[ ] the court merely to look

and see if [the] plaintiff has sufficiently alleged a basis of subject matter

---

[10]    The testimony of Ms. Hardie, Credit Nation's manager of operations, had
limited probative value.  The parties do not rely on her testimony in their
post-hearing briefs, and the Court does not rely on it in this Opinion and Order.
[11]    The Court sets out additional facts and allegations below.

jurisdiction, and the allegations in [the] complaint are taken as true for the purposes of the motion.'"   Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th Cir.1980),[12] cert. denied, 449 U.S. 953 (1980) (citing Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977)).  "Factual attacks" are challenges to the "existence of subject matter jurisdiction in fact . . . and matters outside the pleadings . . . are considered."   Id.

The Court, having reviewed the arguments presented by both parties, determines that Defendants' Rule 12(b)(1) Motion to Dismiss is a facial attack. The Court thus considers the allegations in the Complaint as true for the purposes of the motion.  Menchaca, 613 F.2d at 511.

### 2.   Federal Rule of Civil Procedure 12(b)(6)

On a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must "assume that the factual allegations in the complaint are true and give the plaintiff[] the benefit of reasonable factual inferences."   Wooten v. Quicken Loans, Inc., 626 F.3d 1187, 1196 (11th Cir. 2010).  Although reasonable inferences are made in the plaintiff's favor, "'unwarranted deductions of fact' are not admitted as true."   Aldana v. Del Monte

---

[12]    In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Fresh Produce, N.A., 416 F.3d 1242, 1248 (11th Cir. 2005) (quoting S. Fla. Water

Mgmt. Dist. v. Montalvo, 84 F.3d 402, 408 n.10 (11th Cir. 1996)).  Similarly, the

Court is not required to accept conclusory allegations and legal conclusions as true.

See Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010)

(construing Ashcroft v. Iqbal, 556 U.S. 662 (2009); Bell Atl. Corp. v. Twombly,

550 U.S. 544 (2007)).

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).  Mere "labels and

conclusions" are insufficient.  Twombly, 550 U.S. at 555.  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged."

Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).  This requires more than

the "mere possibility of misconduct."  Am. Dental, 605 F.3d at 1290 (quoting

Iqbal, 556 U.S. at 679).  The well-pled allegations must "nudge[] their claims

across the line from conceivable to plausible."  Id. at 1289 (quoting Twombly, 550

U.S. at 570).

B.    Analysis

    1.    The LS Interests are Securities

As a threshold matter, the parties disagree whether the LS Interests sold by Credit Nation qualify as securities under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act.[13]

The Eleventh Circuit Court of Appeals addressed this issue in SEC v. Mutual Benefits Corp., 408 F.3d 737 (11th Cir. 2005).  In Mutual Benefits, the Eleventh Circuit upheld the district court's denial of defendant's motion to dismiss for lack of subject matter jurisdiction, holding that life settlement contracts are "investment contracts" under the test set forth by the United States Supreme Court in SEC v. W.J. Howey Co., 328 U.S. 293 (1946).  408 F.3d at 745.  The Howey test provides that an investment contract for purposes of the federal securities laws means "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party . . . ."  328 U.S. at 298-99.

Applying the Howey test, the Mutual Benefits court found that there was no genuine dispute that the life settlement contracts at issue involved "(1) an

---

[13]    In response to the SEC's first set of requests for admission, Defendants admitted that the promissory notes offered by CN Capital are securities.  ([48.1] at 3).

investment of money, (2) in a common enterprise, (3) involving the expectation of profits." 408 F.3d at 742-43. Turning to the remaining element, "whether the investor's expectation of profits is based 'solely on the efforts of the promoter or a third party[,]'" the Eleventh Circuit noted that "investment schemes may often involve a combination of both pre- and post-purchase managerial activities, both of which should be taken into consideration in determining whether <u>Howey</u>'s test is satisfied." <u>Id.</u> at 743-44. The Eleventh Circuit also noted that many courts "have found investment contracts where significant efforts included the pre-purchase exercise of expertise by promoters in selecting or negotiating the price of an asset in which investors would acquire an interest." <u>Id.</u> at 744 (citing cases). The Eleventh Circuit concluded:

> The investors here relied on [the defendant] to identify terminally ill insureds, negotiate purchase prices, pay premiums, and perform life expectancy evaluations critical to the success of the venture. The flexible test we are instructed to apply by <u>Howey</u> . . . covers these activities, qualifying [the defendant]'s viatical settlement contracts as 'investment contracts' under the Securities Acts of 1933 and 1934.

<u>Id.</u> at 745.

Defendants' attempts to distinguish the SEC's allegations here from those at issue in <u>Mutual Benefits</u> are unconvincing. Defendants first argue that the SEC's allegations do not satisfy the "common enterprise" prong of the <u>Howey</u> test. ([21.1] at 8). Relying on <u>SEC v. Unique Fin. Concepts, Inc.</u>, 196 F.3d 1195 (11th

28

Cir. 1999), Defendants argue that whether the "common enterprise" prong is met

depends on whether the "fortunes of the investor are interwoven with and

dependent on the efforts and success of those seeking the investment or of third

parties." ([21.1] at 8). They argue here, the SEC alleges investors purchase

policies from Credit Nation inventory, and that policies are identified and acquired

before an investor ever places an investment with Credit Nation. (Id. at 9 (citing

Compl. ¶¶ 4, 51)). Defendants contend their "investors' fortunes are tied directly

to market forces (e.g., when a policy matures), not interwoven with the efforts and

success of Credit Nation." (Id.).

This argument is meritless. First, that some of Defendants' activities

occurred pre-purchase is irrelevant, because "investment schemes may often

involve a combination of both pre- and post-purchase managerial activities, both of

which should be taken into consideration in determining whether Howey's test is

satisfied." Mutual Benefits, 408 F.3d at 743-44. Second, in finding a common

enterprise, the Eleventh Circuit in Mutual Benefits noted only that "[t]he

investment scheme here involved both horizontal commonality, in that investor

money was typically pooled to invest in a viatical settlement and investors shared

both the promise of profits and the risk of loss, and vertical commonality in that

any profits were tied to the efforts of the promoters." 408 F.3d at 743 n.4. The

Eleventh Circuit did not set forth a temporal requirement that the "efforts of the promoters" must be undertaken after the investor makes the investment.[14]

Here, the Complaint alleges that, as part of the LS Interest scheme: "investors receive a pro rata distribution from the policy proceeds when the insured dies"; "CN Acceptance is required to pay the policy premiums for up to two years beyond the insured's projected life expectancy"; "CN Acceptance establishes a projected life expectancy for the insured"; if the insured lives more than two years beyond the projected life expectancy, CN Acceptance may "require LS Interest investors to make the future premium payments"; CN Acceptance will "monitor when premium payments are due"; and CN Acceptance provides LS Interest investors with "a list of services that CN Acceptance provides."  (Compl. ¶¶ 4, 53, 55, 57).  These allegations show investors shared the promise of profits and the risk of loss, and that investors' profits were tied to CN Acceptance's life expectancy projections, their ongoing efforts of monitoring, making premium payments, and facilitating collection of the benefit upon maturity.  The "common enterprise" prong is satisfied.

---

[14]   The Eleventh Circuit found "frivolous" the defendant's contention that the "common enterprise" prong was not met, and the Eleventh Circuit relegated to a footnote its analysis of this prong.  Mutual Benefits, 408 F.3d at 743 n.4.

Defendants next argue the allegations in the Complaint do not satisfy the final Howey prong, which requires that the investor's expectation of profits be based solely on the efforts of the promoter or a third party.  Defendants argue that the Complaint does not allege facts analogous to those alleged by the SEC in Mutual Benefits.  ([21.1] at 9-11).  Defendants note specifically that, in Mutual Benefits, the defendant, among other activities, "required investors to place money in escrow before it purchased any interest or engaged in any activities on [investors'] behalf"; "never asked investors pay additional premiums" "after policies were purchased"; "recruited doctors to evaluate the health of an insured"; and "monitored the health of the insureds[.]"  (Id. at 9-10).  Defendants also argue that the "SEC does not allege that Credit Nation selects interests specifically for LS Interest purchasers."  (Id. at 10).

The Mutual Benefits decision does not require a complaint to allege these specific facts.  The Howey test was met in Mutual Benefits because "investors' expectations of profits . . . relied heavily on the pre- and post-payment efforts of the promoters in making investments in viatical settlement contracts profitable." 408 F.3d at 744.  In reaching this conclusion, the court did not identify any individual factor as dispositive.  Instead, the Court simply listed several factors that supported its conclusion that the final prong was met, including:  "[t]he investors

here relied on [the defendant] to identify terminally ill insureds, negotiate purchase prices, pay premiums, and perform life expectancy evaluations critical to the success of the venture." Id. at 745.  The Complaint here alleges that Defendants bought life insurance policies from insureds, paid premiums, performed life expectancy evaluations, and monitored premium payments, among other "services that CN Acceptance provides." (See Compl. ¶¶ 4, 51-57).  The Complaint's allegations here track those listed by the court in Mutual Benefits.

The crux of Defendants' argument is that the "the LS Interest purchasers' fortunes relied more on market forces (i.e., insured's health and longevity) than Credit Nation's efforts and success." ([21.1] at 11).  This characterization ignores the reality of the investment Defendants offered—an investment that required investors to rely on Defendants to evaluate and purchase insurance policies based on Defendants' analysis of and recommendations regarding "market forces," specifically, insureds' health and longevity.  In a real way, Defendants' argument discredits their effort to distinguish this case from Mutual Benefits.  Their argument ignores that LS Interest purchasers necessarily relied on Defendants' pre-purchase selection of the insurance policies, and that the Complaint alleges this selection involved, at the very least, life expectancy evaluations.  (See Compl. ¶¶ 4, 51-57).  As the Eleventh Circuit noted, "investment schemes may often involve a

32

combination of both pre- and post-purchase managerial activities, both of which should be taken into consideration in determining whether <u>Howey</u>'s test is satisfied." <u>Mutual Benefits</u>, 408 F.3d at 743-44. The <u>Mutual Benefits</u> Court also noted:

> [w]hen profits depend upon market forces, public information is available to investors by which they can independently evaluate the possible success of the investment. In the case before us, investors were far more dependent on the efforts and information provided by [defendant] than an investor relying on the open market to produce a profit.

408 F.3d at 744 n.5. Here, the Court finds that the allegations in the Complaint show that LS Interest investors were dependent on the efforts and information provided by Credit Nation and did not rely on the open market to produce a profit.[15] The LS Interest contracts are "investment contracts" subject to the Securities Act and the Exchange Act.

### 2. Violation of Section 5 of the Securities Act

The SEC alleges that Defendants violated Sections 5(a) and 5(c) of the Securities Act. "Under Section 5 of the Securities Act, securities offered for sale

---

[15]    Defendants rely on <u>SEC v. Life Partners, Inc.</u>, 87 F.3d 536 (D.C. Cir. 1996) to show that other courts have found that "ministerial efforts" such as those alleged by the SEC do not convert Life Settlements into investment contracts subject to SEC regulation. ([21.1] at 11). Defendants' reliance is misplaced, because the Eleventh Circuit in <u>Mutual Benefits</u> expressly "decline[d] to adopt the test established by the <u>Life Partners</u> court." 408 F.3d 737.

must be registered by filing a registration statement with the SEC, unless a

statutory exemption to the registration requirement applies."  SEC v. Bronson,

14 F. Supp. 3d 402, 407 (S.D.N.Y. 2014) (citing 15 U.S.C. § 77e).  "In order to

establish a prima facie case for a violation of § 5 of the Securities Act, the SEC

must demonstrate that (1) the defendant directly or indirectly sold or offered to sell

securities; (2) through the use of interstate transportation or communication and the

mails; (3) when no registration statement was in effect."  SEC v. Big Apple

Consulting USA, Inc., 783 F.3d 786, 806-807 (11th Cir. 2015) (quoting

SEC v. Calvo, 378 F.3d 1211, 1214 (11th Cir. 2004)).  "Once participation in an

unregistered sale has been shown, the [sellers] have the burden of proving an

exemption to the registration requirements."  Id. at 807 (quoting Zacharias v. SEC,

569 F.3d 458, 464 (D.C. Cir. 2009)).

   Defendants acknowledge their promissory notes are securities.  ([21.1] at 12;

see also [48.1][16] at 3).[17]  They argue, however, that the SEC's Section 5 claims

should be dismissed because Credit Nation "was permitted to offer its notes to

---

[16]   The SEC introduced this document into evidence at the preliminary
injunction hearing as Plaintiff's Exhibit 100.
[17]   Defendants admit that CN Capital "used instrumentalities of interstate
commerce in connection with the offer and sale of promissory notes."  ([48.1] at
4).  Defendants also admit that "[n]o registration statement was in effect with the
Commission as to the promissory notes sold by Credit Nation Capital."  (Id.).

unaccredited investors" under Rule 506(c), 17 C.F.R. § 230.506(c), ([21.1] at 13), essentially contending that the promissory notes are exempt from the registration requirements.

Defendants have the burden to prove an exemption applies.  Big Apple, 783 F.3d at 807.  "A court may dismiss a claim on the basis of an affirmative defense raised in the motion to dismiss, only if the facts supporting the defense appear on the face of the complaint, and it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." Bronson, 14 F. Supp. 3d at 407 (citing United States v. Space Hunters, Inc., 429 F.3d 416, 426 (2d Cir. 2005)); see also Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP, 609 F. App'x 972, 976 (11th Cir. 2015) ("A complaint may be dismissed . . . when the existence of an affirmative defense 'clearly appears on the face of the complaint.'" (quoting Quiller v. Barclays Am./Credit, Inc., 727 F.2d 1067, 1069 (11th Cir. 1984))).

Here, Defendants do not argue that the allegations in the Complaint conclusively show the promissory notes are exempt from registration.  They argue, instead, that the SEC does not allege sufficient facts to show that the promissory notes *are not* exempt from registration.  (See [21.1] at 12-14 ("The SEC also does not specify when Investor A invested with Credit Nation . . . .  Without more

specific information, the . . . Defendants are unable to answer the SEC's allegations"; "the SEC fails to allege who met with Investor A and secured his investment . . . third-party verification is not the only way to satisfy the requirement in Rule 506(c) . . ."; "A sizeable minimum investment *may* also indicate accredited status depending on other information available to a promoter." (emphasis added))).  The SEC, however, does not have the burden to prove that the promissory notes are not exempt from registration.  It is Defendants' burden to show the promissory notes are, in fact, exempt.  Big Apple, 783 F.3d at 807.  Defendants fail to identify any Complaint allegations clearly showing the promissory notes are exempt from registration.  Defendants' Motion to Dismiss the SEC's Section 5 claims is denied.  See Twin City, 609 F. App'x at 976.

3.     Violation of the Anti-Fraud Provisions

Defendants next move to dismiss the SEC's claims that Defendants violated Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, Section 10(b) of the Exchange Act, and SEC Rule 10b-5 (collectively, the "Anti-Fraud Provisions"). To establish a violation of Section 10(b) and Rule 10b-5, the SEC must prove by a preponderance of the evidence that Defendants made "(1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities," and that they "(3) made [them] with scienter."

36

SEC v. Merchant Capital, LLC, 483 F.3d 747, 766 & n.17 (11th Cir. 2007) (citing

Aaron v. SEC, 446 U.S. 680, 695 (1980); SEC v. Zandford, 535 U.S. 813, 816 n.1

(2002)).

A complaint alleging claims under Section 10(b) and Rule 10b-5 must

satisfy the heightened pleading requirements established under Rule 9(b) of the

Federal Rules of Civil Procedure.  SEC v. Strebinger, 114 F. Supp. 3d 1321, 1329

(N.D. Ga. 2015) (citing Kammona v. Onteco Corp., 587 F. App'x 575, 581 (11th

Cir. 2014)).  To do so, a plaintiff "must state with particularity the circumstances

constituting fraud or mistake."  Fed. R. Civ. P. 9(b).

Proof of a violation of Section 17(a)(1) through (3) requires "[e]ssentially

the same elements" in connection with the offer or sale of a security, except that

proof of scienter is not required for the SEC to seek an injunction under Section

17(a)(2) or (3).  SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999)

(citing SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996));

see also Merchant Capital, 483 F.3d at 766 (citing Aaron v. SEC, 446 U.S. 680,

697, 702 (1980)).[18]

---

[18]    All of these violations also require proof of an interstate commerce or mails
element.  See 15 U.S.C. § 78j(b); 15 U.S.C. § 77q(a).  The Complaint alleges,
(Compl. ¶ 15), and Defendants admit, ([48.1] at 4-5), that CN Capital and CN
Acceptance used instrumentalities of interstate commerce in connection with the

The SEC alleges that Defendants[19] misled investors about the safety and profitability of Credit Nation.  (See, e.g., Compl. ¶¶ 1, 83).  It also accuses Mr. Torchia of misappropriating investor funds, using new investor money to disguise the venture's operating losses, extensively commingling funds among entities under his control, and using the Defendant entities' assets to prop one another up.  (See, e.g., id. ¶ 89).

The misleading statements or material omissions alleged in the Complaint include:

- The promissory notes were "100% asset backed" or "backed by hard assets dollar for dollar."  (Id. ¶¶ 46, 48, 49).

- CN Capital "expect[ed]" to generate interest income and long-term capital gains from its investments in automobile loans and Life Settlements in excess of the interest payable on the notes.  (Id. ¶ 43).

- CN Capital "ancitipat[ed]" that less than one month's collection of automobile loan payments was sufficient to meet one year of premiums on Life Settlements Credit Nation held.  (Id. ¶ 45).

---

offer and sale of promissory notes and LS Interests.  The Court determines the Complaint sufficiently alleges the interstate commerce element.

[19]     The SEC alleges the "Offering Defendants" made misrepresentations and omissions.  The Offering Defendants are Mr. Torchia, CN Capital, and CN Acceptance.  For the sake of simplicity, the Court refers to the Offering Defendants simply as "Defendants" or "Credit Nation."

- CN Capital "expect[ed]" that its Life Settlements would generally yield about 15% per annum.  (Id. ¶ 44).

- Credit Nation's investments are fully secured by assets, and Credit Nation is profitable.  (Id. ¶¶ 71-73, 76, 83).

- Credit Nation failed to disclose its "multi-million dollar per year operating losses" and "massive insolvency."  (Id. ¶¶ 3, 77-81).

- Neither CN Capital nor the promissory notes it offers are disclosed to those who purchase LS Interests through CN Acceptance.  (Id. ¶ 56).

- Credit Nation failed to disclose its obligation to repay startup loans from Torchia and related entities.  (Id. ¶ 112).

Defendants argue that the SEC's claims fail to identify when, where, and to whom the alleged misstatements or omissions were made, and thus fail to meet the heightened pleading requirements of Rule 9(b).  ([21.1] at 17).

The Eleventh Circuit has stated:

Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.

Dixon v. Allergan USA, Inc., —— F. App'x ——, ——, 2016 WL 946553, at *2 (11th Cir. Mar. 14, 2015) (quoting Tello v. Dean Witter Reynolds, Inc., 494 F.3d 956, 972 (11th Cir. 2007)).

Defendants' suggestion that the SEC failed to identify when, where, and to whom the alleged misstatements or omissions were made is, at least, disingenuous. In addition to the allegations listed above, the Complaint also alleges a variety of fact-specific allegations of fraud:

- CN Capital's "2013 offering memorandum, which was used from September 2013 through November 2014," (Compl. ¶ 40), "expects the pool of Life Settlements will generally yield about 15% per annum," (id. ¶ 44).

- "The November 2014 Offering Memorandum, which is still in use, contains similar statements[.]"  (Id. ¶ 41).

- "Credit Nation's newspaper advertisements, which have appeared in Georgia, South Carolina, Texas and California, generally state, among other things, that the investment:  (i) generates a 9% fixed return with interest paid quarterly; (ii) is 100% asset backed . . . ."  (Id. ¶ 46).

- Radio advertisements have been broadcast in Texas, Georgia, and South Carolina, (id. ¶ 47), the specific text of which advertised a 9% return on investment and that assets are backed dollar for dollar, (id. ¶¶ 48-49).

- A 78 year old retiree and resident of South Carolina ("Investor A") invested $50,000 in promissory notes and $50,000 in LS Interests after seeing a Credit Nation advertisement in his local newspaper in late 2013.  (Id. ¶¶ 66-67).

- In early September 2015, Credit Nation produced to the SEC non-GAAP financial reports which "confirm that the representations made by the company regarding the safety of the investments and the profitability of its investment strategy are false."  (Id. ¶¶ 74-76).  The report showed the notes are not "100% asset backed" or "backed by hard assets dollar for dollar" because "the company's liabilities dwarf its assets and the company has sustained multi-million dollar per year operating losses."  (Id. ¶ 77).

These allegations are merely a subset of the detailed allegations in the Complaint.[20]  The Court finds that the SEC's factual allegations, with respect to its fraud claims under Section 10(b) and Rule 10b-5, satisfy the particularity pleading requirements of Rule 9(b).

Defendants next argue that, in alleging that Defendants' representations and omissions were misleading, "the SEC misconstrues the financial information [Defendants] provided in connection with the SEC's two-year investigation." ([21.1] at 17).  They contend that the SEC inappropriately relies on a cost basis analysis of Credit Nation's finances to allege that Credit Nation's liabilities exceed its assets, that Credit nation does not use cost basis to value its Life Settlements, that the SEC ignores GAAP accounting principles, and that the SEC ignores key disclosures in the offering memoranda.  (Id. at 17-19).

On a motion to dismiss pursuant to Rule 12(b)(6), the Court must "assume that the factual allegations in the complaint are true and give the plaintiff[] the benefit of reasonable factual inferences."  Wooten, 626 F.3d at 1196.  The Complaint plausibly alleges that Credit Nation's assets are substantially outweighed by its liabilities, (see, e.g., Compl. ¶¶ 3, 76-83), and the Court must

---

[20]    The SEC points out that the offering memoranda and LS Interest sales packets were produced by Credit Nation to the SEC and given to each investor, and Credit Nation thus had ample "fair notice" of the SEC's claims.  ([25] at 21).

assume these allegations are true.[21]  Defendants also urge the Court to consider their argument that the Financial Packets referenced in the Complaint do not show that Credit Nation is insolvent.  That the Court conducted a TRO hearing and a two-day preliminary injunction hearing addressing, in large part, whether the Financial Packets show Credit Nation is insolvent undermines Defendants' litigation position that the Complaint and Financial Packets, on their face, do not show that Credit Nation is insolvent.  Defendants' arguments that the Complaint relies on "misconstrue[d]" evidence are appropriate arguments in opposition to the SEC's Preliminary Injunction Motion, and their arguments are addressed below in the Court's consideration of that motion.  These arguments are not, however, a

---

[21]     In their Motion to Dismiss, Defendants point to disclosures in their offering memoranda warning investors of the possibility of Credit Nation operating at a loss and its liabilities exceeding its assets.  ([21.1] at 19).  Taking as true the Complaint's allegations that the offering memoranda were distributed while Credit Nation actually operated at a loss and while its liabilities exceeded its assets, the offering documents' generic cautionary language was affirmatively deceptive, because the language implied that the risks cautioned against had not occurred, when they had.  See Merchant Capital, 483 F.3d at 769 ("[T]o warn that the untoward may occur when the event is contingent is prudent, to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.").

basis for the Court to dismiss the SEC's claims.[22]  Defendants' Motion to Dismiss

is denied.

## III.    THE SEC'S PRELIMINARY INJUNCTION MOTION

The Court now addresses the SEC's motion for injunctive relief.  In its

Preliminary Injunction Motion, the SEC seeks a preliminary injunction, a freeze of

Defendants' assets, and the appointment of a receiver.  The Court first addresses

whether the SEC has met its burden to support the preliminary injunction sought.

---

[22]    Defendants also argue that Mr. Torchia and Credit Nation did not commingle funds or misappropriate investor money, and that Credit Nation is not a Ponzi scheme.  It is not clear which elements of a violation of Section 17, Section 10(b), or Rule 10b-5 Defendants seek to undermine with these arguments.  The SEC is not required to allege that Credit Nation meets some specific definition of a Ponzi scheme for it adequately to allege securities violations.  The allegations in the Complaint regarding Mr. Torchia's misappropriation of investor money support the SEC's fraud claims, and, as a result, the SEC alleges sufficient facts to sustain claims of fraud under the Securities Act and the Exchange Act.  The Court finds that the SEC's allegations that Mr. Torchia and Credit Nation misappropriated investor money are sufficiently well-pled.  A sample of the SEC's specific allegations of misappropriation includes:  Mr. Torchia gave undocumented "loans" to Credit Nation, for which transfers to himself and his other business are purportedly repayment; these purported loans were not disclosed to investors; Spaghetti Junction and CN Capital transferred hundreds of thousands of dollars to Sixes Tavern; and Mr. Torchia transferred $195,842 of CN Capital funds to Willie's West, LLC, which used the funds to purchase a residential home in Canton, Georgia in which Mr. Torchia lives.  (Compl. ¶¶ 100, 104, 110, 112).

A.      Preliminary Injunction

The Securities Act provides:

> Whenever it shall appear to the Commission that any person is
> engaged or about to engage in any acts or practices that constitute or
> will constitute a violation of the provisions of this subchapter, or of
> any rule or regulation prescribed under authority thereof, the
> Commission may, in its discretion, bring an action in any district court
> of the United States, . . . to enjoin such acts or practices, and upon a
> proper showing, a permanent or temporary injunction or restraining
> order shall be granted without bond . . . .

15 U.S.C. § 77t(b).  The Exchange Act contains a similar provision authorizing

injunctive relief.  See 15 U.S.C. § 78u(d)(1).

In this Circuit, the "SEC is entitled to a preliminary injunction when it

establishes . . . (1) a prima facie case of previous violations of federal securities

laws, and (2) a reasonable likelihood that the wrong will be repeated."  Unique Fin.

Concepts, 196 F.3d at 1199 n.2; see also Calvo, 378 F.3d at 1216 (applying same

standard on review of a permanent injunction).  In determining the probability that

a party will again engage in violations of the securities laws, a court should

consider the "egregiousness of the defendant's actions, the isolated or recurrent

nature of the infraction, the degree of scienter involved, the sincerity of the

defendant's assurances against future violations, the defendant's recognition of the

wrongful nature of the conduct, and the likelihood that the defendant's occupation

44

will present opportunities for future violations."  Id. (quoting SEC v. Carriba,

681 F.2d 1318, 1322 (11th Cir. 1982)).

In considering the SEC's Preliminary Injunction Motion, the Court

understands that the federal securities laws are to be interpreted broadly and

liberally to effectuate Congress's intent to protect investors and to reach the

various schemes devised by those persons who would use the money of others on

the promise of profits.  See Carriba, 681 F.2d at 1324.

In this case, Defendants admit that the promissory notes sold by CN Capital

are securities, ([48.1] at 3), and the Court has found that the LS Interests also are

securities.  The evidence in the record and the testimony and evidence presented

during the preliminary injunction hearing further support the Court's conclusion

that the LS interests are securities.[23]  The Court next considers whether the SEC

established a prima facie case that Defendants violated the securities laws.

---

[23]    For instance, the record shows that CN Acceptance performed services for
investors such as monitoring the insured's status, obtaining annual statements from
insurance companies, and applying for death benefits.  ([2.15] at CN-SEC-000569,
-576).  Mr. Torchia testified that Credit Nation hired doctors to analyze life
expectancy.  (Tr. at 214:8-14).

1. <u>Prima Facie Case of Securities Violations</u>

The SEC alleges that Defendants violated Sections 5(a) and 5(c) of the Securities Act and the Anti-Fraud Provisions of the Securities Act and the Exchange Act.

a) <u>Section 5 of the Securities Act</u>

"In order to establish a prima facie case for a violation of § 5 of the Securities Act, the SEC must demonstrate that (1) the defendant directly or indirectly sold or offered to sell securities; (2) through the use of interstate transportation or communication and the mails; (3) when no registration statement was in effect." <u>Big Apple</u>, 783 F.3d at 806-807. "Once participation in an unregistered sale has been shown, the [sellers] have the burden of proving an exemption to the registration requirements." <u>Id.</u> at 807.

Defendants admit that (1) the promissory notes sold by CN Capital are securities; (2) they were sold using the instrumentalities of interstate commerce; and (3) no registration statement was in effect with the SEC as to those promissory notes. ([48.1] at 3-4). It is thus Defendants' burden to prove an exemption to the registration requirements.

Defendants argue that the SEC "fails to show that Credit Nation did not take reasonable steps to verify investors' accredited statuses." ([26] at 5). Defendants

46

also reiterate the argument they made in support of their Motion to Dismiss that "an investor's ability to satisfy a sizeable minimum investment *can* be an indication of accredited status."  (Id. (emphasis added)).  While interesting observations, they ignore that the burden is on Defendants to prove an exemption to the registration requirements.[24]  They also side step Defendants' failure to offer any evidence, or argument, to support that their sales of promissory notes were exempt from the registration requirements.  That they have raised the *possibility* that the promissory notes were exempt is not enough.  There is an absence of evidence to support even an inference that a registration exemption applies.  There is nothing in the record to show that Defendants made any effort to determine if investors were accredited or otherwise have the financial acumen or resources to evaluate and understand the value or risk of the investments Defendants were touting as providing 9% annual returns.  Because the SEC has demonstrated that Defendants sold securities through the use of interstate communication when no registration statement was in effect, and because Defendants have not met their burden to prove an exemption to the registration requirements, the Court

---

[24]    Defendants' citations to SEC regulations that might provide exemptions from the registration requirements, (see [26] at 5), is not enough to meet their burden of proof.  Defendants do not offer any evidence in support of their argument that the regulations cited apply to the promissory notes.

necessarily finds that the SEC has established a prima facie case that Defendants violated Section 5 of the Securities Act.[25]  See Big Apple, 783 F.3d at 806-807.

b)   The Anti-Fraud Provisions

The SEC also alleges that Defendants violated Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, Section 10(b) of the Exchange Act, and SEC Rule 10b-5—known as the Anti-Fraud Provisions.  To establish prima facie violations of Section 17(a)(1), Section 10(b), and Rule 10b-5, the SEC must demonstrate that Defendants made "(1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities," and that they "(3) made [them] with scienter."  See Merchant Capital, 483 F.3d at 766 & n.17.  To establish that Defendants violated Sections 17(a)(2) and 17(a)(3), "the SEC need only show (1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with negligence."[26]  Id.

---

[25]     Based on the evidence presented, it is questionable whether Defendants will be able to prove that an exemption applies.

[26]     All of these violations also require proof of an interstate commerce or mails element.  See 15 U.S.C. § 78j(b); 15 U.S.C. § 77q(a).  Defendants admit, ([48.1] at 4-5), that CN Capital and CN Acceptance used instrumentalities of interstate commerce in connection with the offer and sale of promissory notes and LS Interests.  The SEC thus has proved this element for purposes of its prima facie case.

"[I]n SEC civil enforcement actions for preliminary injunctive relief under the antifraud provisions of the federal securities laws . . . the proper standard of proof is the preponderance of the evidence." SEC v. First Fin. Grp. of Tex., 645 F.2d 429, 434 (5th Cir. Unit A May 1981) (citations omitted).

Having determined that the promissory notes and LS Interests sold by Defendants are securities, the Court determines that the second element of each test is met. The Court now considers whether (1) Defendants made material misrepresentations or materially misleading omissions (2) with scienter.

(1) Material Misrepresentations or Omissions

"The test for materiality in the securities fraud context is 'whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action.'" Merchant Capital, 483 F.3d at 765 (citing Carriba, 681 F.2d at 1323). The SEC shows that Defendants advertised to investors that promissory notes offered to them for sale would yield a "9% fixed return APR" and were "100% asset backed" or "backed by hard assets." (See, e.g., [2.9], [2.10]). Defendants admit that: (1) CN Capital has reported losses to the IRS for each year since at least 2011; (2) CN Capital's investments in sub-prime automobile loans were not profitable in 2014 or in the first six months of 2015; and (3) CN Capital told investors that "the expenses of operating the Company and

49

investment losses *could* exceed the Company's income[,]" ([48.1] (emphasis added)), but did not disclose that they already had.

At the hearing, Ms. Hartman, the forensic accountant hired by Defendants to respond to the SEC's investigation, testified at length regarding her analysis of Credit Nation's finances. Ms. Hartman was eminently qualified to perform the forensic analysis about which she testified, and was well-qualified to explain the opinions and conclusions she offered. Her testimony was articulate, supported by uncontested facts, direct, and helpful. She was a compelling, credible witness.

Ms. Hartman testified that Credit Nation was operating at a loss in 2014 and 2015. (Tr. at 125:21-25). The company was not profitable. (Id. at 126:6). Based on her analysis of Credit Nation's profits and losses from 2014 to 2015, the losses were accelerating. (Id. at 126:8-15). She testified that her analysis showed that Credit Nation's liabilities greatly exceeded its assets. (See id. at 79:13-21, 94:10-25, 98:1-22; Pl.'s Ex. 1 at 15).

Defendants admit they cannot identify any inaccuracies in Ms. Hartman's analysis of Credit Nation's financial condition in 2014 and the first six months of 2015. ([48.1] at 5-6). They argue, however, that the SEC fails to show Defendants made material misrepresentations or omissions because (1) the SEC incorrectly values Credit Nation's life insurance policies; (2) Ms. Hartman's Financial

Snapshots are not GAAP compliant and thus understate its assets; and (3) Credit Nation fully disclosed the possibility of operating losses to investors and explained that its liabilities could exceed its assets.  ([26] at 6-11).

Defendants argue that the SEC incorrectly values Defendants' life insurance policies.  At the end of 2014, Defendants owned policies with a maturity value of approximately $13 million.  (Pl.'s Ex. 2 at 31).  After December 31, 2014, Defendants spent approximately $6 million to purchase new policies, (Pl.'s Ex. 1 at 1 (purchases of policies from third parties for $5,074,500 and purchase of a policy from an affiliate for $1,196,549)), which have a maturity value of $75 million, (id. at 13).  Defendants thus claim that the total market value of their life settlements "is at least $40 million," (see, e.g., [19] at 4), which shows that Defendants are solvent.

In support of this claim, Defendants rely solely on Mr. Torchia's testimony that he could sell Credit Nation's settlement policies "in under three months for at least [$]35 million."  (Tr. at 219:3-13).  Mr. Torchia's testimony was not credible. The "opinions" he offered were not supported by facts and were based on broad, speculative generalizations.  His conclusory statements were not persuasive and the Court believed many of them to be untrue.  Mr. Torchia struggled to provide a coherent explanation of his process to determine the purchase price for life

insurance policies, and his testimony was evasive.  When confronted with

Mr. Freeman's analysis of the total premiums Credit Nation was required to pay on

the Kahan policy and that the premiums exceeded the death benefits Credit Nation

expected, he testified, without any factual or logical support, that he "inherited

along with that [Kahan] portfolio . . . 14 million dollars' worth of death benefits on

top of it for free on people that were older."  (Tr. at 251:24-252:2).  Mr. Torchia

did not explain the source of the purportedly "free" $14 million in additional death

benefits, and the Court discredits the assertions as untrue.  (Id. at 252:3-254:2).

Defendants do not identify, and the Court is unable to find, any support in the

record for Mr. Torchia's far-fetched assertions.  Confronted with a projected loss

on the Sneider policy, he claimed, equally unconvincingly, that "we inherited 24

million dollars in death benefits for free.  Just pay the premiums." [27]  (Id. at

---

[27]      In their post-hearing reply brief [63], Defendants attempt to show that their
Sneider policy transactions were profitable.  Defendants provide a declaration by
Ms. Hardie [63.1] which purports to show that, after taking into account the
purchase price, estimated premiums, sale revenue, maturity value, and maturity
owed to third parties, the net profit to Credit Nation is approximately $11.4
million.  (See [63] at 2).  Ms. Hardie did not offer testimony about the Sneider
transaction at the preliminary injunction hearing to explain Mr. Torchia's
testimony about the "free" death benefits included in the transaction.  In her
attempt to explain the transaction weeks later, and without being subject to
cross-examination, Ms. Hardie still does not provide specific information to
explain the "free" value about which Mr. Torchia testified and appears only to

258:24-259:3).  The Court found wholly unpersuasive Mr. Torchia's effort to prop up Credit Nation's finances.

The Court finds Defendants' valuations of their life insurance policies are, at best, unsubstantiated, and, at worst, deliberately misleading.  Mr. Freeman, the SEC's life settlement valuation expert,[28] testified that the ten policies that make up the majority of the death benefits owned by Credit Nation have a total fair market value between $1.5 million and $2.2 million.  (Tr. at 164:12-22; Pl.'s Ex. 20). Ms. Hartman's analysis of Credit Nation's own accounting records shows that the total value, on a cost basis, of life settlements owned by Credit Nation was approximately $9 million.  ([2.5] at 15).  These figures are credible both because Mr. Freeman and Ms. Hartman provided detailed, thorough analyses, and because the values are reasonably related to the price Credit Nation paid for the policies it purchased in 2015—$6 million—and to the face value of the policies owned at the end of 2014—$13 million.

Defendants, on the other hand, did not offer any evidence to support their unsubstantiated claim that they could, today, sell for $40 million the policies they

provide information about the financial results they hope to achieve.  Defendants do not attempt at all to show that their Kahan policy transactions were profitable.
[28]    The Court found Mr. Freeman to be well-qualified to offer the testimony he gave.  His opinions were well-supported and reliable.

purchased a year ago for $6 million and policies they purchased previously—

policies that, in the aggregate, had only $13 million in maturity value at the end of

2014.[29]  According to Defendants, a company that has liabilities exceeding its

assets can purchase life insurance policies for a few million dollars that would,

practically overnight, inflate its assets by tens of millions of dollars because the

policies at some point would realize their face value when the insured died.

Extraordinary "wishing it were so" claims like these require evidence to support

them, which is not in the record here.  Their theory appears to be that the moment

an insurance policy is purchased, its value is its face value minus the premiums it

expects to pay until the insured dies.  Put another way, if a policy with a face value

of $1 million is purchased for $600,000, its value is $1 million minus estimated

premiums required to be paid to keep the policy in force.  They reject that the value

is what they paid for the policy or what a willing purchaser would pay for the

policy in an arm's length purchase.[30]  This valuation assumption is illogical and

---

[29]    Defendants' policy face value valuation claim is illogical and inconsistent
with the evaluations performed by Ms. Hartman and Mr. Freeman.  The value of an
asset is the fair market value, not what it may produce at some uncertain future
date after the continuous payment of premiums.  Defendants' valuation method
may be persuasive when advertised to investors.  It is not persuasive to the Court.
[30]    Defendants do not appear to account for an insured living longer than the life
expectancy they estimate, the failure of the insurer, the company's overhead, the

inconsistent with commercial reality.[31, 32]

Defendants also point to the following language in CN Capital's offering

memoranda to support the claimed truthfulness of its representations to investors:

> **[T]he Company will determine the value of each Life Settlement in its sole discretion**, based on accepted industry standards . . . .  For purposes of valuing the Life Settlements, **the Company may rely in whole or in part upon**, among other things, verbal or written statements produced by generally accepted industry valuation techniques, industry experts or unaffiliated third parties, **and/or its own estimates**.

---

general uncertainty in the market, fraud in the application for the insurance policy, or other factors.  Mr. Torchia's view is that it will all work out over time.

[31]      For these same reasons, the Court does not credit Defendants' argument that the "dramatic[]" increase in the maturity value of Credit Nation's assets since the end of 2014 is "an indication that [Credit Nation]'s financial picture is continuing to improve and that [Credit Nation] is not 'failing.'" ([61] at 5).  If Defendants' valuation method was sound there would have been no need to purchase additional policies to prop up the value of Defendants' assets by simply increasing the aggregate face value of policies held.

[32]      The Court notes that the total maturity value of the policies owned by Credit Nation at the end of 2014 was approximately $13 million, and that Credit Nation's liabilities were approximately $30 million.  That the maturity value and fair market value of policies owned by Credit Nation may have increased in 2015 does not bear on the securities sold during 2014.  Even if, for every life insurance policy owned by Credit Nation at the end of 2014, every insured had died on January 1, 2015, Credit Nation would have received $13.3 million in death benefits—not nearly enough to repay the $29 million it owed to investors, even if Credit Nation's other assets were included.  (See Tr. at 80:11-17; Pl.'s Ex. 1; Pl.'s Ex. 2).  This evidence alone is sufficient to show that, in 2014, the offering memoranda and advertisements contained material misstatements and omissions.

(2013 Offering Memorandum at 23; 2014 Offering Memorandum at 23 (emphasis added)).  Ms. Hartman, Defendants' forensic accounting analyst, valued the Life Settlements at their investment basis and determined that the policies are worth approximately $9 million, which, together with Credit Nation's $6 million in other assets, is disturbingly short of the amount required to cover Credit Nation's approximately $42 million in liabilities.  ([2.5] at 15).[33]  Defendants do not offer any accepted industry standards they ever used to conduct valuations, and do not offer any evidence of statements produced by generally accepted industry valuation techniques, experts or other credible industry parties or methods upon which they relied in valuing their life settlements.  Defendants do not even offer credible estimates they made, choosing to rely on Mr. Torchia's back-of-the-napkin "valuation" decisions.  There certainly is no evidence that Mr. Torchia's valuations were accepted within his industry.  Simply stated, the only evidence

---

[33]    The Court also does not credit Defendants' characterization of their business as one that is "in the early years" and as one that is analogous to "a medical device research and development company."  ([26] at 8).  Defendants also argue that "Credit Nation considers [losses] part of the[ir business] model."  ([61] at 5).  Credit Nation has been raising money since 2009, and Defendants do not appear to contest that their investment strategy has never been profitable.  Moreover, Defendants did not disclose or market their investments as speculative—instead, they told investors that their investments would be backed by hard assets dollar for dollar.

offered by Defendants was Mr. Torchia's unsubstantiated testimony that he could sell the policies for at least $35 million.

To try to shore up their financial status, Defendants next argue that their own forensic accountant's analysis of Credit Nation's finances is wrong. Defendants contend that Ms. Hartman's Financial Snapshots are "preliminary, subject to revision, and based on a review of cash flow . . . ." ([26] at 9). They argue that the Financial Snapshots are non-GAAP, which understates the value of Defendants' assets. (Id. at 9-10).

Defendants ignore that Ms. Hartman's analysis is not GAAP compliant largely because Defendants' records were kept by untrained, uncertified employees and thus the records were not even capable of allowing a GAAP analysis. (See Tr. at 13:19-22, 14:5-20). Defendants nevertheless argue—without factual or legal support—that, under GAAP, premiums paid on the Credit Nation's life settlements would not be booked as an expense. Defendants also ignore Ms. Hartman's testimony that her non-GAAP accounting operated in Defendants' favor, and not its detriment. Ms. Hartman testified that a GAAP compliant balance sheet would record "unearned revenue" for policies that Credit Nation sold to investors in the past. (Id. at 67:4-23, 75:10-25, 95:14-25). Unearned revenue is a liability that accounts for the fact that Credit Nation promised to pay premiums on behalf of

investors to whom it sold policies.  (See id. at 67:6-23).  The conclusion the Court

reaches here, considering all of the evidence available to it, including that

presented at the evidentiary hearing, is that Ms. Hartman's analysis properly

presents sufficient evidence of Defendants' finances based on Defendants' own

bank statements and internal accounting records.  Ms. Hartman's Financial

Snapshots are a credible, accurate presentation of Defendants' finances, and are

reliable.

Based on Ms. Hartman's testimony and her Financial Snapshots,

Mr. Freeman's testimony, and the entirety of the evidence in the record, the Court

finds that, during the period alleged by the SEC, Defendants' liabilities exceeded

its assets by a material amount.  Without disclosing these important financial facts,

Defendants made material misstatements when they told investors that the

promissory notes were "100% asset backed" and "backed by hard assets dollar for

dollar."  Defendants made material omissions when they failed to disclose their

losses and true financial circumstances to investors.

The Court also finds Credit Nation's generic risk disclosures are insufficient

to make these misstatements and omissions immaterial.  Defendants claim the

following language in their offering memoranda is sufficient to make its

disclosures not misleading:

> **Operating Deficits.**  The expenses of operating the Company and investment losses could exceed the Company's income, which **could result in the Company's aggregate liability under the Notes exceeding the value of its assets**.  If that occurs, the Company has the right to repay Noteholders less than the principal amount of their Notes.

(2013 Offering Memorandum [21.4] at 19 (ECF Pagination); 2014 Offering

Memorandum [21.5] at 19 (ECF Pagination) (emphasis added)).

Defendants necessarily admit that, when these disclosures were made,

CN Capital had reported losses to the IRS each year since at least 2011.  (See

[48.1]).  Ms. Hartman's largely uncontroverted testimony further supports that

Credit Nation has been unprofitable for years and that its liabilities exceeded its

assets.  Defendants' generic disclosures that the company "could" experience

losses or that its liabilities may exceed its assets did not save Defendants'

misrepresentations, and they otherwise were affirmatively, materially misleading.

As the Eleventh Circuit stated in Merchant Capital, "[t]o warn that the untoward

may occur when the event is contingent is prudent, to caution that it is only

possible for the unfavorable events to happen when they have already occurred is

deceit."  483 F.3d at 747.  Here, the SEC presents ample evidence that the

unfavorable events—losses and liabilities that exceed assets—had already occurred

when Defendants made their disclosures, which made those disclosures materially

misleading.  Further, these misstatements and omissions were material because "a

59

reasonable man would attach importance" to them.  See id. at 765.  Reasonable

investors, aware of the truth of the information represented to them and the status

of Defendants' financial health withheld from them, would have been hesitant to

make the investment offered.

The SEC has met its burden to satisfy the first two elements required to

establish a prima facie case of a violation of the Anti-Fraud Provisions of the

securities laws.  The Court now addresses the final element of scienter.[34]

(2)     Scienter

As the Eleventh Circuit explains:

> Scienter may be established by a showing of knowing misconduct or
> severe recklessness.  Proof of recklessness requires a showing that the
> defendant's conduct was an extreme departure of the standards of
> ordinary care, which presents a danger of misleading buyers or sellers
> that is either known to the defendant or is so obvious that the actor
> must have been aware of it.

SEC v. Monterosso, 756 F.3d 1326, 1335 (11th Cir. 2014) (alterations omitted)

(quoting Carriba, 681 F.2d at 1324).  Scienter can be established through

circumstantial or direct evidence.  Id. (citing SEC v. Ginsburg, 362 F.3d 1292,

1298 (11th Cir. 2004)).

---

[34]     To show that Defendants violated Sections 17(a)(2) and 17(a)(3), the SEC need only show negligence, rather than scienter.  Merchant Capital, 483 F.3d at 766.

The evidence here shows that Defendants were, at the very least, severely reckless in offering the promissory notes for sale to investors.  Defendants admit CN Capital had reported losses to the IRS each year since at least 2011, ([48.1]), but failed to inform investors of their poor financial health, choosing to instead state that Credit Nation *could* incur losses rather than had actually incurred significant losses by the time the representations were made to investors. Mr. Torchia testified that Credit Nation reported losses in 2011, 2012, and 2013. (Tr. at 271:2-8).  He testified that Defendants "told [investors] we *could* run at a loss.  And I don't think it's my duty to tell [investors] that we *are* running at a loss."  (Id. at 277:23-278:3 (emphasis added)).  This evidence alone is sufficient to support a finding of scienter.[35]  It certainly is evidence of Mr. Torchia's and Defendants' belief they were not obligated to be truthful about their financial status.

Beyond operating losses, at the end of 2014, Credit Nation had approximately $32 million in liabilities and assets consisting only of about $2.8 million in outstanding principal on auto loans, life settlements with a maturity value of approximately $13.3 million, and about $1 million in cash.  It is incredible

---

[35]    Ms. Hartman testified that the individuals responsible for accounting at Credit Nation "were not trained accountants," and that this was unusual for a company the size of Credit Nation, (see Tr. at 13:19-22, 14:5-20), supporting that Defendants' practices at least deviated from the standards of ordinary care.

that a company faced with such a financial condition—even if the details were unclear—was oblivious to it.  The Court finds that Credit Nation's financial situation was "so obvious that [Mr. Torchia and Defendants] must have been aware of it."  Monterosso, 756 F.3d at 1335.  Indeed, the Court finds that Mr. Torchia knew of Defendants' precarious financial status, that it was trending worse, and chose not to disclose it.

Credit Nation's 2015 purchase of $6 million in life insurance policies further supports that Mr. Torchia acted with scienter.  Faced with an SEC investigation, Credit Nation purchased $6 million in life insurance policies, and Mr. Torchia and Defendants now claim—despite all evidence to the contrary—that the market value of those policies is $35 to $40 million, rendering Credit Nation solvent.  This sort of arbitrary valuation sleight of hand, offered by a CEO whose testimony was not credible, shows an "extreme departure from the standards of ordinary care" that presented so obvious a danger of misleading buyers that Mr. Torchia "must have been aware" of the risk.  See SEC v. Imperiali, Inc., 594 F. App'x 957, 961 (11th Cir. 2014) (quoting Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001)).  Further, the circumstances surrounding Credit Nation's purchase of the policies, and their arbitrarily-inflated valuation of them, supports the reasonable inference that Credit Nation purchased the policies to inflate artificially its assets

on its balance sheet.  This inference further supports the Court's determination that Mr. Torchia acted with scienter.[36]  Because Mr. Torchia controls the other Defendants, his scienter is imputed to them.  SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1089 n.3, 1096 n.16 (2d Cir. 1972).

The Court finds that the SEC has shown, by a preponderance of the evidence, that Defendants violated the Anti-Fraud Provisions.

### 2.    Likelihood the Wrong Will Be Repeated

Having established their prima facie case of securities violations, the SEC must establish a reasonable likelihood that the wrong will be repeated.  Indicia that a wrong will be repeated include:  (1) the egregious nature of Defendants' actions; (2) the isolated or recurrent nature of the violations; (3) the degree of scienter involved; (4) the sincerity of Defendants' assurances; (5) Defendants' recognition of the wrongful nature of their conduct; and (6) the likelihood that Defendants' present occupations will present opportunities for future violations.  Salvo, 378 F.3d at 1216 (quoting Carriba, 681 F.2d at 1322).

---

[36]    Even if the Court had not found Defendants acted with scienter, the SEC met its lesser burden to show, for purposes of Sections 17(a)(2) and 17(a)(3), that Defendants acted with "negligence."  See Merchant Capital, 483 F.3d at 766. Violations of Sections 17(a)(2) and 17(a)(3) also support the issuance of the injunction the Court orders in this case.

Defendants argue that a preliminary injunction should not be issued, including because they "already agreed to discontinue the sale of 9% promissory notes pending resolution of the SEC's" Preliminary Injunction Motion, they are currently "revising [their] offering documents," and they "asked [their] forensic accountant to provide recommendations for improving [their] accounting processes . . . ." ([26] at 15-16).  This is too little, too late.

The Court finds the SEC has shown a reasonable likelihood of future violations.  Defendants' conduct, in light of their financial situation, is egregious: Defendants have repeatedly sold and solicited "100% asset backed" promissory notes with a "9% fixed return" knowing—or at least recklessly disregarding—that Credit Nation was unprofitable and that its financial situation was deteriorating. Despite their assurances that they are revising their offering documents, Defendants have not presented any assurances that they will not continue to violate federal securities laws now or in the future.  Defendants also have not recognized the wrongful nature of their acts, maintaining that their finances and their business model are sound.  Defendants' present occupations—selling Sub-Prime Auto Loans and LS Interests—clearly present opportunities for future violations.  Credit Nation continues to seek to sell promissory notes and LS interests, claiming that its financial management is responsible and its financial condition enviable, and that

64

the SEC simply misunderstands its business model.  The core facts are, however, that Credit Nation has operated at a loss for years, its liabilities substantially exceed its assets, and its financial situation is deteriorating.  Defendants' continuing financial and management issues support a reasonable likelihood of future securities violations.  To the extent Mr. Torchia claims he is seeking to reform his companies' operations to comply with SEC requirements, the Court does not believe him.  Rather his "fight it to the death" approach to business and court obligations, (Tr. at 273:9-10), supports that reform is not reasonable to expect.

The SEC has established a prima facie case of previous violations of federal securities laws, as well as a reasonable likelihood that the wrong will be repeated. The SEC has thus satisfied both requirements for a preliminary injunction pending the outcome of this litigation.[37]  See Unique Fin. Concepts, 196 F.3d at 1199 n.2. Having determined that the SEC has met its burden to show that a preliminary injunction is warranted, the Court addresses whether an asset freeze should be imposed and a receiver appointed.

---

[37]    The Court notes, however, that additional discovery will be taken in this matter and that neither party should infer from this preliminary decision that the Court's findings and rulings will be unaffected by a full trial on the merits of this action.  SEC v. Shiner, 268 F. Supp. 2d 1333, 1343 (S.D. Fla. 2003).

B.    <u>Receiver</u>

In <u>First Fin. Grp.</u>, the former Fifth Circuit Court of Appeals, in a case that is binding precedent here, set out the considerations for the appointment of a receiver in SEC enforcement actions:

> The appointment of a receiver is a well-established equitable remedy available to the SEC in its civil enforcement proceedings for injunctive relief.  The district court's exercise of its equity power in this respect is particularly necessary in instances in which the corporate defendant, through its management, has defrauded members of the investing public; in such cases, it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste to the detriment of those who were induced to invest in the corporate scheme and for whose benefit, in some measure, the SEC injunctive action was brought.  As the Seventh Circuit stated in <u>Securities and Exchange Commission v. Keller Corporation</u>, 323 F.2d 397, 403 (7th Cir. 1963):
>
> > The prima facie showing of fraud and mismanagement, absent insolvency, is enough to call into play the equitable powers of the court.  It is hardly conceivable that the trial court should have permitted those who were enjoined from fraudulent misconduct to continue in control of (the corporate defendant's) affairs for the benefit of those shown to have been defrauded.  In such cases the appointment of a trustee-receiver becomes a necessary implementation of injunctive relief.
>
> Thus, the appointment of a temporary receiver is often a necessary ancillary form of relief in a SEC civil enforcement action for injunctive relief.  And it was for this purpose to insure complete enforcement of the federal securities laws that the appointment of a temporary receiver was requested by the SEC and granted by the district court in the instant case.

645 F.2d at 438 (citations omitted).[38]

The Court determines that the evidence presented to it proves that Credit Nation's management, and financial position, are not sound.  The Court is unconvinced Credit Nation will act responsibly between now and trial.  The evidence also shows that Credit Nation reported losses every year since at least 2011, and that, based on Ms. Hartman's analysis of Credit Nation's profits and losses from 2014 to 2015, its losses are accelerating, (Tr. at 126:8-15; see also Pl.'s Ex. 1; Pl.'s Ex. 2).  Under these circumstances, "the appointment of a []receiver [is] a necessary implementation of injunctive relief."  First Fin. Grp., 645 F.2d at 438 (citing Keller Corp., 323 F.2d at 403).[39]

That Mr. Torchia and Credit Nation's employees appear to be, at the very

---

[38]     District courts have recently applied the standard articulated in First Fin. Grp.  See, e.g., SEC v. Evolution Capital Advisors, LLC, 866 F. Supp. 2d 661, 668 (S.D. Tex. 2011) ("[U]pon a showing of fraud and mismanagement, appointment of a receiver becomes a necessary implementation of injunctive relief" (internal quotation marks omitted)); SEC v. AmeriFirst Funding, Inc., Civil Action No. 3:07-cv-1188-D, 2007 WL 2192632, at *3 (N.D. Tex. July 31, 2007).

[39]     Defendants argue that, in deciding whether a receiver should be appointed, the Court should consider the availability of less severe equitable remedies and the probability that a receiver may do more harm than good.  ([26] at 14-15).  Defendants do not provide any authority that, in the context of an SEC civil enforcement action, the Court should take these factors into consideration.  The Court finds that, in any event, given Defendants' deteriorating financial situation, a receiver is required, less severe equitable remedies would not suffice, and a receiver would not do more harm than good.

least, severely reckless in their handling of their finances and the running of their

business, further supports that a receiver is required.  Mr. Torchia testified that he

and his company are "the best in the world" at buying and selling insurance

policies, but he showed little grasp of the process by which a life insurance policy

is valued, or was unwilling to disclose it to the Court.  His answers were evasive

and general.  For instance, he stated he buys certain policies "[b]ecause we feel

that the life expectancies in certain areas are off," and that he is "looking for

homeruns and . . . for potential."  (Tr. at 214:3-20).  He stated that he is "just not a

very good accountant.  We have outside CPAs that were brought in to set up the

systems that were in place . . . .  Accounting is not my strong suit."  (Id.

223:25-224:6).  Yet Ms. Hartman testified that the individuals responsible for

accounting at Credit Nation "were not trained accountants," and that this was

unusual for a company the size of Credit Nation.  (See id. at 13:19-22, 14:5-20).

Ms. Green, Mr. Torchia's own financial manager, could not explain the purpose of

Mr. Torchia's nearly $3 million in loans to CN Auto from 2007 to 2013.  (Id. at

315:18-316:20).  The testimony presented at the preliminary injunction hearing and

the evidence in the record shows numerous undocumented, unverified, or

unexplained transactions between Mr. Torchia and other entities, supporting that

Mr. Torchia and his staff are unable or unwilling to manage their finances.  (See,

e.g., id. at 40:14-16 (CN Auto paid the payroll of both CN Auto and AMC); id. at

54:9-15 (money flow between Credit Nation and RiverGreen tracked on

spreadsheet by Mr. Torchia's employees); Pl.'s Ex. 2 at 39 (non-collectable loan to

CN Auto of $6.4 million at the end of 2014); Pl.'s Ex. 1 at 5-6 and Pl.'s Ex. 2 at

17-19 (Mr. Torchia directed the transfer of hundreds of thousands of dollars to CN

Auto, Spaghetti Junction, National Viatical, RiverGreen, Willie West, Jason's

Automotive, and Sixes Tavern); Tr. at 328:2-20 (no documentation memorializing

loans from Mr. Torchia or Credit Nation to Spaghetti Junction); id. at 304:24-305:5

(no loan agreements in place memorializing Mr. Torchia's loans to Credit Nation

and other entities)).  These findings further support that a receiver is required in

this case.

   C.   Asset Freeze

   A district court may exercise its full range of equitable powers, including an

asset freeze, to preserve sufficient funds for the payment of a disgorgement award.

FTC v. U.S. Oil & Gas Corp., 748 F.2d 1431, 1433-34 (11th Cir. 1984); see also

Levi Strauss & Co. v. Sunrise Int'l Trading Co., 51 F.3d 982, 987 (11th Cir. 1995).

Freezing assets is a well accepted equitable remedy employed to "preserve the

status quo" and is proper in actions arising under the Securities Act.  SEC v. ETS

Payphones, Inc., 408 F.3d 727, 734-35 (11th Cir. 2005) (citing United States

v. Oncology Assocs., 198 F.3d 489, 494-99 (4th Cir. 1999)); see also Levi Strauss, 51 F.3d at 987 (a request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze).

In light of Credit Nation's precarious financial situation and inability or unwillingness to manage its finances, the Court concludes an asset freeze is justified and appropriate to preserve the status quo and to preserve sufficient funds for the payment of any disgorgement award.[40]  The Court notes that there already are in place certain restrictions on Defendants' business and use of assets pursuant to the November 20, 2015, and January 13, 2016, Consent Orders.

IV.   **CONCLUSION**

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss [21] is **DENIED**.

**IT IS FURTHER ORDERED** that the SEC's TRO Motion [2] is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that the SEC's Preliminary Injunction Motion [20] is **GRANTED**.  The specific terms of the injunction are as follows:

---

[40]     The SEC's TRO Motion seeks the same relief as its Preliminary Injunction Motion.  Because the Court grants the SEC's Preliminary Injunction Motion, it denies as moot the SEC's TRO Motion.

## PRELIMINARY INJUNCTION ORDER

### I.     ENJOINING VIOLATIONS

**IT IS HEREBY ORDERED** that Defendants and their agents, servants, employees, attorneys, and all persons in active concert or participation with them are enjoined from violating, directly or indirectly:

A.    Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a), (b) and (c) promulgated thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

  1.    to employ any device, scheme, or artifice to defraud, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

  2.    to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, by providing false or misleading information or omitting to provide material information to actual or prospective investors concerning the performance, return, existence, use or disposition of investor funds.

B.    Section 17(a)(1), (2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (2) and (3)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by

use of the mails, directly or indirectly:

1.      to employ any device, scheme, or artifice to defraud;

2.      to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, or

3.      to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser; by providing false or misleading information or omitting to provide material information to actual or prospective investors concerning the performance, return, existence, use or disposition of investor funds.

C.      Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), (c)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly to offer to sell securities, through the use or medium of any advertisement, placement memoranda or otherwise, without a registration statement having been filed with the SEC as to such securities.

D.      Defendants are specifically enjoined from making the representations and omissions identified in this Order or representations and omissions regarding rates of return and Defendants' financial status in connection with the sale of securities based on sub-prime auto loans, life insurance settlements, or the sale of fractional interests in life settlement contracts.

## II.   PRESERVING RECORDS

**IT IS FURTHER ORDERED** that Defendants and their officers, directors, agents, employees, servants, managers, general and limited partners, trustees, employees, attorneys and accountants, any bank or financial institution holding any assets of Defendants and all persons or entities in active concert or participation with them, and each of them, are restrained and enjoined from destroying, transferring or otherwise rendering illegible all books, records, papers, ledgers, accounts, statements and other documents employed in any of such Defendants' business, which reflect the business activities of Defendants, including those described in the Complaint in this action.

## III.   FREEZING OF ASSETS

**IT IS FURTHER ORDERED** that the assets of Defendants be, and hereby are, frozen. The "Assets" are defined as any money, investment, property of any kind, or any other thing of value, tangible or intangible, including those in which one or more of Defendants has a beneficial interest that, in whole or in part, was derived from, was acquired using, was used in connection with or otherwise related to, or the result of, the conduct alleged in the Complaint in this action. The freeze shall include, but not be limited to, those funds in any bank accounts, brokerage accounts, mutual funds, hedge funds and any other accounts or property of any

Defendant.  Defendants and their officers, directors, agents, employees, servants, managers, general and limited partners, trustees, employees, attorneys and accountants, and all persons in active concert or participation with them, except the Receiver appointed by this Court, hereby are restrained from, directly and indirectly, transferring, setting off, receiving, changing, selling, pledging, encumbering, assigning, liquidating or otherwise disposing of or withdrawing the Assets.

Any bank, brokerage firm, mutual or other fund, other financial firm and institution, or any other person, partnership, corporation or other entity maintaining or having custody or control of any of the Assets shall:

1.    freeze such Assets;

2.    within five (5) business days of receipt of such notice, file with the Court and serve on counsel for the SEC and for Defendants, a statement setting forth, with respect to such Assets, or account in which Assets are maintained, the balance in the account or the description of the Assets as of the close of business on the date of the receipt of the notice; and

3.    promptly cooperate with the Receiver and the SEC to determine whether and to what extent any accounts, funds or other assets are actually assets or proceeds of assets of any of the Defendants.

## IV.   **APPOINTMENT OF RECEIVER:  GENERAL PROVISIONS**

**IT IS FURTHER ORDERED** that a Receiver be appointed in this action to marshal and preserve the Assets.  Mr. Al B. Hill of Taylor English Duma LLP in Atlanta, Georgia is determined by the Court to be uniquely qualified to serve as Receiver, and he is appointed the Receiver in this matter.[41]  Mr. Hill has immediate exclusive jurisdiction and possession of the Assets, and the property, real and personal, including cash, securities, receivables and accounts, of Defendants.

If the Receiver seeks to resign his appointment as Receiver, the Receiver shall first give written notice to counsel of record in this case, and the Court, of the Receiver's request to resign.  The resignation must be approved by the Court under any terms or conditions set by the Court.

This Court shall retain jurisdiction over any action filed against the Receiver and any persons retained to assist the Receiver to perform the duties required by the Receiver.

---

[41]     Mr. Hill advises that he intends to engage lawyers at his firm to assist him to fulfill his duties as Receiver.  He has represented the hourly rates for the levels of the attorneys he expects to request to work on this engagement.  The Court finds the hourly rates for Mr. Hill and the attorneys he intends to engage to assist him are reasonable in the Atlanta market for legal services.  The Court will, at a later date, approve the engagement of his firm to provide legal services to him in connection with the Receivership.

## V.    AUTHORITY OF THE RECEIVER

**IT IS FURTHER ORDERED** that the Receiver shall have all the powers, authorities, rights and privileges as those that would be exercised by the officers, directors, managers and general and limited partners of the Defendants under state and federal law, by the Defendants' governing charters, by-laws, articles or agreements, in addition to all powers and authority of a receiver at equity, and those powers conferred on a receiver under 28 U.S.C. §§ 754, 959 and 1692, and Fed. R. Civ. P. 66.

The officers, directors, trustees, managers, general and limited partners, employees, investment advisors, attorneys, accountants, and other employees or agents of the Defendants (collectively, the "Managers") may be dismissed by the Receiver, in the Receiver's discretion.  The powers and authorities of officers, general partners, directors, managers and agents of the Defendants are suspended upon entry of this Order.  The Managers shall not have any power or authority with respect to the Defendants' operations or assets, until such time as power or authority may be expressly granted by the Receiver.

The Receiver shall assume and control the operation of Defendants.  No person other than the Receiver and those authorized by the Receiver to act on the Receiver's behalf shall possess any authority to act by or on behalf of any of the

Defendants while this injunction is in effect.

The Receiver shall have the following general powers and duties:

1.    to use reasonable efforts to determine the nature, location and value of all Assets;

2.    to take custody, control and possession of all Assets and records relating to them; to sue for and collect, recover, receive and take into possession any Assets in the custody, possession or control of third parties.  All persons and entities having control, custody or possession of any Assets or documents relating to them are hereby directed to turn such property over to the Receiver;

3.    to manage, control, operate and maintain the Assets;

4.    to use the Assets solely for the benefit of Defendants' businesses that are the subject of the Complaint, making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business in discharging the duties of Receiver;

5.    to engage and employ persons who, in the Receiver's discretion, will assist in carrying out the Receiver's duties and responsibilities, including, but not limited to, accountants, attorneys, securities traders, registered representatives, financial or business advisers, liquidating agents, real estate agents, forensic experts, brokers, traders or auctioneers;

6.    to take necessary and appropriate action to preserve the Assets or to prevent the dissipation or concealment of Assets;

7.    to issue subpoenas for documents and testimony consistent with the Federal Rules of Civil Procedure;

8.    to bring appropriate legal actions allowed in state, federal, or foreign court as the Receiver deems necessary or appropriate to

discharge his duties as Receiver;

9.      to pursue and defend all suits, actions, claims and demands
        which may now be pending or which may be brought by or
        asserted against the Defendants arising out of their businesses;
        and

10.     to take such other action as may be approved by this Court.

## VI.   REPORTS REQUIRED

**IT IS FURTHER ORDERED** that, while this injunction is in effect, the

following written reports are required:

A.      Within fourteen (14) calendar days of the entry of this Order, Defendants

        shall file with the Court and serve upon the Receiver and counsel for the

        parties a sworn statement, listing:  (a) the identity, location and estimated

        value of all Assets; (b) all employees (and job titles thereof), other

        personnel, attorneys, accountants and any other agents or contractors of

        Defendants; and, (c) the names, addresses and amounts of claims of all

        known creditors and investors of the Defendants.

B.      Within thirty (30) days of the entry of this Order, Defendants shall file with

        the Court and serve upon the Receiver and counsel for the parties a sworn

        statement and accounting, with complete documentation, covering the period

        from **January 1, 2012**, to the present, and providing the following

        information:

1.      all Assets, wherever located, held by or in the name of Defendants, or in which any of them, directly or indirectly, has or had any beneficial interest, or over which any of them maintained or maintains or exercised or exercises control;

2.      every account at every bank, brokerage or other financial institution:  (a) over which Defendants have signatory authority; and (b) opened by, in the name of, or for the benefit of, or used by, Defendants;

3.      all credit, bank, charge, debit or other deferred payment card issued to or used by each Defendant and their officers, directors, employees and other agents, including but not limited to the issuing institution, the card or account number(s), all persons or entities to which a card was issued and with authority to use a card, the balance of each account and card as of the most recent billing statement, and all statements for the last twelve months;

4.      all Assets received by any of them from any person or entity, including the value, location, and disposition of any assets so received; and

5.      all funds received by Defendants, and each of them, in any way related, directly or indirectly, to the conduct alleged in the Complaint.  The submission must clearly identify, among other things, all investors, the securities they purchased, the date and amount of their investments, and the current location of such funds; and

6.      all expenditures and transfers exceeding $1,000 made by any of them, including those made on their behalf by any person or entity.

C.      Within thirty (30) calendar days of the entry of this Order, Defendants shall

provide to the Receiver and counsel for the parties copies of Defendants'

federal income tax returns for 2012 through the present with all relevant and necessary underlying documentation.

D.      The Receiver is authorized, empowered and directed to develop a plan for the fair, reasonable, and efficient recovery and management of all remaining, recovered, and recoverable, Assets (the "Asset Plan").  Within ninety (90) days of the entry date of this Order, the Receiver shall file the Asset Plan in this action, with service copies to counsel of record.

E.      Within thirty (30) days after the end of each calendar quarter, the Receiver shall file and serve a full report and accounting of the Assets (the "Quarterly Status Report"), reflecting (to the best of the Receiver's knowledge as of the period covered by the report) the existence, value, and location of all Assets, and of the extent of liabilities, both those claimed to exist by others and those the Receiver believes to be legal obligations of Defendants.  The Quarterly Status Report shall contain the following:

1.      a summary of the operations of the Receiver;

2.      the amount of cash on hand, the amount and nature of accrued administrative expenses, and the amount of unencumbered funds in the estate;

3.      a schedule of all the Receiver's receipts and disbursements (attached as Exhibit A to the Quarterly Status Report), with one column for the quarterly period covered and a second column for the period from the inception of the receivership;

4.  a description of all known Assets, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended;

5.  a description of liquidated and unliquidated claims of Defendants, including the need for forensic and/or investigatory resources; approximate valuations of claims; and anticipated or proposed methods of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and, (ii) collecting such judgments);

6.  a list of all known creditors and investors with their addresses and the amounts of their claims;

7.  the status of creditor and investor claims proceedings, after such proceedings have been commenced; and

8.  the Receiver's recommendations for continuation or discontinuation of the receivership, and the reasons for the recommendations.

F.  Within ten (10) days after the entry of this Order, Defendants shall file with the Court and serve upon the Receiver and counsel for the parties a list of each proceeding of any kind, including, but not limited to, administrative, civil, or criminal, in which one or more of the Defendants or their officers, directors, employees or agents is a party.  The list shall provide a detailed summary of each proceeding.

## VII.   DEFENDANTS' REQUIREMENTS

**IT IS FURTHER ORDERED** that, in addition to the other requirements set out in this Order:

A.   Defendants and the past and present officers, directors, agents, managers, general and limited partners, trustees, attorneys, accountants and employees of the entity Defendants, as well as those acting in their place, are hereby ordered and directed to:

1.   preserve and deliver to the Receiver, within ten (10) calendar days of the entry of this Order, all paper and electronic information relating to Defendants and all Assets; such information shall include but not be limited to books, records, documents, accounts and all other instruments and papers;

2.   assist the Receiver in fulfilling the Receiver's duties and obligations. They must respond promptly and truthfully to all requests for information and documents from the Receiver; and

3.    answer, including under oath if required by the Receiver, all questions which the Receiver may ask and produce all documents required by the Receiver regarding the business of Defendants, or any other matter relevant to the operation or administration of the receivership or the collection of funds due to Defendants.  The questions may be asked in writing or by any means allowed by the Federal Rules of Civil Procedure.

B.   Any persons acting for or on behalf of Defendants, and any persons receiving notice of this Order by personal service, facsimile transmission or otherwise, having possession of the property, business, books, records,

accounts or assets of the Defendants are hereby directed to promptly contact the Receiver to discuss delivery of such records to the Receiver.

## VIII.  <u>FINANCIAL INSTITUTION REQUIREMENTS</u>

**IT IS FURTHER ORDERED** that all banks, brokerage firms, financial institutions, and other persons, corporations, partnerships or entities which have possession, custody or control of any Assets in the name or for the benefit, directly or indirectly, of Defendants that receive actual notice of this Order by personal service, or any other means shall:

1.  not liquidate, transfer, sell, convey or otherwise transfer any assets, securities, funds, or accounts in the name of or for the benefit of Defendants except upon instructions from the Receiver;

2.  not exercise without the permission of the Court, any form of set-off, alleged set-off, lien, or any form of self-help whatsoever, or refuse to transfer any funds or assets to the Receiver's control;

3.  within seven (7) calendar days of receipt of that notice, file with the Court and serve on the Receiver and counsel for the parties a statement setting forth, with respect to each such account or other asset not identified pursuant to Section III above, the balance in the account or description of the assets as of the close of business on the date of receipt of the notice; and

4.  cooperate immediately to provide information and to transfer funds, assets and accounts to the Receiver or at the direction of the Receiver.

## IX.   INTERFERING WITH RECEIVER

**IT IS FURTHER ORDERED** that Defendants and all persons receiving

notice of this Order by personal service, or any other means, are hereby restrained

and enjoined from directly or indirectly taking any action, or causing any action to

be taken, without the express written agreement of the Receiver, which would:

1. interfere with the Receiver's actions to take control, possession, or management of any Assets; such prohibited actions include but are not limited to, using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or interfering with or creating or enforcing a lien upon any Assets;

2. hinder, obstruct or otherwise interfere with the Receiver in the performance of his duties; such prohibited actions include, but are not limited to, concealing, destroying or altering records or information;

3. dissipate or otherwise diminish the value of any Assets; such prohibited actions include but are not limited to, releasing claims or disposing, transferring, exchanging, assigning, encumbering, or in any way conveying any Assets, enforcing judgments, assessments or claims against any Assets or any Defendant, attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate (the due date), of any lease, loan, mortgage, indebtedness, security agreement or other agreement executed by any Defendant or which otherwise affects any Assets; or

4. interfere with or harass the Receiver, or interfere in any manner with the exclusive jurisdiction of this Court over the Assets.

The Receiver shall promptly notify the Court and counsel of record of any

failure or apparent failure of any person or entity to comply in any way with the terms of this Order.

## X.   <u>RECEIVER COMPENSATION</u>

**IT IS FURTHER ORDERED** that the Receiver is entitled to reasonable compensation and expense reimbursement from the Assets.  Compensation payable to the Receiver shall be reasonable and appropriate as determined by the Court.

A.   The Receiver shall apply, on or before the first day of each month, to the Court for compensation and expense reimbursement from the Receivership Estates (the "Monthly Fee Applications").  Each Monthly Fee Application shall:

1.   comply with the terms of compensation agreed to by the Receiver; and,

2.   contain representations that:  (i) the fees and expenses included therein were incurred in the best interests of Defendants; and, (ii) with the exception of the agreement entered into with the Court, the Receiver has not entered into any agreement, written or oral, express or implied, with any person or entity concerning the amount of compensation paid or to be paid from the Receivership Estate, or any sharing thereof.

B.   Monthly Fee Applications will be interim.  At the conclusion of the Receiver's duties, as determined by the Court, the Receiver will file a final fee application (the "Final Fee Application").

C.      Monthly Fee Applications may be subject to a holdback up to 20% of

the fees and expenses approved by the Court upon the submission of

each Monthly Fee Application.  The amounts held back during the

course of the receivership will be considered for payment by the Court

as part of the Final Fee Application.

At the termination of the Receiver's duties, as determined by the Court, the

Receiver shall submit a Final Accounting, in a format to be approved by the Court.

## XI.    TERM OF THE PRELIMINARY INJUNCTION

The purpose of this Preliminary Injunction is to maintain the status quo

while the Court considers whether to enter a permanent injunction in this matter.

As a result, this Preliminary Injunction will be in effect at least until a judgment is

entered in this case.

Counsel for the parties shall immediately send a copy of this Order and

Injunction to each person that they know, or reasonably should know, has

possession, custody and control of any of the Assets, including, but not limited to

banks, brokerage firms, mutual or other funds, and other financial institutions and

firms.

## XII.   STATUS CONFERENCE

**IT IS FURTHER ORDERED** that the Court shall hold, on Wednesday, May 11, 2016, at 10:00 am, a telephonic status conference with counsel for the parties and the Receiver.  Counsel and the Receiver are required, before the status conference, to confer and submit to the Court their joint summary of any disputes or potential disputes regarding the scope or application of this Order, or any practical issues or considerations regarding the enforcement and execution of this Order.

**SO ORDERED** this 25th day of April, 2016.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE