IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                      Plaintiff,<br><br>  v.<br><br>JAMES A. TORCHIA, CREDIT NATION CAPITAL, LLC, CREDIT NATION ACCEPTANCE, LLC, CREDIT NATION AUTO SALES, LLC, AMERICAN MOTOR CREDIT, LLC, and SPAGHETTI JUNCTION, LLC,<br><br>                      Defendants. | 1:15-cv-3904-WSD |

**OPINION AND ORDER**

This matter is before the Court on the parties' and Receiver Al Hill's ("Receiver") briefs regarding the disposition of insurance policies held by Defendants James A. Torchia, Credit Nation Capital, LLC ("CN Capital"), Credit Nation Acceptance, LLC, Credit Nation Auto Sales, LLC, American Motor Credit, LLC ("AMC"), and Spaghetti Junction, LLC (collectively, "Defendants").[1]

---

[1] American Financial and Retirement Services ("Amicus") filed its Unopposed Motion for Leave to File Amicus Curiae Brief [79] ("Amicus Brief").

## I.   BACKGROUND

A.   Facts[2]

On April 25, 2016, the Court appointed [66] a Receiver for Defendants, finding that Defendants' financial position was not sound and its losses were accelerating. Since taking over Defendants' operations, the Receiver has determined (i) there are different categories of investors in CN Capital assets; (ii) the cash flow of Defendants is insufficient to meet premium payments on insurance policies that are the most valuable assets; and, as a result (iii) CN Capital's operations cannot continue and it must liquidate. On May 2, 2016, the Court held a status conference during which the Court asked the parties and the Receiver to brief the manner in which Defendants' promissory note purchasers and purchasers of interests in life insurance policies ("LS Interests") should be treated for purposes of liquidation—that is, whether these investors should participate, pro rata, in the receivership estate, or whether certain categories

---

The Court granted the motion. In the Amicus Brief, the Amicus offers its view on how to treat the insurance policy assets in the receivership.

[2]   The Courts draws the facts largely from the Receiver's Brief to the Court Regarding Liquidation Plans [81]. Except as described below, the parties' briefs do not indicate any disagreement regarding the facts, and the Court finds that the Receiver is in the best position to determine the facts relevant to this Opinion and Order. The Court's April 25, 2016, Order [66] contains a more detailed description of the facts in this case.

of investors, specifically owners or beneficiaries of insurance policies, should be treated differently.

There are three general categories of CN Capital investors:  (1) those who loaned money to CN Capital in return for a promissory note equal to the amount of the loan ("Promissory Note Investors"); (2) investors who purchased life insurance policies where the investor was named the sole beneficiary of the death benefits ("Direct Investors"); and (3) investors who purchased, with others, a fractional interest in life insurance policies where CN Capital or Mr. Torchia individually was the sole beneficiary of the death benefit ("Indirect Investors").

CN Capital guaranteed Promissory Note Investors a 9% return on their investment.  CN Capital commingled the amounts loaned with other assets of CN Capital.  One use of the commingled funds was to buy subprime auto loans and fractional interests in life insurance policies.  CN Capital named itself or Mr. Torchia as the beneficiary of life insurance policies it bought with promissory note proceeds.

The Direct Investors purchased specific, identifiable policies and they are the named beneficiary of all or a portion of the death benefit payable under the policies.  The Receiver states that, "[w]hile the Direct Investors' policies have been fully assigned, [CN Capital] has paid and continues to pay the entire premiums on

3

the policies." ([81] at 5). In its Amicus Brief, the Amicus states that some Direct Investors agreed to have CN Capital pay premiums, while "sometimes it has been agreed that [CN Capital] will bill the Owner/Purchaser for all premiums," which the Owner/Purchaser paid. (Amicus Br. at 4). Similar to Direct Investors, Indirect Investors purchased all or portions of life insurance policies from CN Capital, but, unlike the Direct Investors, CN Capital—or James Torchia or another CN Capital officer individually—was the named owner and beneficiary of the policy and CN Capital paid the policy premiums.

The Receiver states that, after interviewing employees of CN Capital, he found that CN Capital comingled funds, and "treated Promissory Note Investor funds, Direct Investor funds, and Indirect Investor funds as fungible and available for any investment, payment, or expense." ([81] at 7). The Receiver states that CN Capital's cash flow is insufficient to pay all premiums due on life insurance policies, and that, if the premiums are not paid, the policies will lapse resulting in a complete loss of the value of the policies. He also states that CN Capital's operations cannot continue and it must be liquidated, including by selling its principal asset, the life insurance policies.

B.  The Parties' and Receiver's Positions

On May 6, 2016, Plaintiff Securities and Exchange Commission ("SEC") filed its Brief Regarding the Disposition of Certain Insurance Policies Owned by the Defendants [78].  On May 9, 2016, the Receiver filed the Receiver's Brief to the Court Regarding Liquidation Plans [81], and Defendants filed their Brief Regarding the Disposition of Insurance Policies Owned and/or Held by Defendants [85].

The Receiver outlines five options for liquidating the life insurance policies: (1) continue to sell CN Capital and AMC assets, including insurance policies, in order to pay premiums on other policies, including those sold to Direct and Indirect Investors; (2) assign the premium payment obligation to the Direct Investors on the policies on which they are named beneficiaries, allowing them to retain their assigned death benefit or to sell the policy if they prefer; (3) offer the same option to the Indirect Investors, then record the appropriate assignments directly with the insurers to put the Indirect Investors in the same position as Direct Investors; (4) follow the procedures outlined in (2) and (3) above, but require the Direct and Indirect Investors to repay all premiums previously paid by CN Capital, allowing, upon election, payment from the death benefit when realized; or (5) treat the policies owned by either Direct Investors or Indirect Investors, or both, as "pooled"

assets of CN Capital because CN Capital paid all premiums, then sell all policies in bulk or individually. ([81] at 9). The Receiver argues that the majority of courts who have addressed this asset treatment issue favor options (1) and (5), particularly where, as here, investors' funds were commingled. The Receiver argues that pooling—that is, pro rata distribution—of Defendants' assets is appropriate for all categories of investors, including Direct Investors, because the Direct Investors "would have had no policy in force had [CN Capital] not [initially] paid the premiums with funds derived in part from the other investors." (Id. at 9-10).

The SEC also urges pooling. It argues that receivers in SEC enforcement actions typically make a pro rata distribution of assets of the receivership estate to fraud victims, even when certain assets or funds may be traceable to an individual investor. ([78] at 5). The SEC notes, however, that with respect to "the small subset of [LS Interest] investors to whom Defendants actually transferred ownership of the underlying policy"—that is, Direct Investors—"they should likely be permitted to keep the policies (and pay the premiums going forward), subject to the right of the receiver to recover any fictitious profits resulting from [CN Capital]'s past payment of premiums on the policies." (Id. at 3 n.2).

The Amicus argues that life settlement policies that have been "wholly" sold to Direct Investors and Indirect Investors should be transferred to the investors

under certain circumstances. (Amicus Br. at 7). The Amicus states that the Direct and Indirect Investors of whole policies "appointed [CN Capital] to act as their agent for the purpose of acquiring and servicing all or a specific portion of an interest in a specific life settlement policy." ([79.1] at 3). For the Indirect Investors, the Amicus argues the sole purpose of keeping the policies in CN Capital's name was to facilitate the servicing of the policies, which included monitoring the insured's status, obtaining annual statements from insurance companies, and applying for death benefits. (Id. at 4). The Amicus notes that, for some Investors, the parties agreed that CN Capital was responsible for paying premiums, and for others, CN Capital billed the investor for premium payments. (Id.). The Amicus argues that CN Capital has no ability to sell policies that it has already sold and holds only for the benefit of others, because an agent cannot sell the principal's property for the agent's own benefit. (Id. at 5-6).

Defendants argue that Direct Investors that own either whole or fractionalized policies should assume premium obligations going forward. ([85] at 2). They argue that "it is unclear how the Court or the Receiver would 'claw back' the [Direct Investor's p]olicies from their owners when the owners are the record beneficiaries of those policies." (Id. at 3). Defendants acknowledge the case law supports that investor losses should be treated equally and distribution of

7

receivership assets should be on a pro rata basis.  (Id.).  They argue, however, that Direct Investors who own whole or fractionalized policies have not yet suffered any losses, and it would be unfair for the Receiver to divest these investors of their ownership interests in their policies, "such divestiture being the proximate cause of actual financial harm to these owners."  (Id. at 4).[3]

## II.   DISCUSSION

The Court has "broad powers and wide discretion to determine the appropriate relief in an equity receivership."  SEC v. Elliott, 953 F.2d 1560, 1566 (11th Cir. 1992); see also SEC v. Drucker, 318 F. Supp. 2d 1205, 1206 (N.D. Ga. 2004).  In cases involving the liquidation of assets by a receiver, courts typically approve either a pro rata distribution or tracing of assets to specific investors.  When victims seeking restitution occupy similar positions, a pro rata distribution is preferred.  Drucker, 318 F. Supp. 2d at 1206 (citing Elliott, 953 F.2d at 1570).  In other words, where claimants occupy essentially the same legal position as other victims, "equity would not permit them a preference; for 'equality is equity.'"  Elliott, 953 F.2d at 1570 (quoting Cunningham v. Brown, 265 U.S. 1, 13 (1924)).

---

[3]   Defendants refer to a category of life settlement policies "held solely by [CN Capital] for the benefit of investors in Defendants' promissory notes."  ([85] at 2).  The Receiver's observations regarding Defendants' comingling of funds undermine that such a category of policies—held solely for promissory note investors—exists.

This principle recognizes that to "allow any individual to elevate his position over that of other investors . . . would create inequitable results, in that certain investors would recoup 100% of their investment while others would receive substantially less." Id. at 1569. "Thus, where a victim seeking preferential treatment cannot materially distinguish his situation from that of other victims, a pro rata distribution is recognized as the most equitable solution." Drucker, 318 F. Supp. 2d at 1207.

Here, the Receiver, the SEC, and Defendants agree that the weight of authority favors a pro rata distribution. ([81] at 10; [78] at 5; [85] at 3). The Court, as a general matter, concludes that a pro rata distribution is the preferred course and one the Court followed in other cases. In reaching this conclusion, the Court finds particularly persuasive the Receiver's finding that CN Capital comingled funds, and "treated Promissory Note Investor funds, Direct Investor funds, and Indirect Investor funds as fungible and available for any investment, payment, or expense." ([81] at 7). Because of this commingling, the funds provided to CN Capital by Direct Investors and Indirect Investors were not necessarily used to purchase the life insurance policies, and the Direct and Indirect Investors cannot "trace" their investments to those policies. As the SEC argues, it would be inequitable to allow some life insurance policy investors to gain most of

the benefit of their bargain while other investors may recover only pennies on the dollar. ([78] at 7).[4] Moreover, both the Direct and Indirect Investors' life insurance policies were kept in force using commingled funds, and the Promissory Note Investors' interest was paid using commingled funds. As the Receiver notes, the life insurance policy investors "would have had no policy in force had [CN Capital] not paid the premiums with funds derived in part from the other investors." ([81] at 9-10). "[T]o allow [a specific class of] investors to elevate their claims by standing on the backs of the other [ ] investors whose funds kept [those] policies viable is not to do equity." Liberte Cap. Grp. v. Capwill, 229 F. Supp. 2d 799, 804 (N.D. Ohio 2002) ("[B]ut for the Liberte investor funds used toward Crivello premiums, the Crivello policy would have lapsed.").

The Court notes, however, that the Direct Investors are named as beneficiaries on their life insurance policies, and this consideration complicates the otherwise straightforward pro rata analysis. The Receiver, the parties, and the Amicus have not identified—and the Court is unable to find—any cases regarding the proper disposition of such policies in a liquidation. As the SEC concedes,

---

[4] The SEC also notes that, if the Court allowed tracing with respect to the Direct and Indirect Investors, investors "with more financial wherewithal and sophistication (and those better able to coordinate with other investors in their policies) will take at a higher rate than less fortunate" investors. ([78] at 7). This consideration also weighs in favor of a pro rata distribution.

Direct Investors "should likely be permitted to keep the policies (and pay the premiums going forward), subject to the right of the receiver to recover any fictitious profits resulting from [CN Capital]'s past payment of premiums on the policies." ([78] at 3 n.2).  The Court agrees.  The Court thus finds it is equitable for the Direct Investors to keep their respective life insurance policies if they remit to the Receiver the value of the benefit they have received from CN Capital.  Because the Direct Investors have until now received, from commingled funds, the benefit of CN Capital's premium payments on, and servicing of, their policies, the Direct Investors are required to remit to the Receiver these fictitious profits—that is, the amount of premiums paid by CN Capital to keep the Direct Investors' policies in force, and the fair market value of other services provided to the Direct Investors by CN Capital.  See Perkins v. Haines, 661 F.3d 623, 627 (11th Cir. 2011) ("Any transfers over and above the amount of the principal [invested in a Ponzi scheme]—i.e., for fictitious profits—are not made for 'value' because they exceed the scope of the investors' fraud claim and may be subject to recovery by a plan trustee.").[5]  The payment to the Receivership of an amount equal to the

---

[5]   Though Perkins involved bankruptcy proceedings, the Eleventh Circuit noted that, "[i]n the case of Ponzi schemes, the general rule is that a defrauded investor gives 'value' to the Debtor in exchange for a return of the principal amount of the investment, but not as to any payments in excess of principal."  661

previous payments paid and the value of services previously rendered returns to the receivership estate the funds wrongfully used to benefit the insurance policy investors. When these restitution payments are made, CN Capital and the Receivership will be relieved of all further obligations as to the Direct Investors' policies, including obligations to service the policies and to pay premiums—obligations that will fall on the Direct Investors who seek to retain their life insurance policies.[6,7] The fictitious profits remitted to the Receiver will be pooled and distributed pro rata among the investors.

A second subset of investors also is atypical. The Amicus claims there are certain Direct, and perhaps Indirect, Investors who own whole life insurance policies for which they assumed the obligation to pay premiums. These investors purportedly contracted with CN Capital only to "service" the life insurance policies owned by the investors. To the extent such investors exist, their situation can be "materially distinguish[ed] . . . from that of other victims," Drucker, 318 F. Supp. 2d at 1207, because commingled funds were used only, if at all, to service the

---

F.3d at 627 (citing Donnell v. Kowell, 533 F.3d 762, 770 (9th Cir. 2008)). This principle remains true in a receivership context. See Donnell, 533 F.3d at 770.

[6] The fair market value of the services will be determined by the Receiver.

[7] If the Direct Investors do not remit their fictitious profits to the Receiver, the Receiver may request the Court to issue an order requiring the Direct Investors to assign their life insurance policy interests to CN Capital or the Receiver.

policies—a relatively minor cost in comparison to paying premium obligations. For such life insurance policy investors, a different treatment is appropriate. Like the Direct Investors, these investors must remit to the Receiver the fair market value of the services provided to them by CN Capital—services that were provided using the commingled funds contributed by the rest of CN Capital's investors.

The Amicus contends that other life insurance policy investors should keep their investments and assume the obligation to pay premiums. The Amicus argues, for instance, that CN Capital has no ability to sell policies that it has already sold and holds only for the benefit of others, because an agent cannot sell the principal's property for the agent's own benefit. ([79.1] at 5-6). This argument is not persuasive in an equity receivership, where the Court has "broad powers and wide discretion to determine the appropriate relief . . . ." Elliott, 953 F.2d at 1566. Even where life insurance policy investors "may well be the actual beneficiaries" and "may well have valid legal claims," "a court sitting in equity has the discretionary authority to deny state law remedies as inimical to the receivership." Liberte Cap. Grp., LLC v. Capwill, 148 F. App'x 426, 434 (6th Cir. 2005). It is well-established that "equitable principles may supersede rights an investor would have under other law to recover its assets through tracing." SEC v. Cred. Bancorp, Ltd., No. 99 CIV. 11395 RWS, 2000 WL 1752979, at *15 (S.D.N.Y.

Nov. 29, 2000) (citing United States v. Vanguard Inv. Co., Inc., 6 F.3d 222, 226 (4th Cir. 1993) ("[E]ven if entitlement [to trace assets] under state law could be established, that wouldn't end the matter in this federal receivership.")); see also Elliott, 953 F.2d at 1569 (disallowing tracing on equitable grounds despite claims of remedy under a contractual theory). The remainder of the investors will recover on a pro rata basis. See Elliott, 953 F.2d at 1570.

### III.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that the Receiver shall distribute Defendants' assets on a pro rata basis, except as follows: (i) Direct Investors shall, consistent with this Opinion and Order, maintain their interests in life insurance policies only if they remit to the Receiver fictitious profits they have received from CN Capital as a result of its premium payments and servicing of their policies; and (ii) a Direct or Indirect Investor who owns 100% of a life insurance policy for which the investor has paid premiums shall, consistent with this Opinion and Order, maintain the investor's interest in the life insurance policy only if the investor remits to the Receiver fictitious profits the investor has received from CN Capital as a result of its servicing of the investor's policy. The payments required to be made under this Order to maintain an interest in a life insurance policy must be paid within twenty

(20) calendar days after the Receiver sends to the investor a statement of the amount of fictitious profits the investor must pay to the Receiver.[8]

**SO ORDERED** this 25th day of May, 2016.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

---

[8] If a Direct or Indirect Investor timely makes the required payments, the investor is wholly responsible to arrange for servicing of his or her policy and the payment of premiums required to maintain the policy in effect.

15