IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>     Plaintiff,<br><br>     v.<br><br>JAMES A. TORCHIA, CREDIT NATION CAPITAL, LLC, CREDIT NATION ACCEPTANCE, LLC, CREDIT NATION AUTO SALES, LLC, AMERICAN MOTOR CREDIT, LLC, and SPAGHETTI JUNCTION, LLC,<br><br>     Defendants. | 1:15-cv-3904-WSD |

## OPINION AND ORDER

This matter is before the Court on Intervenors'[1] Motion to Amend Pooling Order [185] ("Motion to Amend").

---

[1] Honey Investment, Ltd., Faye Bagby as trustee of the Charles G. Quarnstrom and Marjorie E. Quarnstrom Revocable Living Trust, Gaylon Childers as trustee of the Childers' Family Trust, Javier Salgado, Jackie Simmers, Larry Simmers, William Jones, Professional Janitorial Services of Midland, Inc., LG Pump, Inc., Robert Chambers, Mark Darville, Larry Slaughter, Jo-Ann Fugitt, Zane Wallace, Gary Moore, Harry Graham, Judy Slaughter, Gary Broyles, Charles Beck, Shirley Beck, Paul lvey, Louis Nunez, Kathryn Janicek, Donald Jones, Joseph Kramer, Terry McIver, Gary Jones, Luann Sanders, Charles Gibson, Charles Dahlen, Sue Dahlen, Mary Jo Evans, Nelda Couch as executor of the

## I.     BACKGROUND

On May 25, 2016, the Court entered an Order [120] ("May 25th Order") regarding the disposition of insurance policies held by Defendants James A. Torchia, Credit Nation Capital, LLC ("CN Capital"), Credit Nation Acceptance, LLC, Credit Nation Auto Sales, LLC, American Motor Credit, LLC ("AMC"), and Spaghetti Junction, LLC (collectively, "Defendants").  Al Hill, the receiver appointed in this matter ("Receiver") determined that CN Capital's operations cannot continue and it must be liquidated, including by selling its principal asset, the life insurance policies.  The parties disagreed on how to dispose of the life insurance policies, including whether certain life insurance policy holders should keep their investments and assume premium obligations going forward, or whether all investors should receive a pro rata distribution.  In its May 25th Order, the Court—based on the briefs of the parties and Amicus American Financial and Retirement Services—found there are three general categories of CN Capital life insurance investors:  (1) those who loaned money to CN Capital in return for a promissory note equal to the amount of the loan ("Promissory Note Investors"); (2) investors who purchased life insurance policies where the investor was named

---

Estate of Floyd Monroe, deceased and Charlotte Holcomb as trustee of the Charlotte Holcomb Revocable Living Trust.

the sole beneficiary of the death benefits ("Direct Investors"); and (3) investors who purchased, with others, a fractional interest in life insurance policies where CN Capital or Mr. Torchia individually was the sole beneficiary of the death benefit ("Indirect Investors").

After reviewing the relevant case law and the parties' briefs, the Court ordered:

> that the Receiver shall distribute Defendants' assets on a pro rata basis, except as follows: (i) Direct Investors shall, consistent with this Opinion and Order, maintain their interests in life insurance policies only if they remit to the Receiver fictitious profits they have received from CN Capital as a result of its premium payments and servicing of their policies; and (ii) a Direct or Indirect Investor who owns 100% of a life insurance policy for which the investor has paid premiums shall, consistent with this Opinion and Order, maintain the investor's interest in the life insurance policy only if the investor remits to the Receiver fictitious profits the investor has received from CN Capital as a result of its servicing of the investor's policy. The payments required to be made under this Order to maintain an interest in a life insurance policy must be paid within twenty (20) calendar days after the Receiver sends to the investor a statement of the amount of fictitious profits the investor must pay to the Receiver

(May 25th Order at 14-15).[2]

On July 21, 2016, Intervenors filed their Motion to Amend. Intervenors allege they invested money in connection with the Berman, Weeks, Ransom,

---

[2] On June 16, 2016, the Court entered an Order [155] clarifying its May 25th Order. The Court clarified that its May 25th Order applies also to groups of Direct and Indirect Investors who collectively own a policy.

Austin, and Okress Policies.  (Intervenors' First Am. Compl. [181] ¶ 23).[3]
Intervenors seek amendment of the May 25th Order to allow all life insurance policy investors—Direct and Indirect—to take ownership of certain insurance policies without paying fictitious profits.  They contend, among other things, that (i) the distinction between Direct Investors and Indirect Investors is arbitrary, that (ii) Direct and Indirect Investors are, in fact, similarly situated and should be treated similarly, and (iii) that fictitious profits should not be paid to maintain ownership of a policy, including because CN Capital made money off of its sales of insurance policies and investors "pre-paid" premiums in the original purchase price.

In response to Intervenors' Motion to Amend, the Receiver argues that Direct Investors, unlike Indirect Investors, have contractual rights vis-à-vis the insurance companies, because they are listed as owners or beneficiaries of the insurance policies.  The Receiver also points to the documents that the Intervenors executed, which show that Indirect Investors agreed they were not buying "any interest in the life insurance policies," but instead purchased "the right to receive proceeds payable under such life insurance policies . . . ."  ([192.1] ¶ 17).  As to

---

[3]   For all but the Austin policy, which is owned by Leta Edge, the "owner" of each policy is CN Capital.  ([192] at 2).  Intervenors thus appear to be Indirect Investors, as that term is defined in the Court's May 25th Order.

fictitious profits, the Receiver maintains that the Intervenors' policies were kept in force—that is, the premiums were paid—using money that was "hopelessly commingled." ([192] at 3). The Receiver states he "has inquired of [Credit Nation] personnel regarding the company's pricing methodology and has confirmed that the company did not include a pre-paid premium calculation in its pricing." (Id. at 12).

## II. DISCUSSION

As an initial matter, the Court notes that, while the Intervenors style their motion as a "motion to amend," it is, in fact, a motion for reconsideration.[4] Pursuant to Local Rule 7.2(E), "[m]otions for reconsideration shall not be filed as a matter of routine practice." L.R. 7.2(E), NDGa. Rather, such motions are only appropriate when "absolutely necessary" to present: (1) newly discovered evidence; (2) an intervening development or change in controlling law; or (3) a need to correct a clear error of law or fact. Bryan v. Murphy, 246 F. Supp. 2d 1256, 1258-59 (N.D. Ga. 2003) (internal quotations and citations omitted). Motions for reconsideration are left to the sound discretion of the district court and are to be decided as justice requires. Belmont Holdings Corp. v. SunTrust Banks,

---

[4] Intervenors' Motion to Amend is unlike the Receiver's June 14, 2016, "Motion for Clarification," in that the Motion to Amend seeks a fundamental reworking of the Court's May 25th Order.

Inc., 896 F. Supp. 2d 1210, 1222-23 (N.D. Ga. 2012) (citing Region 8 Forest Serv. Timber Purchasers Council v. Alcock, 993 F.2d 800, 806 (11th Cir. 1993)). Intervenors do not identify newly discovered evidence, change in controlling law, or a need to correct a clear error of law or fact. Their Motion instead appears to "instruct the court on how the court 'could have done it better' the first time." Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs, 916 F. Supp. 1557, 1560 (N.D. Ga. 1995), aff'd, 87 F.3d 1242 (11th Cir. 1996). Moreover, Intervenors' Motion is untimely, because a motion for reconsideration must be filed within twenty-eight days after entry of the order about which the party is seeking reconsideration. L.R. 7.2(E), NDGa.[5] Because it is untimely, Intervenors' motion for reconsideration—styled as their Motion to Amend—is denied. Even if the Court considered Intervenors' Motion to Amend, Intervenors' arguments are unpersuasive.

The Court has "broad powers and wide discretion to determine the appropriate relief in an equity receivership." SEC v. Elliott, 953 F.2d 1560, 1566

---

[5] On July 1, 2016, the Court granted Intervenors' motion to intervene. Intervenors nevertheless waited three weeks until July 21, 2016, to file their Motion to Amend. The Motion to Amend, filed almost two months after the Court's May 25th Order, is untimely. The Court also notes that, in determining the distribution of assets in its May 25th Order, the Court considered the arguments of Amicus Honey Investments, Ltd., one of the present Intervenors.

(11th Cir. 1992); see also SEC v. Drucker, 318 F. Supp. 2d 1205, 1206 (N.D. Ga. 2004).  In cases involving the liquidation of assets by a receiver, courts typically approve either a pro rata distribution or tracing of assets to specific investors. When victims seeking restitution occupy similar positions, a pro rata distribution is preferred.  Drucker, 318 F. Supp. 2d at 1206 (citing Elliott, 953 F.2d at 1570).  In other words, where claimants occupy essentially the same legal position as other victims, "equity would not permit them a preference; for 'equality is equity.'" Elliott, 953 F.2d at 1570 (quoting Cunningham v. Brown, 265 U.S. 1, 13 (1924)). This principle recognizes that to "allow any individual to elevate his position over that of other investors . . . would create inequitable results, in that certain investors would recoup 100% of their investment while others would receive substantially less."  Id. at 1569.  "Thus, where a victim seeking preferential treatment cannot materially distinguish his situation from that of other victims, a pro rata distribution is recognized as the most equitable solution."  Drucker, 318 F. Supp. 2d at 1207.

In determining the appropriate method of distribution in its May 25th Order, the Court noted that the Receiver, the SEC, and Defendants agreed that the weight of authority favors a pro rata distribution in this case.  (May 25th Order at 9).  The Court found "particularly persuasive the Receiver's finding that CN Capital

7

comingled funds, and treated Promissory Note Investor funds, Direct Investor funds, and Indirect Investor funds as fungible and available for any investment, payment, or expense."  (Id. (internal quotations omitted)).  "Moreover, both the Direct and Indirect Investors' life insurance policies were kept in force using commingled funds, and the Promissory Note Investors' interest was paid using commingled funds."  (Id. at 10).  The Court noted that "to allow [a specific class of] investors to elevate their claims by standing on the backs of the other [ ] investors whose funds kept [their] policies viable is not to do equity."  Liberte Cap. Grp. v. Capwill, 229 F. Supp. 2d 799, 804 (N.D. Ohio 2002) ("[B]ut for the Liberte investor funds used toward Crivello premiums, the Crivello policy would have lapsed.").

     The Court determined a pro rata distribution was required.  The Court noted, however, that certain types of investors had unique situations that were materially distinguishable from the other investors.  The Court found it equitable for Direct Investors—that is, those investors who are named as beneficiaries on the life insurance policies in which they had an interest—to keep their respective life insurance policies if they remit to the Receiver the value of the benefit they received from CN Capital.  The Court held that, "[b]ecause the Direct Investors have until now received, from commingled funds, the benefit of CN Capital's

premium payments on, and servicing of, their policies, the Direct Investors are required to remit to the Receiver these fictitious profits—that is, the amount of premiums paid by CN Capital to keep the Direct Investors' policies in force, and the fair market value of other services provided to the Direct Investors by CN Capital." (Id. at 11 (citing Perkins v. Haines, 661 F.3d 623, 627 (11th Cir. 2011)). The Court reasoned that "payment to the Receivership of an amount equal to the previous payments paid and the value of services previously rendered returns to the receivership estate the funds wrongfully used to benefit the insurance policy investors." (Id. at 11-12).[6]

Intervenors now argue that (i) the distinction between Direct Investors and Indirect Investors is arbitrary, that (ii) Direct and Indirect Investors are, in fact, similarly situated and should be treated similarly, and (iii) that fictitious profits should not be paid to maintain ownership of a policy, including because CN Capital made money off of its sales of insurance policies and investors "pre-paid" premiums in the original purchase price.

---

[6] The Court also noted that, to the extent certain Direct and Indirect Investors owned policies for which they assumed the obligation to pay premiums, their situation can be materially distinguished from that of other victims, because commingled funds were used only, if at all, to service the policies—a relatively minor cost in comparison to paying premium obligations. (Id. at 12-13). This subset of investors is not the subject of Intervenors' Motion to Amend.

The Court disagrees with Intervenors that Direct Investors and Indirect Investors are similarly situated and thus should be treated similarly. As the Receiver notes, Direct Investors have contractual rights in their relationship with the insurance companies, because they are listed as owners or beneficiaries on the insurance policies in which they have an interest. In addition, Intervenors admit they invested in their policies "using their IRA accounts," which accounts, under the Internal Revenue Code, are prohibited from investing directly in life insurance policies. (Mot. to Amend at 5 & n.1 (citing 26 U.S.C. § 408(a)(3)). Far from a "minor, technical distinction," (id. at 6), "it appears that Defendants structured these investments to circumvent the tax laws." ([193] at 3). As part of this structuring, Indirect Investors agreed they were not buying "any interest in the life insurance policies," but instead purchased "the right to receive proceeds payable under such life insurance policies . . . ." ([192.1] ¶ 17). Put simply, Direct and Indirect Investors agreed to, and purchased, different types of interests in life insurance policies.

Intervenors next attempt to show they are entitled to keep their policies by highlighting the differences between Indirect Investors and Promissory Note Investors. Intervenors argue that the Promissory Note Investors invested in a "high-risk affair" which "depended solely on the financial success or failure of

Defendants and their various businesses." (Mot. to Amend at 8). Promissory Note Investors, however, were told their notes were "100% asset backed" and "backed by hard assets dollar for dollar." ([66] at 58). These misrepresentations were a significant basis for the Court granting a preliminary injunction in this action. Indirect Investors, just like Promissory Note Investors, effectively have an unsecured claim against CN Capital.

In any case, Intervenors' arguments are unpersuasive, because the Court already determined—and does not change its conclusion here—that because funds from Direct, Indirect, and Promissory Note Investors were commingled, and those commingled funds were used to keep insurance policies in force, a pro rata distribution is equitable. The Court allowed only minor carve-outs from this pro rata rule to account for unique situations presented by the broad range of investments Defendants solicited. To now increase the scope of that carve-out to include all insurance policy investors—and to allow those investors to maintain their interests in the insurance policies without first returning fictitious profits received from commingled funds—would allow Intervenors "to elevate their

claims by standing on the backs of the other [ ] investors whose funds kept [their] policies viable . . . ." Liberte, 229 F. Supp. 2d at 805.[7]

The Court also disagrees with Intervenors' contention that fictitious profits should not be paid to maintain ownership of a policy. Intervenors argue that CN Capital made money off of its sales of insurance policies and investors "pre-paid" premiums in the original purchase price. First, Intervenors' assertion that the original purchase price included prepayment of premiums is cast into significant doubt by the Receiver, who states he "has inquired of [Credit Nation] personnel regarding the company's pricing methodology and has confirmed that the company did not include a pre-paid premium calculation in its pricing." ([192] at 12).[8] Second, even if Intervenors could show that Defendants represented the purchase price included the prepayment of premiums, investors are not entitled to benefit to

---

[7] Intervenors' reliance on United States v. Ovid, No. 09-CR-216, 2012 WL 2087084 (E.D.N.Y. June 8, 2012) is misplaced. In Ovid, the Court noted that a pro rata distribution was unwarranted where "defendants established two separate hedge funds. They marketed them separately to different groups of investors at different times. The two hedge funds were legally separate entities and there was no commingling of their assets. Their respective assets were invested differently and suffered different losses at different times.' Id. at *8. Here, the record shows the Defendant entities commingled funds and that commingled funds almost certainly were used to keep insurance policies in force.

[8] The Court notes that the Receiver is in the best position to determine the facts relevant to this Opinion and Order, including because he has direct access to the personnel who structured and sold the policies at issue.

the detriment of other investors simply because of what Defendants represented to them. See CFTC v. Walsh, 712 F.3d 735, 749 (2d Cir. 2013) (a receiver "is not required to apportion assets in conformity with misrepresentations and arbitrary allocations that were made by the defrauder, otherwise the whim of the defrauder would . . . control[ ] the process that is supposed to unwind the fraud." (internal quotation marks omitted)).

Intervenors argue that the Berman policy shows fictitious profits do not exist, because Credit Nation purchased the policy for only $900,000 while investors paid $2,750,000 for it. (Mot. to Amend at 10). The Receiver, however, shows that CN Capital did not earn a profit from the sale of the Berman policy, including because Torchia, Intervenor Faye Bagby, and a man named Barry Neumann kept profits from the sale. ([192] at 3). CN Capital also took on the liability to pay premiums, and, to date, has paid $649,000 in premiums to keep the Berman policy in force. (Id. at 4). The premiums were paid "from the general funds of CN Capital, which came from the sale of other policies, receipt of death benefits, sale of promissory notes, receipt of payments on automobile loans, or some other untraceable company source." (Id.).

It also is not clear whether CN Capital made money on its life insurance business, because profitability is contingent upon insureds living to life

expectancy. Moreover, as the Receiver noted, Defendants' liabilities substantially exceed their assets, and, in order to preserve the life settlement policies of both Direct and Indirect Investors, the Receiver was required to liquidate other of Defendants' assets to pay premiums to avoid a lapse of life insurance policies. (See May 5, 2016, Order [74] at 1-2).

It is understandable that Intervenors seek to retain the benefit of their bargain with Defendants by maintaining their interests in insurance policies and retaining fictitious profits. "The bottom line," however, "is that the same pool of commingled money paid insurance premiums, paid interest and principal to promissory note investors, and paid the operating expenses of the receivership companies." ([192] at 14). "That pool was replenished by more sales of promissory notes, by more sales of insurance policy investments, by auto loan sales, and on occasion by death benefits." (Id.). The Court, in the interest of equity, created a minor exception to the pro rata distribution rule for specific investors it determined stood in a materially different position than the other investors. Even if Intervenors' motion for reconsideration—styled as their Motion to Amend—were timely, the Court would decline Intervenors' request to expand the scope of this exception. Intervenors' proposed expansion of the exception would swallow the rule, and allow all life insurance investors to retain the benefit

14

of their bargain at the expense of Promissory Note Investors whose funds helped keep the policies in force.

## III. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Intervenors' Motion to Amend Pooling Order [185] is **DENIED**.

**SO ORDERED** this 24th day of August, 2016.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE