IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>JAMES A. TORCHIA, CREDIT NATION CAPITAL, LLC, CREDIT NATION ACCEPTANCE, LLC, CREDIT NATION AUTO SALES, LLC, AMERICAN MOTOR CREDIT  LLC, AND SPAGHETTI JUNCTION, LLC,<br><br>    Defendants. | Civil Action File No.<br>1:15-cv-3904-WSD |

## RECEIVER'S MOTION TO EXPAND RECEIVERSHIP WITH BRIEF IN SUPPORT

Al Hill, Receiver ("Receiver"), files his Motion to Expand Receivership and moves this Court to add River Green Capital, LLC ("River Green"), National Viatical, Inc. ("NVI"), and National Viatical Trust ("NVT") to the Credit Nation Capital receivership (the "Receivership").

### I.   INTRODUCTION

The Receiver is appointed by the Court to marshal the assets of James A. Torchia ("Torchia"), Credit Nation Capital, LLC ("CN Capital"), Credit Nation

1

Acceptance, LLC, Credit Nation Auto Sales, LLC, American Motor Credit, LLC ("AMC"), and Spaghetti Junction, LLC (collectively, the "Defendants").

Since the inception of the receivership on April 25, 2016, there has been no one, other than the Receiver, in place to manage and maintain the assets of River Green, NVI, and NVT.  Since those assets (which consist solely of life settlement policies) have material value, the Receiver has advanced funds to pay the premiums on the policies and has moved the policies to TrackLife for management and monitoring.

While the Receiver plans to continue to pay premiums on such policies until the Court rules on this motion, payment of such premiums and management of such policies without any commensurate benefit to the Receivership represents a material burden on the Receivership and necessarily benefits the investors in River Green and NVI to the detriment of the investors in CN Capital.  Therefore, the Receiver requests that this Court expand the Receivership to include River Green, NVI, and NVT.  Alternatively, if the Court denies the Receiver's motion, the Receiver requests that this Court order that the Receiver has no obligation with respect to those entities and may cease all management activities, including payment of premiums, with respect to River Green, NVI, and NVT.

## II. **FACTS**

### Description of the Entities

a. *River Green Capital, LLC*

River Green Capital, LLC ("River Green") is a Georgia limited liability company owned by entities organized by and affiliated with Torchia. *See* Declaration of Al Hill, ¶ 1, attached here and incorporated herein as Exhibit "1" ("Decl. Hill"). River Green acquired and currently holds twenty life settlement policies. *Id*.

River Green has a complicated ownership and investment structure.[1] According to CN Capital employees, River Green and its related entities were originally formed to allow foreign investors to invest in promissory notes backed by policies. Decl. Hill ¶ 3. River Green has raised capital exclusively by causing its affiliated entities to issue promissory notes in the aggregate amount of $5,354,322.05. *Id*. River Green has paid operating expenses and policy premiums through a combination of its own operating funds, loans from CN Capital, and

---

[1] River Green received its capital from River Green Settlements, S.a r.l. ("RGS"), a Luxembourg entity whose sole reason for creation was to provide a tax haven for foreign investors who wished to invest in viatical insurance products. RGS's funding came from River Green Autolife Capital LP, a Cayman Island entity which is the "Master Feeder" for the S.a r.l. The Master Feeder's funds came from investors who invested in River Green Blended Asset LP, a U.S.-based "onshore" feeder; and River Green Autolife Fund Ltd, a Cayman Island based "offshore" feeder." Decl. Hill ¶ 2.

sales of policies, primarily to CN Capital. *Id*. River Green did not and does not have any employees, but has relied on employees of CN Capital to operate its business. Decl. Hill ¶ 6.

    b.   *NVI and NVT*

NVI is a predecessor to CN Capital. Decl. Hill ¶ 4. Like CN Capital, NVI purchased life insurance policies and sold them to direct and indirect investors. *Id.* Like CN Capital, NVI provided policy management services and remitted premiums on the policies. *Id*. NVT is a trust entity created by NVI, and it was operated and primarily owned by Torchia. *Id.* NVT's initial trustee was Mills, Potoczak & Company. On August 7, 2007, Torchia was named successor trustee of NVT. *Id*.

Records provided by CN Capital reflect that NVT has raised capital by issuing promissory notes in the aggregate amount of $386,176.18 and by selling fractional interests in life settlement policies in the aggregate amount of $1,824,647.84. Decl. Hill ¶ 5. NVT has invested its funds in life settlement policies that it has retained for its own account and others in which it has sold fractional interests. *Id*. Like River Green, NVT has paid operating expenses and policy premiums through a combination of its own operating funds, loans from CN

Capital, and sales of policies, including some sales to CN Capital.[2]  *Id*.  NVT does not have any employees, but relies solely on employees of CN Capital to operate its business.  Decl. Hill ¶ 6.

## Current State of Operations

River Green, NVI, and NVT have no employees.  *Id*.  Each entity relies upon CN Capital employees to acquire, manage, and sell policies.  *Id*.  CN Capital does so, and has always done so, without compensation.  *Id*. River Green, NVI and NVT do not have sufficient funds to support the future premiums required to maintain the value of their assets.  All premiums are currently funded by advances from CN Capital, though the Receiver believes that each entity can generate sufficient short term cash to fund itself through liquidation if there is someone with authority to complete such liquidation.  Since its inception on April 25, 2016, the Receivership has advanced approximately $78,588.58 to pay premiums on behalf of River Green, NVI, and NVT.  Decl. Hill ¶ 7.

History of interaction and commingling between CN Capital, River Green, NVI, and NVT.

There is a history of interaction and commingling of assets among CN Capital, River Green, NVI, and NVT.

---

[2] NVT's current receivable to CN Capital is $38,503.51.  Decl. Hill ¶ 5.

(a) River Green has twenty active policies, all of which were purchased from Credit Nation. Decl. Hill ¶ 8.

(b) Of these twenty policies, twelve were at one time owned by NVI. *Id.*

(c) Ten of CN Capital's currently active policies were purchased from NVT. *Id.*

(d) Twelve of CN Capital's currently active policies were purchased from River Green. *Id.*

(e) When asked about the rationale behind sales of policies from River Green to CN Capital, key CN Capital employees stated that "whenever River Green needed money [to pay interest to its investors], it sold a policy to Credit Nation." *Id.*

While there are many examples of the transfer of policies among the entities, the two Samuels policies (the "Samuels Policies") are particularly noteworthy. NVI originally purchased the Samuels Policies from the insured for $180,000 in 2004. Decl. Hill ¶ 9. Within two years, NVI sold both policies to third parties at a profit in excess of $238,000. *Id.* In 2011, CN Capital acquired both Samuels Policies from entities related to American Pegasus (an entity to whom Torchia sold a predecessor business known as Synergy Acceptance Corporation – it is not known if American Pegasus acquired the Samuels Policies from Torchia or an

affiliated entity). *Id*. The purchase price in February 2011 was $47,500 per policy. *Id*. Three months later (May 2011), CN Capital sold one of the Samuels Policies to River Green for $300,000 (6.3 times its purchase price three months earlier). *Id*. Fourteen months later, CN Capital sold the other Samuels Policy to River Green for $360,000 (7.6 times its purchase price). *Id*. River Green then sold the first policy (the one it acquired in May 2011) back to CN Capital in July 2013 for $410,000. *Id*. One year later (July 2014), River Green sold the remaining Samuels Policy to CN Capital for $500,000. *Id*.

Immediately upon acquiring each Samuels Policy (in 2013 and 2014), CN Capital sold each policy to investors for a small profit, though such profit was sufficient to cover future premiums for only a few months. *Id.* As of the date of this filing, CN Capital has paid premiums on the Samuels Policies of $582,000, leaving it with a net loss of $438,240.40 on its final purchase of these policies. *Id*. Given that Torchia was operating all three entities at the time of the 2013 and 2014 sales, it is unclear to the Receiver why the sale was not transacted directly between River Green and the investors instead of having CN Capital buy the Policies and then sell beneficial interests to the investors. One possibility is that management wanted to move the premium payment obligation to CN Capital without adequately

providing for payment of such premiums. If so, River Green received a substantial benefit to the detriment of CN Capital.

## Receivership of River Green, NVI, and NVT

Given the history of commingling and the fact that no one is available to manage or remit premium payments for River Green and NVT policies except the Receiver, the Receiver recommends River Green, NVI, and NVT be put into receivership but that their assets be kept separate from those of CN Capital until the Court can determine whether such assets should be pooled with those of the Receivership.

Alternatively, in the event the Court decides that receivership of River Green, NVI, and NVT is not warranted, the Receiver requests that this Court find that the Receiver is not obligated to make premium payments on any policy of River Green, NVI, or NVT, which will mean that policies of River Green, NVI, and NVT will likely lapse. In addition, if the Court denies receivership of River Green, NVI, and NVT, the Receiver requests that these entities be required to remit to the Receiver all amounts advanced on their behalf since April 25, 2016, without prejudice to any other claims the Receivership may have against such entities.

### III.     LEGAL ANALYSIS AND CITATION OF AUTHORITY

This Court has broad powers and wide discretion in shaping equity decrees. *See SEC v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992); *SEC v. Drucker*, 318 F. Supp. 2d 1205, 1206 (N.D. Ga. 2004).  In *SEC v. Elmas Trading Corp.*, 620 F. Supp. 231, 233 (D. Nev. 1985), the Court authorized the expansion of a receivership upon a finding that entities outside the receivership were not separate and distinct from the receivership entities.  *Id*.  In *Elmas*, the Court analyzed its authority to add additional entities without process under the doctrines of alter ego doctrine and piercing the corporate veil.  *Id*. Where certain factors are found like commingling of funds, similar ownership in the different entities, absence of corporate assets, failure to maintain arm's length relationships among entities, and manipulation of assets and liabilities between entities so as to concentrate assets, a court can disregard the corporate entity and consider receivership.  *Id*. at 233-234.

A receiver's primary objective in a receivership is to ensure that all available assets are brought within the receivership for proper distribution to the creditors. Id. at 234.  In Elmas, the Court concluded that because the operations between the Receivership and other entities were so intertwined, in the exercise of discretion an expansion of the receivership was proper.  Id. at 235, 241.[3]

---

[3] Intertwined operations and corporate shells can be inferred from various facts, including a finding that money flowed between entities, a lack of explanation for

Expansion into the receivership estate is proper although the non-receivership entity is not an alter ego of the receivership entities, where the non-receivership entity used scheme proceeds to generate profit. *See SEC v. Nadel*, 2013 U.S. Dist. LEXIS 73816, at *9-10 (M.D. Fla. 2013). In *Nadel*, the receivership entity loaned Quest $1.1 million of scheme proceeds. *Id*. at *2. Quest thereafter used the loan proceeds to purchase oil and gas leases. *Id*. at *6. Over objection, the receiver was granted the right to take receivership of Quest. *Id*. at *10. "The fact that not all of the funding for Quest came from [receivership entities] does not change the outcome. The vast majority of the initial funding . . . was tainted." *Id*.

In this case, it is proper for the Court to expand the Receivership to include River Green, NVI, and NVT due to the facts that (a) the assets of the entities have been constantly commingled in the same collective enterprise and (b) the value remaining in River Green, NVI, and NVT will be lost to all investors if the assets are not maintained going forward.

It appears that River Green followed the same business model as CN Capital, with the only difference being River Green's ability to accept foreign investment. However, unlike CN Capital, River Green never went to market to

---

transactions, unperformed services, and a reliance upon the Receivership entity for business transactions. *Id*. at 234.

purchase its own policies and auto loans. River Green's sole supplier and customer was CN Capital. Like CN Capital, River Green's model is unsupportable if there are no new investors, premiums are not escrowed, and policies cannot be sold.

The funds between CN Capital, River Green, NVI, and NVT became commingled once River Green and NVT investors paid CN Capital to purchase a policy. After this, CN Capital's funds, which came from CN Capital Investors, were used to pay River Green and NVT policy premiums. If River Green, NVI, or NVT sold a policy to CN Capital, CN Capital remitted payment for the policy using CN Capital investor funds.

River Green and NVT's receivables were also tainted with CN Investor funds. Any policies sold to CN Capital by River Green, NVI, or NVT, if not from new investment money, used CN Capital investor funds. In addition, some CN Capital investors are also River Green, NVI, and NVT investors.

The immediate problem now facing the Receivership is the fact that River Green policies can only stay in force using CN Capital resources. CN Capital has been carrying the premiums to date, and although a River Green policy matured which will give an immediate cash flow of $80,000 to River Green, that cash infusion would only satisfy River Green's cash needs for a few months. Without

another policy maturity, River Green cannot remit premium payments. NVI and NVT are in a similar scenario of inability to meet premium payment requirements.

Therefore, the Receiver recommends that River Green, NVI, and NVT be placed into receivership with the assets for each entity separately held and not commingled with CN Capital assets. Whether to pool assets of River Green, NVI, and NVT with CN Capital is for a later determination upon full evaluation of impact to CN Capital investors and a ruling by this Court. Once in receivership, if the Court so orders, River Green, NVI, and NVT shall repay to CN Capital any amounts advanced on their behalf by the Receiver since April 25, 2016.

If Receivership of River Green, NVI, and NVT is granted, the Receiver requests that the Court extend Orders currently applicable to the Receiver and Defendants in Receivership, regarding Receivership, to similarly apply to River Green, NVI, and NVT. The relevant Orders regarding the treatment and disposition of assets by the Receiver include, but are not limited to, Doc. 66 (Appointment of Receiver); Doc. 95 (Procedure for Selling); Doc. 120 (Pooling Order); and Doc. 155 (Order on Guidance). In Receivership, it is the Receiver's intent to treat River Green, NVI, and NVT investors the same as the investors in CN Capital, but to seek further guidance from the Court before making a decision

whether to pool the assets of River Green, NVI and/or NVT with each other or with the other Defendants.

Alternative, if this Court determines that receivership is not warranted, the Receiver requests that this Court find the Receiver is not obligated to make premium payments and can cease making payments at his discretion.  Finally, if there is to be no receivership of River Green, NVI, and NVT, the Receiver asks the Court to order these entities to immediately repay CN Capital for all amounts the receivership advanced on their behalf since April 25, 2016.

## IV.   CONCLUSION

For the foregoing reasons, the Receiver requests that this Court rule on whether River Green, NVI, and NVT should be placed into receivership.

Respectfully submitted, this 29th day of August, 2016.

        */s/ Amy K. Weber*
        AMY K. WEBER
        Georgia Bar No. 773736
        aweber@taylorenglish.com
        WILLIAM G. LEONARD
        Georgia Bar No. 446912
        bleonard@taylorenglish.com

        TAYLOR ENGLISH DUMA LLP
        1600 Parkwood Circle, Suite 400
        Atlanta, Georgia  30339
        Telephone:(770)434-6868
        Facsimile: (404) 434-7376
        *Counsel to Receiver*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>JAMES A. TORCHIA, CREDIT NATION CAPITAL, LLC, CREDIT NATION ACCEPTANCE, LLC, CREDIT NATION AUTO SALES, LLC, AMERICAN MOTOR CREDIT LLC, AND SPAGHETTI JUNCTION, LLC,<br><br>Defendants. | **Civil Action File No.**<br>**1:15-cv-3904-WSD** |

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing RECEIVER'S MOTION TO EXPAND RECEIVERSHIP WITH BRIEF IN SUPPORT with the Clerk of the Court using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.

This 29th day of August, 2016.

/s/ Amy K. Weber
AMY K. WEBER
Georgia Bar No. 773736
aweber@taylorenglish.com