IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>   v.<br><br>JAMES A. TORCHIA, CREDIT NATION CAPITAL, LLC, CREDIT NATION ACCEPTANCE, LLC, CREDIT NATION AUTO SALES, LLC, AMERICAN MOTOR CREDIT, LLC, and SPAGHETTI JUNCTION, LLC,<br><br>                    Defendants. | 1:15-cv-3904-WSD |

**OPINION AND ORDER**

This matter is before the Court on Receiver Al Hill's ("Receiver") Motion to Expand Receivership [212].

**I.    BACKGROUND**[1]

The Receiver seeks to add River Green Capital, LLC ("River Green"), National Viatical, Inc. ("NVI"), and National Viatical Trust ("NVT") (collectively,

---

[1]    The history and facts of this action are described in detail in the Court's April 25, 2016, Order [66] and in the Court's May 25, 2016, Order [120]. The Court here describes only those facts pertinent to the pending motions.

the "Target Entities") to the Receivership. The Receiver states that, since the inception of the Receivership pursuant to the Court's April 25, 2016, Order [66], "there has been no one, other than the Receiver, in place to manage and maintain the assets" of the Target Entities. The Target Entities' assets consist solely of life settlement policies, the policies have material value, and the Receiver has advanced funds to pay the premiums on the policies. The Receiver contends the Target Entities commingled funds with Defendants. The Receiver states that the Target Entities do not have sufficient funds to support the future premiums required to maintain the value of their assets.

The Receiver describes the entities as follows, and supports his descriptions with a sworn declaration:

### A. River Green

River Green is a Georgia limited liability company owned by entities organized by and affiliated with Defendant Torchia. River Green acquired and currently holds twenty life settlement policies. River Green has a complicated ownership and investment structure. According to employees of Defendant Credit Nation Capital ("CN Capital"), River Green and its related entities were originally formed to allow foreign investors to invest in promissory notes backed by policies. River Green has raised capital exclusively by causing its affiliated entities to issue

promissory notes in the aggregate amount of $5,354,322.05.  River Green has paid operating expenses and policy premiums through a combination of its own operating funds, loans from CN Capital, and sales of policies, primarily to CN Capital.  River Green did not and does not have any employees, but has relied on employees of CN Capital to operate its business.  CN Capital does not receive compensation for these services.  ([212] at 3-4).

  B. <u>NVI and NVT</u>

  NVI is a predecessor to CN Capital.  Like CN Capital, NVI purchased life insurance policies and sold them to direct and indirect investors.  Like CN Capital, NVI provided policy management services and remitted premiums on the policies.  NVT is a trust entity created by NVI, and it was operated and primarily owned by Mr. Torchia.  NVT's initial trustee was Mills, Potoczak & Company.  On August 7, 2007, Mr. Torchia was named successor trustee of NVT.  ([212] at 4).

  Records provided by CN Capital reflect that NVT has raised capital by issuing promissory notes in the aggregate amount of $386,176.18 and by selling fractional interests in life settlement policies in the aggregate amount of $1,824,647.84.  NVT has invested its funds in life settlement policies that it has retained for its own account and others in which it has sold fractional interests.  Like River Green, NVT has paid operating expenses and policy premiums through

a combination of its own operating funds, loans from CN Capital, and sales of policies, including some sales to CN Capital. NVT does not have any employees, but relies solely on employees of CN Capital to operate its business. CN Capital does not receive compensation for these services. ([212] at 4-5).

    C.    History of Commingling

The Receiver alleges CN Capital, River Green, NVI, and NVT have a history of interaction and commingling. He states the following:

1. River Green has twenty active policies, all of which were purchased from Credit nation.

2. Of these twenty policies, twelve were at one time owned by NVI.

3. Ten of CN Capital's currently active policies were purchased from NVT.

4. Twelve of CN Capital's currently active policies were purchased from River Green.

5. When asked about the rationale behind sales of policies from River Green to CN Capital, key CN Capital employees stated that "whenever River Green needed money [to pay interest to its investors], it sold a policy to Credit Nation."

([212] at 6).

The Receiver specifically details the transfer of the two Samuels policies, which NVI originally purchased from the insured in 2004 for $180,000. Within two years, NVI sold both policies to third parties at a profit of $238,000. In 2011,

4

CN Capital acquired both Samuels policies for $47,500 per policy from entities related to American Pegasus, an entity with which Mr. Torchia had prior business. Three months later, in May 2011, CN Capital sold one of the Samuels policies to River Green for $300,000, 6.3 times its purchase price three months earlier. Fourteen months later, CN Capital sold the other Samuels policy to River Green for $360,000, 7.6 times its purchase price. In July 2013, River Green sold the first policy back to CN Capital for $410,000. One year later, in July 2014, River Green sold the remaining Samuels policy to CN Capital for $500,000. Upon acquiring each Samuels policy, CN Capital sold each policy to investors for a profit sufficient to cover future premiums for only a few months. The Receiver states that, to date, CN Capital has incurred a net loss of $438,240.40 on the Samuels policies due to premium payments. The Receiver believes one reason why the final sale of the policies to investors was transacted by CN Capital rather than River Green was to "move the premium payment obligation to CN Capital without adequately providing for payment of such premiums. If so, River Green received a substantial benefit to the detriment of CN Capital." ([212] at 6-8).

D.   Procedural History

On August 29, 2016, the Receiver filed his Motion to Expand Receivership. The Receiver seeks to expand the Receivership to include the Target Entities, but

to keep the Target Entities' assets separate from those of CN Capital until the Court can determine whether the assets should be pooled with those of the Receivership. Alternatively, if the Court declines to expand the Receivership, the Receiver requests the Court find the Receiver is not obligated to make premium payments on any of the Target Entities' policies.

On September 16, 2016, the Target Entities filed their Opposition [220]. The Target Entities argue expansion is not appropriate because they are not alter egos of Mr. Torchia or CN Capital and were not created with "scheme" funds. The Target Entities also argue expansion is not warranted based on "well-established jurisprudence regarding the rights and defenses of a 'relief defendant.'" ([220] at 9). The same day, the Target Entities filed their "Objections to Evidence Submitted by Receiver in Support of His Motion to Expand Receivership" [221]. The Target Entities object to Paragraphs 2 and 3 of the Receiver's Declaration [212.1] on the ground that the facts in those paragraphs come from purported statements arising from "extensive interviews" with unnamed CN Capital agents, and that the statements are hearsay. The Target Entities also object to Paragraph 3[2] because the Receiver does not identify the "records" upon which he relies to

---

[2] The Target Entities reference Paragraph 2, but the substance of their objection shows they intended to reference Paragraph 3.

support that River Green raised capital through promissory notes and that it used loans from CN Capital.

On October 11, 2016, the Receiver filed his Supplemental Motion to Expand Receivership [241].  In it, he states he recently learned that Mr. Torchia attempted to interfere with death benefits on the matured policy in the name of C. Mahon in which River Green is the collateral assignee.  The Receiver states Mr. Torchia contacted Allstate to obtain claim forms for the policy proceeds.  Mr. Torchia also allegedly instructed investors of River Green to contact the River Green administrator in Curacao, Kedi Chang, to obtain forms to change their indirect investment to a direct investment.  The Receiver contends that, if Mr. Torchia allocates River Green's policies in this manner, promissory note investors in River Green will be treated differently from each other, with some obtaining direct interests in policies while others are left with no assets.

**II.  DISCUSSION**

    A.  <u>Alter-Ego Liability</u>

The Court has broad powers to determine what relief is appropriate in an equity receivership.  See <u>SEC v. Elliott</u>, 953 F.2d 1560, 1566 (11th Cir. 1992). Receiverships have been expanded by use of the alter ego doctrine to include entities related to defendants where funds have been commingled or corporate

assets used for personal purposes.  See, e.g., SEC v. Elmas Trading Corp., 620 F. Supp. 231 (D. Nev. 1985), aff'd 805 F.2d 1039 (9th Cir. 1986).  Some courts have extended this principle to find that a receiver can exercise control over third-party property purchased using "scheme proceeds."  See S.E.C. v. Nadel, No. 8:09-cv-87-T-26TBM, 2013 WL 2291871, at *2 (M.D. Fla. May 24, 2013) (third party entity's use of scheme proceeds to purchase oil and gas leases subjected it to inclusion in receivership despite that it was not an alter ego of defendant); see also SEC v. Lauer, No. 03-80612-Civ, 2009 WL 812719, at *4-5 (S.D. Fla. Mar. 26, 2009) (proceeds from sale of condominium that was maintained with tainted funds are also tainted by the fraud); In re Fin. Federated Title & Tr., Inc., 347 F.3d 880 (11th Cir. 2003) (establishing constructive trust on property purchased with over 90% funds from Ponzi scheme); CFTC v. Hudgins, 620 F. Supp. 2d 790, 795 (E.D. Tex. 2009) (directing sale of condominium because defrauder's innocent girlfriend paid the mortgage with Ponzi scheme funds).

The Target Entities argue expansion is not appropriate because they are not alter egos of Defendants and were not created with scheme proceeds.[3]  "The alter

---

[3] The Target Entities do not offer any authority to support that scheme funds must have been used to "create" an entity.  The case law described above shows that, where property is purchased using scheme proceeds, the property may be subject to the receivership.

ego doctrine, which is remedial in nature, is not applied to eliminate the consequences of corporate operations, but to avoid inequitable results.  To invoke the doctrine against a party, we must find that the party was an actor in the course of conduct constituting the abuse of corporate privilege—we may not apply the doctrine to prejudice an innocent third party." Elmas, 620 F. Supp. at 233.  In determining whether the alter ego doctrine applied to allow expansion of a receivership, the Elmas court considered, among other factors, the following:

> the comingling of funds and other assets; the unauthorized diversion of funds or assets to other than corporate purposes; the treatment by an individual of corporate assets as his own; the failure to maintain minutes or adequate corporate records and the confusion of the records of the separate entities; the identity of equitable ownership in the two entities; the identity of the officers and directors of the two entities, or of the supervision and management; the absence of corporate assets; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation; the concealment and misrepresentation of the identity of the responsible ownership, management, and financial interest or concealment of personal business activities . . . .

Id. at 234.

The Target Entities argue that River Green "is not a mere alter ego or instrumentality of Mr. Torchia or the Credit Nation Defendants.  River Green Capital did not perform phantom services for the Credit Nation Defendants; it did not pay Mr. Torchia's bills; it was not a conduit for the payment of Mr. Torchia or

other Credit Nation insiders." ([220] at 5). The Target Entities do not contest the facts set forth by the Receiver, and they do not present facts of their own. The Receiver presents evidence to show that the Target Entities used CN Capital employees to operate their business, the Entities extensively commingled and transferred life insurance policies with Defendants, "whenever River Green needed money [to pay interest to its investors], it sold a policy to Credit Nation," and CN Capital loaned money to the Target Entities to fund their operations. In addition, the evidence presented at the January 8 and 9, 2016, hearing on the SEC's Preliminary Injunction Motion showed the following: Mr. Torchia directed the transfer of hundreds of thousands of dollars to NVI and River Green (See [66] at 16); money "flowed back and forth between Credit Nation and River[ ]Green, and Mr. Torchia's untrained employees 'kept track of who owes who for what on [a] spreadsheet[,]'" (id. at 16-17); and Mr. Torchia is jointly liable for a $5 million judgment against NVI, (id. at 21). The Receiver previously has presented evidence to show that CN Capital commingled investor funds, and treated all investor funds as fungible and available for any investment, payment, or expense. (See [120] at 9).

    The evidence sufficiently shows that Defendants and the Target Entities consistently commingled assets in the same collective enterprise under

Mr. Torchia's direction. The Court finds the evidence is sufficient to establish that the Target Entities were alter egos of Defendants, or, at the very least, that the Target Entities were substantially funded using the proceeds of the fraudulent scheme engaged in by Defendants, including the use of Defendants' personnel, loans from Defendants, transfers of money to and from Defendants, and transfers of and sales of policies between the Target Entities and Defendants. Under these circumstances, expansion of the Receivership to include the Target Entities is appropriate.

### B.   Relief Defendant

The Target Entities also argue expansion is not warranted based on "well-established jurisprudence regarding the rights and defenses of a 'relief defendant.'" ([220] at 9). The Target Entities argue that a court cannot expand a receivership over non-parties allegedly in possession of investor funds where the receiver cannot prove the non-parties lack an ownership interest in those funds. In support of their position, the Target Entities rely on SEC v. Sun Capital, Inc., No. 209-CV-229-FTM-29SPC, 2009 WL 1362634 (M.D. Fla. May 13, 2009). The Court in Sun Capital explained:

> A relief defendant, sometimes referred to as a "nominal defendant," has no ownership interest in the property that is the subject of litigation but may be joined in the lawsuit to aid the recovery of relief. SEC v. Cavanagh, 445 F.3d 105, 109 n.7 (2d Cir. 2006). A relief

11

> defendant is not accused of wrongdoing, but a federal court may order equitable relief against such a person where that person (1) has received ill-gotten funds, and (2) does not have a legitimate claim to those funds. SEC v. George, 426 F.3d 786, 798 (6th Cir. 2005) (citations omitted).

Id. at *1. In Sun Capital, the SEC sought to expand the receivership to include as a relief defendant Sun Capital, a company that received $550 million fraudulently raised by defendants. The court denied the expansion, finding that "[i]t is undisputed that Sun Capital received the loan proceeds pursuant to written loan agreements with [defendants] . . ., [t]here has been such a debtor-creditor relationship between Sun Capital and [defendants] based on written agreements since 2001[, and t]his constitutes sufficient legitimate ownership interest to preclude treating Sun Capital as a relief defendant." Id. at *2.

Sun Capital does not apply here. First, unlike the facts here, there was no allegation that Sun Capital was an alter ego of the defendants. Sun Capital does not stand for the proposition that a receivership cannot be expanded to include a defendant's alter ego entities. Even if Sun Capital applied, there is no evidence that the Target Entities and Defendants had a formal debtor-creditor relationship or that the continuous transfer of assets amongst the entities was pursuant to any agreement, written or otherwise. To the contrary, the evidence shows Mr. Torchia directed the transfer of hundreds of thousands of dollars to NVI and River Green

(See [66] at 16), and money "flowed back and forth between Credit Nation and River[ ]Green, and Mr. Torchia's untrained employees 'kept track of who owes who for what on [a] spreadsheet[,]'" (id. at 16-17).  The Target Entities also do not present any evidence that they have legitimate claims to the life settlements they purportedly own.  While the Receiver states that part of the Target Entities' operating expenses and policy premiums were paid through their own operating funds, the evidence shows that the Target Entities were funded by using Defendants' personnel, loans from Defendants, transfers of money to and from Defendants, and transfers of and sales of policies between the Target Entities and Defendants.  It appears any "operating funds" were likely derived from some combination of the foregoing activities involving Defendants.  Under these circumstances, expansion of the Receivership to include the Target Entities is appropriate.

### III.  CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Receiver Al Hill's ("Receiver") Motion to Expand Receivership [212] is **GRANTED**.  River Green Capital, LLC, National Viatical, Inc., and National Viatical Trust are placed into the Credit Nation Capital Receivership.

**SO ORDERED** this 25th day of October, 2016.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE