IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

           Plaintiff,

v.

JAMES A. TORCHIA, CREDIT
NATION CAPITAL, LLC, CREDIT
NATION ACCEPTANCE, LLC,
CREDIT NATION AUTO SALES,
LLC, AMERICAN MOTOR
CREDIT, LLC, and SPAGHETTI
JUNCTION, LLC,

           Defendants.

1:15-cv-3904-WSD

## OPINION AND ORDER

This matter is before the Court on Defendant James A. Torchia's Emergency Motion for Preliminary and Permanent Injunction [345] ("Emergency Motion").

**I.   BACKGROUND**[1]

   A.   Facts

On May 10, 2016, Receiver Al Hill ("Receiver") filed a motion requesting "an Order permitting him to sell certain assets of CNC and AMC at his discretion and at the best available price." ([90] at 2). He sought the Court's approval to retain the firm Wm. Page & Associates, Inc. ("Wm. Page") to manage, market, and sell the life insurance policies for a fee for less than the operating costs of Credit Nation Capital. (Id. at 3). The Receiver represented that Wm. Page's management responsibilities included marketing and selling life insurance policies to interested third-parties with the cooperation and approval of the Receiver. (Id.). On May 11, 2016, the Court granted the Receiver's motion and granted the Receiver's request to retain Wm. Page to manage, market, and sell the life insurance policies. ([95] at 6).

The Receiver retained Wm. Page, and he also retained TrackLife, LLC ("TrackLife"), a company affiliated with Wm. Page, to monitor insurance premium due dates and policy maturities and to determine market values of specific policies when requested. Beginning in early May, 2016, the Receiver's staff began

---

[1]   The Court here sets forth the facts pertinent to Mr. Torchia's Emergency Motion. A more complete description of the background of this action is set forth in the Court's Orders of April 25, 2016, [81] and May 25, 2016, [120].

marketing the Sneider policy (policy no. ending in -2626) (the "Policy") for potential sale by sending out information about the Policy and the insured.  The Receiver represents that TrackLife and Wm. Page were not asked to market the Policy and have never marketed any of the Receivership's policies.  On June 1, 2016, the Receiver also sent the Policy to TrackLife and asked for a valuation.  On June 9, 2016, TrackLife determined that the Policy was worth between $500,000 and $900,000.  The Receiver represents that the valuation was for the Receiver's internal use and was not part of the package sent to potential bidders.

    Sometime in early June, an employee of TrackLife disclosed that an Irish company called Redbird was affiliated with TrackLife, and asked whether Redbird could be allowed to bid.  The Receiver determined that allowing Redbird to bid, if it wished to do so, would be appropriate because the Receiver sought as many bids as possible to get the maximum amount for the sale of the policy.  The Receiver's staff sent the same information to Redbird that was provided to all other potential bidders, and it was the same information previously given to TrackLife for its valuation of the Policy.  No bidder received any information regarding the identity or the bid of any other potential buyer. TrackLife and Page were not privy to the

identity of any potential buyers other than Redbird and did not have access to their bids.

Three potential buyers submitted bids for the Policy, with Redbird submitting the highest bid at $1,000,000. After all initial bids were received, the Receiver dealt directly with the principal of Redbird to negotiate the final terms of the offer and sale of the Policy. Redbird paid $1,000,000 for the Policy. An entity called Lifeline signed the purchase agreement as representative of Redbird, and Redbird authorized Lifeline to "act on behalf of Purchaser with respect to written directions to Seller from Purchaser under this Agreement."

The Receiver dealt with Redbird on one other occasion, when Redbird submitted a bid to purchase another policy. On that occasion, Redbird did not submit the highest bid and did not purchase the policy.

B.    Procedural History

On February 14, 2017, Mr. Torchia filed his Emergency Motion,[2] seeking an injunction preventing the Receiver from using Wm. Page, TrackLife, and William Scott Page—Wm. Page's principal—to provide any services to the Receiver including, but not limited to, managing, marketing, and selling the life insurance

---

[2] On February 16, 2017, Mr. Torchia filed his corrected brief in support of his Emergency Motion [379].

policies of the Receivership Estate.  ([379.1] at 13-14).  Mr. Torchia contends that Mr. Page, individually and through his corporate Lifeline entities, had a significant financial incentive to sell the Policy to Redbird for less than fair market value.  He claims that Mr. Page had an undisclosed financial interest in Lifeline, and that two men, Mr. Lauck and Mr. Covington, serve as directors of both Redbird and Lifeline.  Mr. Torchia claims that, prior to the sale of the Policy, the Receiver failed to conduct adequate due diligence about the financial relationships between Page, Lifeline, and Redbird.

The Receiver argues that Mr. Torchia's motion is based on speculation, and that Redbird acquired the policy only because it offered more money than two other unrelated bidders.  He argues Mr. Torchia fails to show a substantial likelihood of success on the merits.  The Receiver also represents that he does not intend to employ TrackLife in the future to market any policies, and thus Mr. Torchia cannot show irreparable harm.  He argues the balance of the equities disfavors an injunction, because the cost of obtaining a new service to monitor the policies on behalf of the Receivership would be prohibitively expensive and potentially impossible at this late stage.  The Receiver also argues that Mr. Torchia's Emergency Motion is frivolous, and requests an opportunity to

submit evidence of the fees incurred by the Receivership in responding to the Motion.

## II.     DISCUSSION

### A.     Legal Standard

A party seeking a preliminary injunction must establish: (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). "The preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly carries the burden of persuasion as to the four prerequisites. The burden of persuasion in all of the four requirements is at all times upon the [moving party]." Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990) (internal quotation marks omitted) (quoting United States v. Jefferson Cty., 720 F.2d 1511, 1519 (11th Cir. 1983)); see Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc., 188 F. Supp. 2d 1350, 1357 (S.D. Fla. 2002) ("Courts in this Circuit will not issue a preliminary injunction where the moving party fails to meet its burden of proof on each of the four factors.").

6

B.     Analysis

The Court finds that Mr. Torchia has not met his burden to show that he will suffer irreparable harm.  "[P]reventing irreparable harm in the future is the *sine qua non* of injunctive relief."  Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1133 (11th Cir. 2005) (internal quotation omitted).  The "asserted irreparable injury must be neither remote nor speculative, but actual and imminent."  Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000) (internal quotation marks omitted).

Mr. Torchia claims that he will be irreparably harmed because the SEC seeks disgorgement of at least the difference between what investors deposited with Defendants and the value of the Receivership Estate after all assets are eventually sold.  He argues every asset that is sold for less than the fair retail value irreparably harms Mr. Torchia, and argues that TrackLife's undisclosed conflicts of interest will cause it to undervalue policies in the future.  The Receiver represents that he does not intend to employ TrackLife to market any policies.  TrackLife's role in the Receivership will continue to be to monitor insurance premium due dates and policy maturities.[3]  Mr. Torchia argues that "the Receiver

---

[3] The Court understands these are the limited activities in which TrackLife will be involved.

7

(either unwittingly or in concert) already allowed TrackLife to market the [] Policy to the Redbird Entities, apparently without authorization to do so." ([385] at 9). He notes that TrackLife represented to the Receiver that Redbird wanted to bid on the Policy, which "is clear evidence that [TrackLife] marketed the [] Policy to [Redbird] before discussing it with the Receiver." ([385] at 6-7). He also argues the Receiver's representation regarding TrackLife is not true, because TrackLife continues to provide valuations for the Receiver on the life policies, which is a central aspect of marketing the policies. He claims that continuing to allow TrackLife to provide valuations despite having undisclosed conflicts of interest will cause irreparable harm.

The Court finds Mr. Torchia's asserted irreparable injury is purely speculative. See Siegel, 234 F.3d at 1176. The only alleged conflict Mr. Torchia presents is the purported conflict between Wm. Page and Redbird. Mr. Torchia does not present any evidence to show what, if any, "undisclosed conflicts" remain, offering only this question: "[w]hat meaningful protections are in place to prevent any undisclosed conflicts of interest from impacting TrackLife's valuations in the future?" ([385] at 9). The possibility that TrackLife may have undisclosed conflicts that may, in the future, incentivize it to lower its valuations which may, in turn, result in below-market sales of policies is the height of speculation. The

Court is confident that the Receiver has and will use his best judgment to provide the highest return on the policies in the Receivership.[4]  Mr. Torchia does not present any evidence that he will suffer actual and imminent harm in the absence of injunctive relief, and his Emergency Motion is denied.[5, 6]

## III.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant James A. Torchia's Emergency Motion for Preliminary and Permanent Injunction [345] is **DENIED**.

---

[4]   While injunctive relief is not appropriate here, but to avoid any claimed appearance of impropriety, the Receiver is instructed to decline to approve bidding on policies by Wm. Page, TrackLife, or any of their affiliates.

[5]   The Court also notes that the irreparable harm Mr. Torchia alleges is monetary in nature.  Normally, monetary injuries do not rise to the level of irreparable harm.  Watts v. Wells Fargo Dealer Servs., Inc., No. 4:15-CV-02250-KOB, 2016 WL 6248018, at *1 (N.D. Ala. Oct. 26, 2016) (citing Sampson v. Murray, 415 U.S. 61, 90 (19874)).  "An injury is 'irreparable' only if it cannot be undone through monetary remedies."  Charles H. Wesley Educ. Found., Inc., 324 F. Supp. 2d 1358, 1368 (N.D. Ga. 2004) (quoting Cunningham v. Adams, 808 F.2d 815, 821 (11th Cir. 1987)).  Mr. Torchia does not show that his alleged irreparable injury could not be undone through monetary remedies.

[6]   Regarding the Receiver's request for attorneys' fees, the Court finds Mr. Torchia's Emergency Motion, while ultimately without merit, was grounded in reasonable concerns.

**SO ORDERED** this 1st day of March, 2017.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE