# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> JAMES A. TORCHIA, CREDIT NATION CAPITAL, LLC, CREDIT NATION ACCEPTANCE, LLC, CREDIT NATION AUTO SALES, LLC, AMERICAN MOTOR CREDIT LLC, AND SPAGHETTI JUNCTION, LLC, <br><br> Defendants. | Civil Action File No. 1:15-cv-3904-WSD |

## QUARTERLY STATUS REPORT OF RECEIVER FOR APRIL 1, 2017 THROUGH JUNE 30, 2017

Pursuant to the Opinion and Order (the "Order") entered on April 25, 2016, this Court appointed Al Hill as Receiver for James A. Torchia, Credit Nation Capital, LLC ("CNC"), Credit Nation Acceptance, LLC, Credit Nation Auto Sales, LLC, American Motor Credit, LLC ("AMC"), and Spaghetti Junction, LLC (collectively, the "Defendants" and, excluding Mr. Torchia, the "Companies"). The Order requires the Receiver to file and serve a full report and accounting of Defendants' Assets entitled "Quarterly Status Report" within thirty (30) days after the end of each

calendar quarter. This is the Receiver's Quarterly Status Report for the calendar quarter ending on June 30, 2017.

I.  **Credit Nation Capital** – This section of this Quarterly Status Report covers the status of CNC only.[1] The status and operations of River Green Capital, LLC ("River Green") and National Viatical, Inc. ("NVI") are covered in Parts II and III, respectively, of this report.

    A.   <u>Accounting</u>

The CNC Income Statement and Cash Flow Statement for the quarter ending June 30, 2017 and the Balance Sheet as of June 30, 2017 (collectively the "CNC Financial Reports") are attached hereto and incorporated herein as Exhibit CNC-A. AMC ceased operations as of June 30, 2016 and its assets and liabilities have been consolidated into the CNC Balance Sheet.

    B.   <u>Additional Information</u>

In addition to the accounting referenced above, the Order specifically requires the Receiver to address the following eight items.

---

[1] The other CNC-related entities, Credit Nation Auto Sales, LLC, AMC and Spaghetti Junction, LLC, are not in operation. All known assets of these entities have been consolidated into CNC.

## 1. *A summary of the operations of the Receiver.*

Since the previous Quarterly Status Report, the Receivership has continued its efforts to market and sell its remaining assets, which consist of life settlement policies. During the second quarter of 2017, CNC realized the following changes in its policy portfolio, all of which are summarized on Exhibit CNC-B:

(a) Two policies were sold for a total price of $135,000;

(b) One policy was lapsed – this policy had maturity benefit of $25,000 and was assessed by the Receiver to have no market value;

(c) One policy matured for which the Receivership has a receivable of $50,000.

The starting and ending policy portfolio for the second quarter is summarized on Exhibit CNC-B. As of June 30, 2017, the Receivership has retained an interest in twelve (12) life settlement policies. The Receivership expects to retain eight (8) of those policies until maturity. Those policies have an aggregate maturity benefit of $5,540,900 of which the Receivership expects to retain approximately $3,900,000 after accounting for retained Direct Investor interests.

As the sales activities of the Receivership have decreased, the Receivership has decreased its headcount by one and now employs only one full time employee who is engaged in the management of the remaining policies and the overall administration of the Receivership. All policies are also monitored by TrackLife, a

third-party service provider, to ensure payment of premiums and monitoring of maturities should the administrative employee become unavailable. TrackLife's fees have decreased significantly as the policy portfolio has decreased. During the second quarter of 2017, TrackLife's total fees were $2,032.50.

The Receiver expects to continue the liquidation of the existing life settlement policy portfolio over the coming months, but may retain some policies through maturity as described above and as indicated on Exhibit CNC-B. The policies to be retained typically have life expectancies less than two years, and it is the Receiver's judgment that the investors will receive greater benefit by retaining such policies until maturity than by selling the policies for current market value. The Receiver will revisit this determination periodically.

**2.     *Cash on hand, amount and nature of accrued administrative expense, amount of unencumbered funds in the estate.***

As of June 30, 2017, the Receivership had unencumbered cash of $7,508,207.01. The Receiver's fees for CNC for the second calendar quarter of 2017 were $188,880.41. The Receiver's cash projections for 2017 are set forth on Exhibit CNC-C. Of particular note:

i.     Accounting and Legal expenses are expected to continue to decrease, though there will likely be a surge in legal fees in July, 2017, due to

the preparation required for the hearing on the Receiver's proposed distribution plan. Daily management activities have declined substantially and should continue to decline as the number of life settlement policies decreases; and

ii.     Premium Payments are projected at an average of $18,500 per month after June, down dramatically from the $300,000 per month rate at the beginning of the receivership. This expenditure will continue to decline as policies are sold or mature.

**3.     *Schedule of receipts and disbursements.***

In addition to the CNC Financial Reports, attached hereto as Exhibit CNC-D is a Schedule of Receipts and Disbursements showing all bank account receipts and disbursements for the second quarter and for the period from the inception of the Receivership through June 30, 2017. The first page of Exhibit CNC-D summarizes the receipts and disbursements; the remaining pages set forth the detail of all individual entries.

4. ***Description of all known Assets, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended.***

The assets of the Receivership are identified on the CNC Financial Reports dated June 30, 2017, attached hereto as Exhibit CNC-A, and on the list of life settlement policies attached hereto as Exhibit CNC-B. Other than cash, the life settlement policies are the only known material assets of the Receivership. The Receivership intends to pursue certain claims as outlined in Section 5 below, which may yield additional assets, but which are not reflected in the CNC Financial Statements at this time. The Receivership intends to retain certain life settlement policies until maturity as listed on Exhibit CNC-B.

5. ***Description of liquidated and unliquidated claims of Defendants, including the need for forensic and/or investigatory resources; approximate valuation of claims; and anticipated or proposed method of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and (ii) collecting judgments).***

A description of all liquidated and unliquidated claims is attached hereto and incorporated herein as Exhibit CNC-E.

The Receiver has asserted "clawback" claims to recover the following:

(1) Sales commissions paid to those who sold promissory notes and insurance policies on behalf of the receivership companies; and

(2) Payments to noteholders in excess of their principal investments.

These claims are based upon actual fraud and constructive fraud theories of recovery under the Georgia Uniform Fraudulent Transfers Act and the Georgia Uniform Voidable Transactions Act, and on common law claims of unjust enrichment and "money had and received." In addition to the recovery of amounts paid by the Companies, the Receiver will seek an award of prejudgment interest.

The total dollar amount of the commission claims is not yet determined. However, preliminary records indicate that sales commissions exceeded $4.5 million in the three-year period from January 1, 2013, to December 31, 2015. On December 28, 2016, the Receiver filed complaints against Bobby Eugene Guess, David Savage, and Michael Sweet seeking recovery of over $2,250,000 of such commissions. Additional lawsuits will be filed as may be necessary to collect on commission claims. Mr. Guess failed to answer the Complaint and the Receiver's motion for default judgment as to liability, with an evidentiary hearing on damages, is pending.

The Receiver has identified potential claims exceeding $600,000 against former noteholders who received excess interest payments that could be asserted cost effectively (the "Clawback Claims"). On December 28, 2016, the Receiver

filed complaints against Antonio Duscio, William Clow, Neal Jones, Beverly and Lynn Leverton, Terry Luck, and Walter Padon seeking to claw back $600,000 of excess interest. Note that these claims are being made only against Noteholders who have received a full repayment of their principal *and* interest payments in addition to such principal. To date, the Receiver has reached settlements in the amount of $65,975.00 on Clawback Claims.

Mr. Duscio has moved to dismiss the Receiver's Clawback Claims against him. The Receiver objected to the motion. We are waiting for the Court's ruling. Three other clawback defendants, Neal Jones, Terry Luck, and Walter Padon failed to answer the Complaint and are in default.

The Receiver may also assert claims against James Torchia and members of his family to recover personal expenses paid by the receivership companies and transfers of funds used to purchase Mr. Torchia's homes and fund his other business interests. The amount of such claims has not yet been determined.

The Receiver anticipates that all clawback claims will be filed in this Court in Atlanta because, in federal equity receiverships, the receivership court acquires nationwide jurisdiction based on the interplay of 28 U.S.C. § 754 and 28 U.S.C. § 1692.

**6.** *List of known creditors and investors with their addresses and amounts of their claims.*

The list of all known creditors of Defendants is attached hereto and incorporated herein as Exhibit CNC-F.

The list of all known Insurance Policy Investors of CNC as of June 30, 2017, is attached hereto and incorporated herein as Exhibit CNC-G.[2] This list excludes those Direct Investors who have claimed life settlement policies in which they have invested or have received proceeds from those policies. The claims of those Direct Investors have been liquidated by such actions.

The list of all known Promissory Note Investors of CNC as of June 30, 2017, is attached hereto and incorporated herein as Exhibit CNC-H.

**7.** *Status of creditor and investor claims proceedings, after such proceedings have been commenced.*

On April 19, 2017, the Receiver filed his Motion and Brief to Approve the Claims Process and Plan of Distribution (the "Distribution Motion") outlining the Receiver's plan for distribution of CNC's assets. A copy of the Distribution Motion was sent to all investors and posted on the Receivership website. The

---

[2] Un-redacted lists disclosing the identity of the insureds and the investors' names and addresses will be filed with the Court under seal if the Court so directs.

Court scheduled a hearing on the Distribution Motion for 10:00 a.m. on July 18, 2017. The Receiver will issue an update to all investors when the Court rules on the Distribution Motion.[3]

**8.** ***Receiver's recommendations for continuation or discontinuation of receivership and the reasons for the recommendation.***

It is the recommendation of the Receiver to continue the Receivership as long as necessary to fully liquidate the life settlement policies and all assets, conclude clawback claims, and obtain court approval of the final distribution.

**II.** **River Green Capital, LLC** – This section of this Quarterly Status Report addresses River Green, an entity affiliated with CNC through common ownership and operation. River Green was added to the Receivership by order of the Court on October 25, 2016.

**A.** **Accounting**

The River Green Statement of Assets and Liabilities as of June 30, 2017 (collectively the "River Green Financial Reports") is attached hereto and incorporated herein as Exhibit RG-A. River Green has always operated as an affiliate of CNC. River Green has no employees or fixed assets; its only assets are

---

[3] The Court has not ruled on the Distribution Motion as of the filing of this Quarterly Status Report.

the life settlement policies recorded in its name. Its only known liabilities are payables to CNC, the promissory notes it has issued and its obligations to pay premiums on its life settlement policies.

## B. Additional Information

In addition to the accounting referenced above, the Order specifically requires the Receiver to address the following eight items.

### 1. *A summary of the operations of the Receiver.*

To the Receiver's knowledge, River Green has never had employees, facilities or physical assets, but has relied upon the services of CNC and, since April 25, 2016, the Receivership to conduct its operations. All investors in River Green have invested via interest bearing promissory notes, with the proceeds of such notes being used by River Green to purchase life settlement policies.[4] Accordingly, no investor has any ownership interest in a specific life settlement policy (or other asset) of River Green. Rather, River Green's asset are owned solely by the River Green entity, and

---

[4] The River Green investors actually invested in either River Green Blended Asset Fund LP (US) ("RG Asset Fund") or River Green Autolife Fund, Ltd. (Cayman) ("RG Autolife Fund"), both of which transferred all investment proceeds into River Green Autolife Capital LP (Cayman) (the "Master Fund"). The Master Fund transferred assets to River Green Settlements S.a.r.l. (Luxembourg) (the "S.a.r.l.") and, in return, the Master Fund received a structured note from the S.a.r.l. The S.a.r.l. paid the proceeds into River Green as paid-in-capital and owns a 99.5% membership interest in River Green. The S.a.r.l. securitized the structured note to the Master Fund with the life settlement policies held by River Green.

the investors are unsecured creditors, each of whom has a claim against River Green for the amount of his or her promissory note investment.

River Green's assets are summarized on Exhibit RG-B. During the second quarter of 2017, the only changes to River Green's policy portfolio were:

- Three policies were surrendered as their surrender value exceeded their market value. The total surrender value of these policies was $7,197.24.

- Two polices were allowed to lapse as they had no market value due to long life expectancies and high premiums relative to the death benefit.

The starting and ending policy portfolio for the second quarter is summarized on Exhibit RG-B. As of June 30, 2017, River Green has retained its interest in eight (8) life settlement policies. The Receiver expects to market and sell seven (7) of those policies and to allow the other policy to lapse.

As with CNC, all policies are monitored by TrackLife, a third-party service provider, to ensure payment of premiums and monitoring of maturities should the remaining Receivership employee become unavailable.

**2.** *Cash on hand, amount and nature of accrued administrative expense, amount of unencumbered funds in the estate.*

As of June 30, 2017, the River Green Receivership had unencumbered cash of $67,784.71. The Receiver's fees for River Green for the second quarter of 2017

totaled $4,744.50. The Receiver's cash projections for 2017 are set forth on Exhibit RG-C. The primary expense is expected to be legal fees; premium payments will be nominal as it is anticipated that all River Green policies will be liquidated in the short term.

### 3. *Schedule of receipts and disbursements.*

In addition to the River Green Financial Reports, attached hereto as Exhibit RG-D is a Schedule of Receipts and Disbursements showing all bank account receipts and disbursements for the second quarter and for the period from the inception of the River Green Receivership through June 30, 2017. The first page of Exhibit RG-D summarizes the receipts and disbursements; the remaining pages set forth the detail of all individual entries. Although River Green has repaid CNC for all amounts previously advanced by CNC to pay premiums on River Green policies, there is a running payable due to CNC to cover payroll expenses. The Receiver believes that River Green has sufficient cash to support its operations and will not have to borrow from CNC in the future.

4. **Description of all known Assets, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended.**

The life settlement policies identified on Exhibit RG-B are the only known material assets of the Receivership, other than the cash shown on the River Green Statement of Assets and Liabilities. The Receivership does not intend to retain any life settlement policies listed on Exhibit RG-B.

5. **Description of liquidated and unliquidated claims of Defendants, including the need for forensic and/or investigatory resources; approximate valuation of claims; and anticipated or proposed method of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and (ii) collecting judgments).**

The Receiver is not aware of any claims that may be pursued by River Green to recover additional assets.

6. **List of known creditors and investors with their addresses and amounts of their claims.**

The only known creditors of River Green are those who invested in promissory notes[5] and J. Murray. A list of the investors is attached hereto and

---

[5] The investors are the ultimate beneficiaries of the Master Fund.

incorporated herein as Exhibit RG-E. Names of investors have been removed for privacy reasons, but each investor can identify his or her investment by initials, state of residence and amount of investment.

7. **Status of creditor and investor claims proceedings, after such proceedings have been commenced.**

No claims proceedings have been commenced.

8. **Receiver's recommendations for continuation or discontinuation of receivership and the reasons for the recommendation.**

It is the recommendation of the Receiver to continue the Receivership as long as necessary to fully liquidate the life settlement policies and obtain court approval of the final distribution.

III. **National Viatical, Inc.** – This section of this Quarterly Status Report addresses the status of National Viatical, Inc. ("NVI") and NVT Trust ("NVT"). NVI is an entity affiliated with CNC through common ownership and operation. NVT is a trust created to be the owner or assignor of life settlement policies purchased by NVI on behalf of the NVI investors, including promissory note holders. NVI and NVT were added to the Receivership by order of the Court on October 25, 2016. NVI investors should visit the Receivership website at www.cncreceiver.com to see the

Asset Plan for NVI and to stay abreast of other filings and actions with respect to the Receivership.

## A.    <u>Accounting</u>

The NVI Statement of Assets and Liabilities as of June 30, 2017 (collectively the "NVI Financial Reports") is attached hereto and incorporated herein as Exhibit NVI-A. Since the inception of CNC, NVI has been operated as an affiliate of CNC. NVI has no employees or fixed assets; its only assets are the life settlement policies recorded in NVT's name and in the names of certain investors. Its only known liabilities are payables to CNC, the promissory notes it has issued and its obligations to pay premiums on its life settlement policies.

## B.    <u>Additional Information</u>

In addition to the accounting referenced above, the Order specifically requires the Receiver to address the following eight items.

### 1.    *A summary of the operations of the Receiver.*

NVI does not have any employees, facilities or physical assets, but has relied upon the services of CNC and, since April 25, 2016, the Receivership to conduct its operations. Investors in NVI have invested in three distinct ways:

(a) Promissory Notes – two investors invested a total of $386,176.18 in promissory notes issued by NVI. To date, those note investors have received

an aggregate of $379,238.07 in interest payments (98.2% of their original investment). The promissory note investments are listed on Exhibit NVI-B-1.

(b) Direct Investment in Life Settlement Policies – Exhibit NVI-B-2 attached hereto sets forth details of investors who made a direct investment in life settlement policies. These policies were purchased by NVI, then resold, in whole or in fractional parts, to the investors. Such policies are recorded with the insurers in the name of NVT or in the names of the investors. In accordance with the Court's May 25, 2016, order (the "Pooling Order"), the Receiver will allow the direct investors to retain their policies upon payment of fictitious profits to NVI. Any policies which direct investors do not wish to retain will be pooled with the other assets of NVI.

(c) Indirect Investment in Life Settlement Policies - Exhibit NVI-B-3 attached hereto sets forth details of investors who have made an indirect investment in life settlement policies. These policies were purchased by NVI, then resold, in whole or in fractional parts, to the investors, but were recorded in the name of NVT. The Receiver intends to seek court approval to liquidate these policies to generate cash that can then be distributed to NVI's creditors, including the indirect investors.

NVI's assets are summarized on Exhibit NVI-C. During the second quarter of 2017, the only changes to NVI's policy portfolio were:

- Eight policies were surrendered as their surrender value exceeded their market value. The total surrender value of these policies was $224,127.06.

- One policy was allowed to lapse as it had no market value due to long life expectancy and high premiums relative to the death benefit.

The starting and ending policy portfolio for the second quarter is summarized on Exhibit NVI-C. As of June 30, 2017, NVI has retained its interest in thirteen (13) life settlement policies. The Receiver expects to lapse or surrender five (5) of those policies and to market and sell seven (7) policies. One other policy, Kelly-Holbrook, is owned by a Direct Investor who has been directed to repay fictitious profits to the Receiver. The Receiver intends to file a motion with the Court to recover those fictitious profits in the event the Direct Investor refuses to surrender.

As with CNC, all policies are monitored by TrackLife, a third-party service provider, to ensure payment of premiums and monitoring of maturities should the remaining CNC employees become unavailable.

Given the amount of advances owed by NVI to CNC, the Receiver is not confident that any funds will be available to the NVI investors unless he is able to recover the Lovell policy (see item 5 below).

**2. Cash on hand, amount and nature of accrued administrative expense, amount of unencumbered funds in the estate.**

As of June 30, 2017, the NVI Receivership had unencumbered cash of $265,372.29. The Receiver's fees for NVI for the second quarter of 2017 total $5,477.50. The Receiver's cash projections for 2017 are set forth on Exhibit NVI-D. The primary expense is expected to be the payment of premiums, which will decrease as policies are sold.

**3. Schedule of receipts and disbursements.**

Attached hereto as Exhibit NVI-E is a Schedule of Receipts and Disbursements showing all bank account receipts and disbursements for the second quarter and for the period from the inception of the NVI Receivership through June 30, 2017. The first page of Exhibit NVI-E summarizes the receipts and disbursements; the remaining pages set forth the detail of all individual entries. NVI remains obligated to CNC for amounts previously advanced by CNC to pay premiums on NVI policies. CNC will continue to advance funds to keep NVI policies in effect until NVI is able to repay such advances.

**4.** *Description of all known Assets, including approximate or actual valuations, anticipated or proposed dispositions, and reasons for retaining assets where no disposition is intended.*

The life settlement policies identified on Exhibit NVI-C are the only known material NVI assets, other than the cash shown on the NVI Statement of Assets and Liabilities.

**5.** *Description of liquidated and unliquidated claims of Defendants, including the need for forensic and/or investigatory resources; approximate valuation of claims; and anticipated or proposed method of enforcing such claims (including likelihood of success in: (i) reducing the claims to judgment; and (ii) collecting judgments).*

The Receiver has filed a claim against Antonio Duscio to recover title to a life settlement policy shown on Exhibit NVI-C as policy number "UM0037090L," with an insured name of "Lovell." The Lovell policy was purchased by NVI, then pledged as security for a loan made by Mr. Duscio to another CNC-related entity. The Receiver believes that the loan to Mr. Duscio has been fully repaid by CNC and that, therefore, Mr. Duscio has no interest in the Lovell policy. Mr. Duscio disagrees. On December 28, 2016, the Receiver filed a complaint against Mr. Duscio, among others, in this Court, Civil Action 1:16-cv-04767-WSD (the "Duscio

Action"), and is contesting the ownership of the Lovell policy. Upon the Receiver's Motion, this Court entered a stay of sale or transfer of the Lovell policy. [Duscio Action, Doc. 32.]

Other than the claim with respect to the Lovell policy, the Receiver is not aware of any claims that may be pursued by NVI to recover additional assets.

**6.** *List of known creditors and investors with their addresses and amounts of their claims.*

The only known creditors of NVI are those who invested in promissory notes (see Exhibit NVI-B-1). The only other known investors are those who invested in life settlement policies (see Exhibits NVI-B-2 and NVI-B-3).

**7.** *Status of creditor and investor claims proceedings, after such proceedings have been commenced.*

No claims proceedings have been commenced.

**8.** *Receiver's recommendations for continuation or discontinuation of receivership and the reasons for the recommendation.*

It is the recommendation of the Receiver to continue the Receivership as long as necessary to fully liquidate the life settlement policies and obtain court approval of the final distribution.

Respectfully submitted, this 28th day of July, 2017.

/s/ Amy K. Weber
AMY K. WEBER
Georgia Bar No. 773736
aweber@taylorenglish.com
WILLIAM G. LEONARD
Georgia Bar No. 446912
bleonard@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 400
Atlanta, Georgia 30339
Telephone: (770) 434-6868
Facsimile: (404) 434-7376
*Attorneys for Receiver Al B. Hill*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | Civil Action File No. 1:15-cv-3904-WSD |
| JAMES A. TORCHIA, CREDIT NATION CAPITAL, LLC, CREDIT NATION ACCEPTANCE, LLC, CREDIT NATION AUTO SALES, LLC, AMERICAN MOTOR CREDIT LLC, AND SPAGHETTI JUNCTION, LLC, | |
| Defendants. | |

## CERTIFICATE OF SERVICE

I hereby certify that I have this day electronically filed the foregoing Quarterly Status Report of Receiver for April 1, 2017 through June 30, 2017 with the Clerk of the Court using the CM/ECF system which will automatically send e-mail notification of such filing to all attorneys of record.

This 28th day of July, 2017.

/s/ Amy K. Weber
AMY K. WEBER
Georgia Bar No. 773736
aweber@taylorenglish.com