IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

                              Plaintiff,

          v.                                              1:15-cv-3904-WSD

JAMES A. TORCHIA, CREDIT
NATION CAPITAL, LLC, CREDIT
NATION ACCEPTANCE, LLC,
CREDIT NATION AUTO SALES,
LLC, AMERICAN MOTOR
CREDIT, LLC, and SPAGHETTI
JUNCTION, LLC,

                              Defendants.

## OPINION AND ORDER

This matter is before the Court on Receiver Al Hill's ("Receiver") Motion to

Approve Claims Process and Plan of Distribution [433] ("Distribution Plan") and

Motion to Disallow Claims [475]. Also before the Court are the objections to the

Distribution Plan filed by numerous claimants, and E. Lynn Schoenmann's

opposition to the Receiver's Motion to Disallow Claims [489]. Also before the

Court is Lee Berman's claim against the Receivership [490.1].

## I.     BACKGROUND

### A.     SEC Action and Appointment of Receiver

On November 11, 2015, the U.S. Securities and Exchange Commission

("SEC") filed an action against James A. Torchia ("Torchia"), Credit Nation

Capital, LLC ("CNC"), Credit Nation Acceptance LLC, Credit Nation Auto Sales,

LLC, American Motor Credit, LLC ("AMC"), and Spaghetti Junction, LLC (CNC

through Spaghetti Junction, LLC, collectively, the "Receivership Entities") for

violations of Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, Section

10(b) of the Exchange Act, Sections 5(a) and 5(c) of the Securities Act, and aiding,

abetting and causing violations of the federal securities laws.  ([1]).

After conducting a hearing on the SEC's motion for preliminary injunction,

on April 25, 2016, the Court issued its order [66] ("April 25th Order") enjoining

Torchia and the Receivership Entities from, among other things, making

representations and omissions identified in the Order or representations or

omissions regarding rates of return and the Receivership Entities' financial status

in connection with the sale of any securities-based sub-prime auto loans, life

insurance settlements, or fractional interests in life settlement contracts.  The

April 25th Order also preserved records, froze assets, and appointed Al B. Hill as

Receiver of the Receivership Entities.

On March 17, 2017, Torchia consented to a permanent injunction and the entry of a final judgment against him, without admitting or denying the substantive allegations in the SEC's complaint.  ([422]).  The Court entered a permanent injunction that prohibits Torchia from selling securities in the future by the use of untrue statements of material facts or misleading statements, and from engaging in any transaction that would operate as a fraud upon the purchaser of a security, including making false representations and omissions regarding rates of return and his businesses' financial status in connection with the sale of securities based on sub-prime auto loans, life insurance settlements, or fractional interests in life settlement contracts.[1]

B.     Nature of Fraudulent Schemes[2]

Beginning in 2010, Torchia, CNC, Credit Nation Acceptance, LLC, and AMC, engaged in fraudulent schemes in two ways.  First, CNC sold unregistered promissory notes ("Promissory Notes") to investors (the "Promissory Note Investors") who were told they would receive a "fixed" return and that the

---

[1]     After the Court approves a plan of distribution of receivership assets to the Credit Nation Capital investors and the total losses suffered by investors are determined, the Court will decide whether Torchia will be required to pay a civil penalty and disgorgement, and if so, in what amount.  ([422] at 4-5).

[2]     A more complete background of the schemes at issue in this action is set forth in the Court's April 25th Order.

Promissory Notes were "100% asset backed."  CNC told Promissory Note Investors that it expected to generate returns from its investments in excess of the interest payable on the notes.  CNC invested Promissory Note sale proceeds in sub-prime automobile loans and purchased life settlement and viatical life insurance policies (the "LS Assets").  The second way CNC raised money was by reselling certain of the LS Assets to investors, either as sales of entire policies or as fractional interests in certain policies.  In each case, CNC retained the obligation to pay premiums on the sold LS Assets.

The Receivership Entities did not generate sufficient earnings to service the Promissory Notes and make the required premium payments on the LS Assets, though the Receivership Entities were able to make those payments as long as they continued to sell additional Promissory Notes and LS Assets.  When the Court issued its injunction preventing the Receivership Entities from raising additional capital from new investors, CNC could no longer make the interest payments on the Promissory Notes or the premium payments to keep the LS Assets in force.

C.     Assets of the Receivership

The assets of the Receivership fall into three broad categories:  (i) LS Assets; (ii) Clawback Claims; and (iii) and "Other Assets."

4

1.   <u>LS Assets</u>

Pursuant to the Court's April 25th Order, the Receiver obtained immediate exclusive jurisdiction and possession of the Assets of Torchia and the Receivership Entities, and all property, real and personal, including cash, securities, receivables, and accounts.  The Receiver determined that, without an infusion of cash into CNC, the LS Assets were at risk of lapse due to non-payment of premiums. Shortly after the Court appointed him, the Receiver liquidated AMC's remaining auto loans and began the process of liquidating the LS Assets, using the proceeds to pay additional premiums until the remaining LS Assets could be sold in an orderly process.  The LS Assets are subcategorized into "Claimed LS Assets" and "Pooled LS Assets."

a)   <u>Claimed LS Assets</u>

Certain LS Assets were sold by CNC to "Direct Investors."[3]  In accordance with the Court's May 25, 2016, Order [120], the Receiver offered Direct Investors the opportunity to retain their interests in their LS Assets in exchange for repayment of Fictitious Profits to the Receivership.  Numerous Direct Investors

---

[3]   Direct Investors are those investors who purchased life insurance policies and are the named beneficiaries of the death benefits.  Indirect Investors are those investors who purchased, with others, fractional interests in life insurance policies where CNC is the named beneficiary of the death benefits.  ([120] at 3).

accepted the offer to retain their applicable LS Assets (the "Claiming Direct Investors"), resulting in the collection by the Receiver of Fictitious Profits in the amount of $142,810.25.  Exhibit "A" to the Receiver's Distribution Plan details all the Claimed LS Assets of the Claiming Direct Investors.  The Receiver's position is that the Claiming Direct Investors have no further claims against the Receivership with respect to the Claimed LS Assets; the Receiver seeks an Order excluding the Claiming Direct Investors from taking any distribution with respect to the Claimed LS Assets from the Initial Distribution or Remaining Funds.

b)    Pooled LS Assets

The LS Assets which remained after removal of the Claimed LS Assets were either indirectly wholly-owned by CNC, owned by Indirect Investors, belong to Direct Investors who chose to not claim their LS Assets, or are owned by a combination of CNC, Indirect Investors and Direct Investors.  These remaining LS Assets (the "Pooled LS Assets") were evaluated by the Receiver, who decided whether to sell, retain until maturity, or allow the lapse of each asset.  A summary of the decisions taken by the Receiver is contained in the Receiver's Distribution Plan.  ([433] at 9-10).

6

   2. <u>Clawback Litigation</u>

The Receiver also commenced litigation ("Clawback Litigation") to recover additional amounts for the receivership estate.   First, the Receiver sued certain promissory note investors who were repaid the full amount of their investments plus additional payments denominated as interest.   The Receiver also seeks to recover, in that litigation, a viatical insurance policy that has not yet matured.   The Receiver also sued three sales agents of CNC who sold Promissory Notes and LS Assets to investors.  These agents engaged in written and oral communications with potential investors and, in some instances, television and radio commercials and print advertisements designed to attract investors.  The agents' compensation was directly tied to their actual production of sales.  The Receiver expects to file suit against other sales agents if acceptable settlements cannot be reached with them.

   3. <u>Other Assets</u>

The Receiver has also liquidated all other known assets of the Receivership, including:  CNC's office equipment and furniture, the portfolio of sub-prime automobile loans held by AMC, a wholly-owned subsidiary of CNC, at the commencement of the Receivership, and Mr. Torchia's interest in a restaurant known as Sixes Tavern.  The total proceeds received to date from the sale of these

"other assets" is $1,652,932.57.  The Receiver is pursuing the potential sale of CNC's web domains and is investigating potential recovery of additional assets from Mr. Torchia.

      D.      Receiver's Claims Verification

In addition to marshaling and collecting assets, the Receiver sought to identify individuals or entities who are (a) Promissory Note Investors or Direct or Indirect Investors in Pooled LS Assets (collectively, "Investors"), or (b) trade creditors or other claimants who have provided goods or services to the Receivership Entities for which they have not been paid or who otherwise have a claim, other than a claim as an Investor, against any of the Receivership Entities (hereinafter collectively "Other Claimants").  Following a careful review of CNC records, and with the assistance of two former staff members of CNC who continue to be employed by the Receiver, the Receiver projects that Investors' claims total approximately $61 million.  This amount excludes those investments that have been fully paid or liquidated, such as those related to the Claimed LS Assets.

      1.      Investors' Claims

To verify the CNC records described above, on December 23, 2016, the Receiver circulated a proof of claim form.  A copy of the correspondence and

proof of claim form is attached to the Receiver's Distribution Plan as Exhibit "B." The proof of claim forms were sent to all known Promissory Note Investors and all Direct and Indirect Investors, other than those Claiming Direct Investors who had already claimed specific LS Assets and Fractional Direct Investors who had already received payment with respect to specific LS Assets.  The Receiver set a deadline of January 31, 2017, for a return of the claim form along with appropriate documentation to support the proof of claim.

The Receiver states there are 639 active claims, involving 445 Promissory Note Investors and 194 Direct and Indirect Investors.  After the initial request for completion and submission of a proof of claim form, the Receiver received 510 returned claim forms with appropriate documentation to which he has no objection and which match CNC's records.  The Receiver has received 16 claim forms which do not match CNC's records; he states he is working with the individual investors to resolve the discrepancies.  There are 113 CNC investors who have not returned a proof of claim form.

2.    Other Claimants

As of March 31, 2017, the Receiver stated he is aware of the Other Claimants described on Exhibit "C" to the Receiver's Distribution Plan, and no

others, with the exception of American Pegasus, SPC ("AmPeg"), discussed below.

      E.    <u>Procedural History</u>

On April 19, 2017, the Receiver filed his Distribution Plan.  The Receiver proposes that the Promissory Note Investors, Direct and Indirect Investors in Pooled LS Assets, and Other Claimants be treated as a single, equal class of claimants and that no Investors or Other Claimants whose claims are recognized receive any priority over any other creditor.  Where a single investor has multiple claims, the Receiver proposes consolidating the claims into a single claim for purposes of evaluating relative distributions, arguing that the consolidation of investments is a more equitable approach than considering each of an investor's investments individually.

The Receiver considered three separate distribution theories:  (1) gross investment method, (2) net loss method, and (3) rising tide method.  After considering the impact of each plan on all Investors, the Receiver proposes to distribute based upon the rising tide theory, arguing that it provides more equal recovery for all Investors, taking into account returns realized prior to the Receivership.

On April 19, 2017, the Court issued its order [435] stating that "[t]he Court, subject to the input of investors and other claimants, preliminarily approves the Receiver's use of the rising tide distribution method for all distributions to investors in the Receivership and preliminarily approves the Distribution Plan." ([435] at 1-2).  To allow all interested parties and third parties the opportunity to respond, the Court set the following deadlines for further processing and consideration of the Plan and objections to it:

> By June 1, 2017: All Proof of Claims Forms must be received by the Receiver to be considered for participation in distribution.

> By June 5, 2017: Deadline to submit objections to the Distribution Plan for all parties and third-parties, including, but not limited to: Parties, All Investors, Claiming Direct Investors, Other Claimants, and American Pegasus, SPC.

> By June 30, 2017: Deadline for Receiver to respond to Objections to the Distribution Plan.

> By June 30, 2017: Deadline for Receiver to move to disallow claims.

> July 18, 2017: Hearing on objections to, and consideration of approval of, the Distribution Plan.

Several investors filed objections to the Distribution Plan.  The Court received objections from:  Herbert Haynie [447], Deborah and Robert Pyne [449], Julie B. Collins [452], David and Linda Foster [453], Kathleen S. Skinner [454], Robert L. LaPrade [455], Joyce and Ben Griffin [456], Bobby and Saundra

Crenshaw [456], Eugene McCalvey [457], Judy and John De Kort [459], Elizabeth Ann Daughtery [460], Kathleen Rice Pennington, on behalf of Joseph Leon Rice [463], and Erlinda Farmer [469].  These investors largely object to the rising tide method in favor of the net loss method of distribution, arguing that the rising tide method does not take into account the "opportunity cost" associated with the investors' inability to invest their funds in different investments.  Many of the investors also object to the pooling of their individual investments for purposes of determining distribution.[4]

The Court also received the "Objections and Brief in Opposition to Receiver's Distribution Plan" [461] filed by attorney Justin O'Dell on behalf of the following investors:  Sonya Gravitt, Antonio Duscio, Tina Coleman, Thomas Coleman, Margaret Coleman, Shirley Gregory, James Gregory, Charles Heild, James Hoyer, Nancy Hoyer, Thomas Jones, Sarah Jones, William Rumer, Holly Hood, Richard Sutherland, and Katherine Sutherland (collectively, the "O'Dell Investors").  The O'Dell Investors argue that (1) the Receiver's summary proceedings violate due process; (2) the Distribution Plan violates due process; (3) the summary proceedings on the proposed Distribution Plan violate due process

---

[4]     Ms. Pennington, on behalf of her father, Mr. Rice, also argues her father's hardships present a unique case.

by prohibiting investors from asserting claims and defense related to their purported property rights in their investments; (4) the Receiver's agents engaged in improper behavior relating to conflicts of interest and undervaluing policies; and (5) investors are entitled to discovery and an opportunity to be heard on the underlying merits of this action.

On June 30, 2017, the Receiver filed his Motion to Disallow Claims.  The Receiver seeks to disallow the following claims:  (1) AmPeg's claim for $393,781.59 because AmPeg allegedly waived its claim by agreeing to allow the policy to lapse and failing to file an objection to the Distribution Plan; (2) AmPeg's claim for $9 million relating to a claim of Torchia's fraudulent transactions, because AmPeg already litigated and settled this issue; (3) James Richard Borland's claim stemming from a policy on the life of Larry Reaves, because the Receivership does not have any record of this policy; (4) Tony Duscio's claims arising out of his business transactions with Torchia ; (5) Sonya Gravitt's claim to recover fictitious profits, because fictitious profits cannot be recovered; (6) James Hoyer's claims to recover assets from River Green, because River Green investor claims are not properly payable out of CNC's assets; (7) Joseph Leon Rice's claims to recover assets from National Viatical, because National Viatical investor claims are not properly payable out of CNC's assets;

13

(8) William Rumer's claim to recover fictitious profits, because fictitious profits

cannot be recovered; (9) Katherine and Richard Sutherland's claim to recover

fictitious profits, because fictitious profits cannot be recovered; (10) Synergy

Acceptance Corporation's ("Synergy") claim arising out of a bankruptcy case and

adversary proceeding against Torchia and related entities; (11) Hazel Bacca,

Thomas Hall, and Bob Guess's potential claims because these individuals failed to

return claim forms after repeated attempts by the Receiver to contact them.

On June 6, 2017, Lee Berman, a former employee of Credit Nation who also

was retained by the Receiver, filed a claim [490.1] for allegedly unpaid

commissions he was owed on policies he sold on behalf of Credit Nation.

On July 18, 2017, the Court held a hearing ("Distribution Plan Hearing") on

the Receiver's Motion to Disallow Claims and on the Distribution Plan.  The

following individuals appeared at the hearing:  Amy Weber and Bill Leonard on

behalf of the Receiver; Justin O'Dell on behalf of the O'Dell Investors; Joshua

Mayes on behalf of the SEC; and Lee Berman.  At the hearing, Ms. Weber

summarized the Receiver's arguments in support of its Distribution Plan and

Motion to Disallow Claims.  Mr. O'Dell presented arguments in further support of

his opposition to the Distribution Plan.  In support of his claim, Mr. Berman stated

that he worked for the Receivership until June 30, 2017, and that he did not receive

14

notice of the deadline to file claims with the Receivership.  The SEC indicated its

support for the rising tide method of distribution.  (Tr. 44).  The Court sets forth

additional facts below.

## II.   LEGAL STANDARD

"In equity receiverships resulting from SEC enforcement actions, district

courts have very broad powers and wide discretion to fashion remedies and

determine to whom and how the assets of the Receivership Estate will be

distributed."  S.E.C. v. Homeland Commc'ns Corp., No. 07-cv-80802, 2010 WL

2035326, at *2 (S.D. Fla. May 24, 2010); see S.E.C. v. Elliot, 953 F.2d 1560, 1566

(11th Cir. 1992) ("The district court has broad powers and wide discretion to

determine relief in an equity receivership.  This discretion derives from the

inherent powers of an equity court to fashion relief." (citations omitted)); see also

Bendall v. Lancer Mgmt. Grp., LLC, 523 F. App'x 554, 557 (11th Cir. 2013)

("Any action by a trial court in supervising an equity receivership is committed to

his sound discretion and will not be disturbed unless there is a clear showing of

abuse." (citation and internal quotation marks omitted)).

"[N]o specific distribution scheme is mandated so long as the distribution is

fair and equitable."  Homeland, 2010 WL 2035326, at *2 (internal quotation marks

omitted) (quoting S.E.C. v. P.B. Ventures, No. 90-cv-5322, 1991 WL 269982,

at *2 (E.D. Pa. Dec. 11, 1991)).  "[W]hen victims seeking restitution occupy similar positions, a pro rata distribution is preferred."  S.E.C. v. Drucker, 318 F. Supp. 2d 1205, 1206 (N.D. Ga. 2004).  "Thus, where a victim seeking preferential treatment cannot materially distinguish his situation from that of other victims, a pro rata distribution is recognized as the most equitable solution."  Id. at 1207.  A "rising tide" allocation, which the Receiver proposes here, "result[s] in a pro rata distribution of available assets to victims."  Michael L. Martinez, The Ebb of Rising-Tide Distributions in Ponzi Scheme Bankruptcies, 35 Am. Bankr. Inst. J. 16 (June 2016); see S.E.C. v. Par., No. 2:07-cv-00919, 2010 WL 5394736, at *3 (D.S.C. Feb. 10, 2010) (discussing "pro-rata payments based on the Rising Tide calculation").

## III.  DISCUSSION

### A.    O'Dell Investors' Objections to Distribution Plan

The O'Dell Investors argue that (1) the Receiver's summary proceedings violate due process; (2) the Distribution Plan violates due process; (3) the summary proceedings on the proposed Distribution Plan violate due process by prohibiting investors from asserting claims and defense related to their purported property rights in their investments; (4) the Receiver's agents engaged in improper behavior relating to conflicts of interest and undervaluing policies; and (5) investors are

entitled to discovery and an opportunity to be heard on the underlying merits of
this action.

### 1.   Fictitious Profits and Due Process

The Court has already addressed the majority of the O'Dell Investors' due
process arguments in previous orders.  At the Distribution Plan Hearing, O'Dell
acknowledged that his due process arguments were made "so as not [to be]
deemed . . . abandoned . . . ."  (See Tr. 17-18).  The Court nevertheless again
addresses the O'Dell Investors' arguments.

The crux of the O'Dell Investors' due process argument is that the
repayment of Fictitious Profits violates the investors' due process.  On
May 25, 2016, the Court issued its Order [120] ("Pooling Order") setting forth the
method by which the Receiver would distribute assets.  The Pooling Order required
a pro rata distribution, except allowed Direct Investors to maintain their interests in
life insurance policies if they remit to the Receiver fictitious profits they received
from CNC as a result of its premium payments and servicing of their policies.  On
July 21, 2016, certain intervening investors filed their motion to amend the Pooling
Order [185], arguing, in part, that fictitious profits should not be required to be
remitted to the Receiver.  On August 24, 2016, the Court issued an order rejecting
the intervenors' motion to amend, explaining:

> In any case, Intervenors' arguments are unpersuasive, because the
> Court already determined—and does not change its conclusion here—
> that because funds from Direct, Indirect, and Promissory Note
> Investors were commingled, and those commingled funds were used
> to keep insurance policies in force, a pro rata distribution is equitable.
> The Court allowed only minor carve-outs from this pro rata rule to
> account for unique situations presented by the broad range of
> investments Defendants solicited.  To now increase the scope of that
> carve-out to include all insurance policy investors—and to allow those
> investors to maintain their interests in the insurance policies without
> first returning fictitious profits received from commingled funds—
> would allow Intervenors "to elevate their claims by standing on the
> backs of the other [ ] investors whose funds kept [their] policies
> viable . . . ."

([208] (citation omitted)).  The Court here similarly rejects the O'Dell Investors'

renewed arguments that they should not be required to pay Fictitious Profits.

The O'Dell Investors also claim they have been denied due process because

they have not been afforded a hearing.  The Court previously addressed this issue

with respect to the objection to repaying fictitious profits lodged by Ms. Gravitt,

one of the O'Dell Investors.  The Court explained:

> Gravitt argues, relying largely on cases from the turn of the 20th
> Century that do not apply here, that a receivership court may not
> summarily order a third party to turn over property to a receiver where
> the third party asserts that it owns the property.  She argues the
> Receiver must file a separate lawsuit to recover the property or join
> her in the receivership action.  The Court disagrees. . . . During these
> multiple opportunities to be heard, Gravitt has not presented any
> arguments that a fuller proceeding would afford her a better
> opportunity to defend against the payment of fictitious profits or the
> assignment of her policy.  See SEC v. Elliott, 953 F.2d at 1567. The
> Court finds that Gravitt has been afforded the process she is due.

([327]).  In addition, the O'Dell Inverstors were afforded an opportunity to be heard on their Fictitious Profits arguments both in their brief in opposition to the Receiver's Distribution Plan and at the Distribution Plan Hearing.  The Court addresses these arguments here.  The O'Dell Investors' contention that they have been denied the opportunity to be heard on their Fictitious Profits arguments is simply untrue.

The O'Dell Investors also argue that the determination as to the "permanent deprivation of their property rights" requires an adequate opportunity to present a defense, which they contend they have been denied.  ([461] at 8-9).   In this case, however, there has been no permanent deprivation of property rights without due process.  As an initial matter, the O'Dell Investors did not timely object to the requirement to repay Fictitious Profits.  Further, unlike in SEC v. Elliott, 953 F.2d 1560, 1566 (11th Cir. 1992), upon which the O'Dell Investors rely, the Receiver does not seek to reclaim fraudulently conveyed property.  The Court allowed Direct Investors to maintain their property interests in life settlement policies so long as Fictitious Profits were repaid.  In sum, none of the O'Dell Investors has been deprived of a property right to continue to retain and own the policies into which they invested, they had an opportunity to be heard both in written briefs submitted to the Court and at the Distribution Plan Hearing, and they do not show

how their interest with respect to repayment of Fictitious Profits would be better protected in a plenary proceeding.

The O'Dell Investors next claim that the repayment of Fictitious Profits— fees assessed against Direct Investors to restore the Receivership estate back to the status quo—is a deprivation of a property right without due process. The O'Dell Investors fail to acknowledge that the Court's Pooling Order elevated the status of Direct Investors with respect to other investors due to the Direct Investors' contractual relationship with the insurance companies. As the Receiver notes, on the whole, Direct Investors will receive in excess of the 29.8% floor of recovery, and, in many cases, some will receive more than 100% of their principal investment when their life settlement policies mature. Further, as explained above, the issue of Fictitious Profits has been thoroughly litigated by the O'Dell Investors, including in their opposition to the Distribution Plan and at the Distribution Plan Hearing. The Court rejects the O'Dell Investors' argument that repayment of Fictitious Profits deprives them of a property right without due process.

The O'Dell Investors next claim that the proposed Distribution Plan itself violates the investors' due process. They argue that "the SEC and the Receiver seek to appropriate the Investors' property without ever proving the allegation that a fraudulent transfer occurred or defending any challenge to them. It is a clear due

process violation." ([461] at 10).  They argue that the Court should not allow a

distribution of assets "without an adjudication on the merits."  (Id. at 12).  As an

initial matter, the Receiver does not seek to "appropriate" or claw back any

property from the O'Dell Investors.  The Distribution Plan seeks only an equitable

distribution of assets that are already a part of the Receivership.  There are no

claims to "adjudicate[e] on the merits."  Second, the O'Dell Investors ignore that

Elliott, upon which they rely, specifically allows for summary proceedings of the

sort conducted here.  The O'Dell Investors received notice, an opportunity to file

written objections to the Distribution Plan, including any supporting evidence, and

an opportunity to be heard at the Distribution Plan Hearing.  That is all due process

requires here.  See Elliott, 953 F.2d at 1566.

> 2. Fictitious Profits and Ability to Assert Claims and Defenses

The O'Dell Investors next set forth arguments related to due process that the

Distribution Plan prohibits investors from asserting claims and defenses related to

their property rights.  They argue that they should have been provided an

opportunity to contest Fictitious Profits on the basis that the "investors were good

faith purchasers for equivalent value and are entitled to a setoff of the policy

premiums and services [for CNC] as bargained for in their purchase agreement."

([461] at 13-14).  That the O'Dell Investors may have been good-faith purchasers

for value is irrelevant in the context of the liquidation of an equity receivership. As the Receiver notes, it appears that all Investors, with a few exceptions, had legally valid contracts with CNC.  The issue here, where CNC was placed into a receivership because its liabilities exceeded its assets, is how the assets of the receivership should be distributed in a liquidation.

The O'Dell Investors next argue that O.C.G.A. §§ 18-2-73 and 18-2-78 prevent the payment of Fictitious Profits because Fictitious Profits are "reasonably equivalent value."  ([461] at 14).  Section 18-2-78(a) provides that "[a] transfer or obligation is not voidable under . . . [section] 18-2-74 against a person who took in good faith for a reasonably equivalent value or against any subsequent transferee or oblige."  Again, however, the Receiver does not seek to void any transfer of a life settlement policy directly owned.  He seeks only to recoup Fictitious Profits the O'Dell Investors received that kept their policies in force.  If a Direct Investor chooses not to remit Fictitious Profits, the investor is not deprived of a property right and would receive a distribution under the Distribution Plan in accordance with the investor's ownership in the directly-owned life settlement policy.  The O'Dell Investors' argument also assumes that premium payments were always collected by CNC in the purchase price.  As the Receiver shows, however, in all

but a few policies, costs for premium payments through the life of the policy were not collected.

Finally, the O'Dell Investors argue that the Receiver is prohibited from clawing back interest payments made before the statute of limitations for fraudulent transfer actions. The O'Dell Investors' argument again appears to be based on the false assumption that the recovery of Fictitious Profits is an attempt to "claw back" or void a fraudulent transfer. The question before the Court is only the fair and equitable division of the assets of the Receivership. There is no statute of limitations on fairness and equity.[5]

B.     Objecting Investors' Objections to Distribution Plan

The Court received objections from Herbert Haynie, Deborah and Robert Pyne, Julie B. Collins, David and Linda Foster, Kathleen S. Skinner, Robert L. LaPrade, Joyce and Ben Griffin, Bobby and Saundra Crenshaw, Eugene

---

[5]     Finally, the O'Dell Investors renew the arguments made previously, ([427], [444]), that the underlying claims giving rise to recovery of Fictitious Profits have been abandoned by the SEC, that the Receiver engaged in improper behavior in selling life settlement policies, and that they should be allowed discovery. With respect to the first argument, the SEC clarified at the Distribution Plan Hearing that it "has no intention of dismissing the securities fraud claims against Mr. Torchia or Credit Nation . . ." (Tr. at 26). Second, the Court already addressed, and rejected, the argument that the Receiver engaged in improper behavior. (See [410]). Third, the Court also addressed, and rejected, the O'Dell Investors' claim that they are entitled to discovery. (See [450] at 5-6). The Court again rejects the O'Dell Investors' arguments.

McCalvey, Judy and John De Kort, Elizabeth Ann Daughtery, Kathleen Rice
Pennington, on behalf of Joseph Leon Rice, and Erlinda Farmer ("Objecting
Investors"). The Objecting Investors largely object to the rising tide method in
favor of the net loss method of distribution, arguing that the rising tide method
does not take into consideration the "opportunity cost" associated with the
investors' inability to invest their funds in different investments. Many of the
investors also object to the pooling of their individual investments for purposes of
determining distribution.

1.    Rising Tide Method

The Court first addresses the investors' objections to the rising tide method
of distribution. The Receiver proposes, and the SEC supports, the rising tide
method of distributing assets. "'A distribution plan that is supported by both the
SEC and the receiver is entitled to deference from the Court.'" SEC v. Detroit
Mem'l Partners, LLC, No. 1:13-cv-1817-WSD, 2016 WL 6595942, at *11 (N.D.
Ga. Nov. 8, 2016) (quoting SEC v. Quan, No. 11-cv-723, 2015 WL 8328050, at *7
(D. Minn. Dec. 8, 2015)); see S.E.C. v. Byers, 637 F. Supp. 2d 166, 175 (S.D.N.Y.
2009) (giving deference to a distribution plan proposed by the receiver and
supported by the SEC). "The basic goal [of the rising tide allocation] is to equalize
recovery for victims regardless of whether the recovery comes before or after the

commencement of the [receivership]."  Michael L. Martinez, The Ebb of

Rising-Tide Distributions in Ponzi Scheme Bankruptcies, 35 Am. Bankr. Inst. J. 16

(June 2016).  "Rising tide appears to be the method most commonly used (and

judicially approved) for apportioning receivership assets."  S.E.C. v. Huber, 702

F.3d 903, 906 (7th Cir. 2012).  This Court has previously approved as "fair and

equitable" the rising tide method of distribution in an equity receivership resulting

from an SEC enforcement action.  Detroit Mem'l, 2016 WL 6595942, at *11.

     The Objecting Investors who prefer the net loss method of distribution are

not projected to receive any distribution under the rising tide method of

distribution.  This is because the rising tide theory takes into account returns

realized prior to the Receivership.  For instance, prior to the Receivership, "most

Promissory Note Investors received monthly or quarterly payments from CNC."

(Distribution Plan at 22-23).  "From January 1, 2009, through April 25, 2016, CNC

paid out approximately $12,960,000 in interest payments to Promissory Note

Investors.  Under the rising tide theory, withdrawals (or payments) are considered

part of the distribution received by an investor and are subtracted from the amount

of the receivership assets to which an investor would otherwise be entitled had

there been no withdrawals or payments."  (Id. at 23).

The Receiver shows that the rising tide method, taking into account returns realized prior to the Receivership, results in each Investor recovering at least 29.8% of his or her investment.  Other distribution methods result in unequal recoveries, with some Investors receiving, in the aggregate, as little as 16.2% of their investment.  ([476] at 4; [434] at Schedule E).  Further, 74% of Investors under the rising tide theory will receive a distribution under the plan, and 56.86% of Investors who suffered a loss would receive more under rising tide than under the net loss method.

Many Objecting Investors object to the rising tide method because investors who invested in CNC "lost the opportunity" to invest their money in other investments which could have provided a return on investment.  For example, Ms. Collins argues:

> The rising tide distribution theory penalizes those of us who have been the longest term investors.  What it does not seem to take into consideration is the opportunity cost associated with our investments from 2010 forward.  While our money has been "tied up" in good faith, with Credit Nation, we have not been able to invest it in other secure investments that would have been positioned to return our principal plus interest.

([452]).  In Lewis v. Taylor, No. 2012CV1699, 2012 WL 12265654 (D.C. Col. 2012), the court considered an investor's counterclaim against the receiver for damages for the lost investment opportunities and time value of principal.  In

granting the receiver's motion to dismiss the counterclaim, the court stated that if each investor could claim a lost investment opportunity as an offset to the receiver's claim for disgorgement, the multitude of victims who lost their entire investment would receive no recovery.  Id. at *3.  The court also reasoned that allowing such offsets would introduce complex problems of proof and tracing into each assessment of the lost investment opportunity of the principal.  Id.  Finally, equitable principals barred the offset, because "[p]ermitting a counterclaim . . . for loss of the investment opportunity or time value of the invested principal would potentially enable [the claimant] to recover at the expense of other innocent investors in the . . . Ponzi scheme and would undermine the purposes of the receivership and this action."  Id.

The Court rejects the Objecting Investors' argument that the distribution method should take into account the opportunity cost of their investment.  The Court finds the rising tide method is the fairest and most equitable method of distribution here.

2.   Pooling of Investor Accounts

Many of the Objecting Investors also argue that the Court should not consolidate their individual accounts for purposes of determining a distribution. For example, the Fosters state:

> We object to the pooling of three of the Foster Accounts into a
> combined group of both interest payment accounts and the noninterest
> paying life settlement accounts.  Specifically, the two Foster accounts
> of 3 year monthly income are combined with one Pooled Policy
> Investment. . . .  By combining accounts that earned interest with
> non-interest earning accounts, the interest income that was received is
> applied with accounts that did not receive any interest.

([453]).  The Receiver states that, if an Investor collectively on all investments has

received more prior payments than the calculated distribution under the

Distribution Plan, the Investor will not receive any distribution.  In the Fosters'

case, Mr. Foster had two three-year notes of $50,000 each, and he was an Indirect

Investor in the amount of $50,000 on a life settlement policy, for a total investment

of $150,000.  To date, Mr. Foster received $49,125 from CNC, and his calculated

distribution under the plan is $44,422.03.  Because the prior payments he received

exceed the calculated distribution, Mr. Foster does not receive any further

distribution under the plan.  ([476] at 9-10).

Mr. Foster suggests that his life settlement investments, which did not yield

any returns, should not be consolidated with his promissory note investments,

which did yield returns.  The Receiver explains that "[i]f the two types of

investments were analyzed separately under the proposed Distribution Plan,

Mr. Foster would receive an estimated additional amount of $14,925, which would

increase his combined recovery to 47.2% of his principal investment.  By

28

consolidating his investments, the Receiver decreases Mr. Foster's recovery to a total of 32.75% of his total investment—still a better recovery than the average Investor." ([476] at 10).  Considering each investment individually would elevate the Fosters at the expense of other investors.

Mr. Foster also urges the Court to reject consolidation by the Receiver because the various accounts are handled by different custodial firms, and the current pooling will make the evaluation for taxes and "RMD" unnecessarily complicated.  The Court is not persuaded that these factors outweigh the equitable result of pooling each Investor's investments.  The Court concludes that pooling each Investor's investments for purposes of determining a distribution produces a fair and equitable result.  The Objecting Investors' objections are overruled, and the Receiver's Motion to approve the Distribution Plan is granted.[6]

---

[6]     Ms. Pennington, on behalf of her father, Mr. Rice, argues her father's financial hardships present a unique case.  The Court is sympathetic to Mr. Rice's financial situation, and it is sympathetic to the situation of all Investors who lost money investing with Mr. Torchia and his entities.  That Mr. Rice's financial situation is particularly dire, however, does not materially distinguish his situation from that of other investors.  Any increase in Mr. Rice's distribution would be at the expense of other investors, many of whom similarly lost significant portions of their life savings.  Ms. Pennington's objection is overruled.

C.    <u>Motion to Disallow Claims</u>

The Receiver seeks to disallow the following claims:  (1) AmPeg's claim for

$393,781.59 because AmPeg allegedly waived its claim by agreeing to allow the

policy to lapse and failing to file an objection to the Distribution Plan;

(2) AmPeg's claim for $9 million relating to a claim of Torchia's fraudulent

transactions, because AmPeg already litigated and settled this issue; (3) James

Richard Borland's claim stemming from a policy on the life of Larry Reaves,

because the Receivership does not have any record of this policy; (4) Tony

Duscio's claims arising out of his business transactions with Torchia ; (5) Sonya

Gravitt's claim to recover fictitious profits, because fictitious profits cannot be

recovered; (6) James Hoyer's claims to recover assets from River Green, because

River Green investor claims are not properly payable out of CNC's assets;

(7) Joseph Leon Rice's claims to recover assets from National Viatical, because

National Viatical investor claims are not properly payable out of CNC's assets;

(8) William Rumer's claim to recover fictitious profits, because fictitious profits

cannot be recovered; (9) Katherine and Richard Sutherland's claim to recover

fictitious profits, because fictitious profits cannot be recovered; (10) Synergy

Acceptance Corporation's ("Synergy") claim arising out of a bankruptcy case and

adversary proceeding against Torchia and related entities; (11) Hazel Bacca,

Thomas Hall, and Bob Guess's potential claims because these individuals failed to return claim forms after repeated attempts by the Receiver to contact them.  The Court also considers Mr. Berman's claim and the Receiver's opposition to it.

           1.     <u>Synergy Claim</u>

E. Lynn Schoenmann, the Bankruptcy Trustee of the Synergy Estate, was the only claimant that responded to the Receiver's Motion to Disallow Claims. Synergy's claims arise out of a transaction in which AmPeg paid Torchia or related entities money for Clear Skies Holdings, an entity owned by CNC, to be acquired by Synergy.  The Receiver's position is that a review of the Receivership Entities' records does not reveal any evidence of monies received by Credit Nation in connection with the Clear Skies Holdings transaction.  The Receiver submitted a declaration to support his position.  At the Distribution Plan Hearing, Ms. Weber also stated there is some evidence funds from the Clear Skies Holdings transaction may have flowed to National Viatical, but that National Viatical is "not before the Court today on a distribution."  (Tr. 7-8).  To support its position that funds flowed to Credit Nation, Schoenmann points to evidence of Torchia's failure to properly document transactions and Torchia's testimony at the hearing on the SEC's preliminary injunction motion that Torchia used sales proceeds from Synergy to fund Credit Nation.  (<u>See</u>[489] at 3-8).

The Court finds that the Receiver is in the best position to understand and examine the flow of funds between and amongst Torchia and the Receivership Entities. The only evidence that funds from the Clear Skies Holdings transaction flowed to Credit Nation is Mr. Torchia's statement that he used sales proceeds from Synergy to fund Credit Nation. The Court, however, found Mr. Torchia's testimony overall "not credible," including because his opinions "were not supported by facts and were based on broad, speculative generalizations," and the Court believed many of his statements "to be untrue." (April 25th Order at 51). In the absence of any credible evidence that funds from the Clear Skies Holdings transaction flowed to Credit Nation, the Receiver's Motion to Disallow Synergy's claim is granted.

###   2.   AmPeg's Claims

The Court next turns to the AmPeg's claim for $9 million, which arises from the same circumstances associated with Synergy's claim. AmPeg contends that Mr. Torchia sold his interest in Clear Skies Holding to Synergy, and that AmPeg's investment of $9 million in Synergy was used to pay Torchia. AmPeg contends the sale was fraudulent, based on Torchia's claim that he invested funds from the Clear Skies transaction into the CNC Receivership Entities. The Receiver states that Ampeg has already litigated and settled this issue. On September 11, 2013,

AmPeg filed suit against Clear Skies Holding, Torchia, Mr. Celello, Celello Law Group, and Jaro, LLC, in this district, Civil Action No. 13-cv-3035-ELR., claiming the defendants misappropriated funds from AmPeg to pay Clear Skies and Synergy noteholders.  On January 27, 2016, the parties filed a Notice of Settlement, and, on February 11, 2016, AmPeg filed a stipulation of dismissal.  The Receiver argues that AmPeg's claim against CNC appears to be an attempt to re-litigate this settled matter, and that, if CNC was the recipient of funds, it was a necessary party to the litigation against Clear Skies.  The Receiver also states that, even if CNC was not a necessary party, the Receivership Entities do not have any record of receiving any proceeds from the sale of Synergy to Clear Skies.

Because CNC was a necessary party and because, as explained above, there is no competent evidence that any funds from the Clear Skies Holdings transaction flowed to CNC, the Receiver's Motion to Disallow AmPeg's claim of $9 million is granted.

AmPeg also filed a claim for $393,781.59 in connection with its purchase of the R. Parnes policy.  The Receiver shows that CNC and AmPeg originally contracted that the policy would revert to AmPeg if CNC failed to pay the full contract price within six months.  CNC paid a portion of the purchase price, but still owed AmPeg $393,781.59.  Rather than reverting the policy to AmPeg, the

parties agreed to resolve the payment default by naming AmPeg as an irrevocable

beneficiary on the Policy without any future payment obligations.  AmPeg was

scheduled to receive a potential death benefit in the amount equal to the balance it

claimed was due.  CNC paid premiums on the Policy starting in June 2010.  After

the Receivership began, the Receiver concluded the Parnes policy had no value,

and chose to let it lapse.  Before doing so, on May 19, 2016, the Receiver sought

the approval of AmPeg.  He also told AmPeg that its agreement to let the policy

lapse would not waive AmPeg's right to make a claim for payment of the purchase

price, though the Receiver did not agree to accept the claim.  AmPeg consented to

the lapse, and CNC stopped making premium payments and let the policy lapse.

The Receiver's position is that AmPeg's contract claim for the unpaid purchase

price was liquidated by its acceptance of an assignment of a portion of the death

benefit.  AmPeg could have reclaimed the Policy when the purchase price was not

paid, but chose instead to accept a beneficial interest in the death benefit, and then

consented to allowing the policy to lapse.  The Court agrees that AmPeg waived its

claim.  Further, the Receiver specifically rejected all of AmPeg's claims in his

Distribution Plan, and AmPeg did not file an objection to the Plan.  For this

additional reason, the Court denies AmPeg's claim for $393,781.59.

3.      Borland Claim

As to Mr. Borland's claim for $87,591.24 on a life settlement policy on the

insured "Larry Reeves," the Receiver states that CNC does not have any record of

a Reeves policy.  Mr. Borland did not submit documentation in support of his

claim.  Without any record to support Mr. Borland's claim, the Court grants the

Receiver's Motion to Disallow it.

4.      Duscio Claims

 Mr. Duscio filed four claims, and the Receiver moves to disallow all four.

Duscio filed a claim for $3,389.56 to recoup Fictitious Profits he remitted to retain

the L. Wardell policy.  Fictitious Profits cannot be recovered by Investors, and this

claim is disallowed.

Duscio's remaining claims for $1,000,000, $900,076, and $700,000

allegedly arise out of loans Duscio made to CNC, Clear Skies Holding, and

Synergy.  The Receiver moves to disallow these claims because Duscio failed to

substantiate his claims with any documents or other evidence to establish any

binding legal obligations of CNC.  The Receiver explains:

> Mr. Duscio makes a claim against CNC in the amount of
> $900,076.  The claim states that it is a claim acquired from "Clear Sky
> Holding Co."  CNC acquired no assets from Clear Sky Holding Co.
> and has no record of this liability.  The documentation Mr. Duscio
> submitted with the claim for $900,076, referencing "an addendum to
> the contract for two policies" does not substantiate or provide any

evidence of a legal obligation on behalf of CNC to repay Mr. Duscio $900,076.

As to the "loans" for $1,000,000 and $700,000, Exhibit 6(a) and 6(c), the records of the CNC Receivership Entities show that on or about September 22, 2008, Mr. Duscio wired $700,000 to Synergy Motor Company, the predecessor of Credit Nation Auto Sales, LLC. Mr. Torchia caused the repayment obligation to be booked as a liability of CNC, but it does not appear that any funds actually made their way from Synergy Motor Company to CNC. No promissory note was issued to Mr. Duscio. On or about January 15, 2009, Mr. Duscio wired $1,000,000 to Credit Nation Auto Sales, LLC. Mr. Torchia caused the repayment obligation to be booked as a liability of CNC, but again it does not appear that any funds actually made their way from Credit Nation Auto Sales, LLC to CNC. No promissory note was issued to Mr. Duscio. Mr. Torchia thereafter caused the transfer of two life insurance policies to Mr. Duscio as security for the debt: a CNC policy issued by American General on the life of D. Vealey ("Vealey") in the face amount of $500,000, and a National Viatical policy issued by American General on the life of C. Lovell ("Lovell") in the face amount of $1.2 million. Mr. Duscio did not provide any consideration to purchase the Vealey and Lovell policies.

On or about December 2, 2010, Mr. Torchia caused CNC to send Mr. Duscio $350,000 as a partial repayment of Mr. Duscio's $700,000 transfer. On or about January 13, 2011, Mr. Torchia caused CNC to send Mr. Duscio an additional $350,000 as a return of the balance of his $700,000 transfer. On or about December 16, 2013, Mr. Torchia caused CNC to send Mr. Duscio $100,000 as a partial repayment of the $1 million transfer. The D. Vealey policy matured, and on or about September 5, 2014, and American General paid Mr. Duscio $500,115.62.

From 2008 to 2010, Mr. Torchia caused CNC to pay Mr. Duscio $127,250 in interest on the $700,000 transfer, as follows: $11,000 was paid in 2008, $63,750 in 2009, and $52,500 in 2010. From 2009 to 2016, Mr. Torchia caused CNC to pay Mr. Duscio

$624,000 in interest on the $1 million transfer, as follows: $78,945.21 was paid in 2009, $90,000 in 2010, $86,054.79 in 2011, $90,000 in 2012, $90,000 in 2013, $81,000 in 2014, $81,000 in 2015, and $27,000 in 2016.

In total, Mr. Duscio transferred $1.7 million to Synergy Motor Company and Credit Nation Auto Sales, and Mr. Torchia caused CNC to pay Duscio $2,051,365.62: $1,300,115.62 in principal (including the $500,115.62 received by Mr. Duscio pursuant to the D. Vealey policy) and $751,250 in interest. Given that Mr. Duscio has recouped his entire principal investment plus profits, there is simply no basis for Mr. Duscio to have claims against CNC. The Receiver moves to disallow Mr. Duscio's claims.

[. . .]

Finally, as it relates to the recoupment and distribution plan of CNC's assets, the records of the CNC Receivership Entities contain no indication that CNC was indebted to Mr. Duscio. The proceeds from the Mr. Duscio's loans were deposited with Synergy Motor Company and Credit Nation Auto Sales, yet CNC repaid the debt. The Receiver reserves the right to proceed against Mr. Duscio for a return of CNC's $1.7 million that it paid to Mr. Duscio on behalf of Synergy Motor Company and Credit Nation Auto Sales, LLC.

(Mot. to Disallow Claims at 8-11).

Duscio does not respond to the Receiver's arguments. Because Duscio does not provide any evidence to establish a binding legal obligation of CNC to pay him, the Court grants the Receiver's Motion to Disallow Duscio's claims.

5.    <u>Gravitt Claim</u>

Ms. Gravitt filed a claim against the Receivership for $1,439.79 in Fictitious Profits she paid to redeem the M. Mader policy.  Fictitious Profits cannot be recovered by Investors, and this claim is disallowed.

6.    <u>Hoyer Claim</u>

Mr. Hoyer submitted a claim for $50,000 arising out of an investment in an unsecured note to River Green Autolife Fund.  Because the distribution plan before the Court involves liquidated assets of CNC, not River Green, Mr. Hoyer's claim is disallowed.  The Receiver states he will consider Mr. Hoyer's claim in the River Green Distribution Plan.

7.    <u>Rice Claims</u>

Mr. Rice submitted claims for $76,176.18, $90,000, and $120,000.  The Claims arise out of investments made with National Viatical.  Because the distribution plan before the Court involves liquidated assets of CNC, not National Viatical, Mr. Rice's claim is disallowed.  The Receiver states he will consider Mr. Rice's claims in the National Viatical Distribution Plan.

### 8.   Rumer Claims

Mr. Rumer submitted claims for $90.96, $98.63, and $1,748.08 to recoup Fictitious Profits he paid to the Receiver.  Fictitious Profits cannot be recovered by Investors, and these claim are disallowed.

### 9.   Sutherland Claims

The Sutherlands filed claims for $155,000, $11,277, $60,751.19, $46,066.03, $2,201.49, and $11,492.70.  The first claim arises out of an investment made with National Viatical.  Because the distribution plan before the Court involves liquidated assets of CNC, not National Viatical, the Sutherland's first claim is disallowed.  The Receiver states he will consider this claim in the National Viatical Distribution Plan.

The remaining claims consist of the payment of Fictitious Profits on the Rongey, Manzanares, Kay, Burke, and Early policies.  Fictitious Profits cannot be recovered by Investors, and these claim are disallowed.

### 10.   Bacca, Hall, and Guess Claims

The Receiver moves to disallow any claims of the Estate of Hazel Bacca, Thomas Hall, and Bob Guess, because they failed to return claim forms.  The Receiver submits documentation summarizing the contact attempts made by the Receiver's agents to effectuate completion of the proof of claim forms.  The

Receiver states that, in any event, Ms. Bacca and Mr. Hall are not scheduled to receive a distribution under the proposed plan based on prior interest payment distributions.  After multiple attempts to contact Hall, Hall advised that he was "not going to fool with it."  The Receiver's Motion is granted with respect to Ms. Bacca and Mr. Hall.

Mr. Guess is scheduled to receive $22,139.24 under the Distribution Plan. The Receiver, however, has commenced litigation against Mr. Guess to recover $1,542,024.16 in sales commissions he received from CNC.  Mr. Guess is in default in that case, and the Receiver moved for default judgment.  The Receiver states that Mr. Guess's proposed distribution will be applied against his liability to the Receivership.  The Receiver's Motion is granted with respect to Mr. Guess.

11.   Berman Claim

On June 6, 2017, Lee Berman, a former employee of Credit Nation who also was retained by the Receiver, filed a claim [490.1] for $45,000 for allegedly unpaid commissions he was owed on policies he sold on behalf of Credit Nation. At the Distribution Plan Hearing, Mr. Berman stated that he worked for the Receivership until June 30, 2017, and that he did not receive notice of the June 5, 2017, deadline to file claims with the Receivership.  He states that he had a conversation with the Receiver "earlier in the year and informed him that [he] did

plan to file this claim at the end of [his] employment." (Tr. at 28). Ms. Weber, on behalf of the Receiver, admits that the Receivership did not give notice to employees of Credit Nation of the June 5, 2017, deadline to file claims. (Tr. at 16). The Receiver argued at the hearing that Mr. Berman is not entitled to commissions on policies sold "in furtherance of [Torchia's] Ponzi scheme." (Tr. at 15).

The Court finds the untimeliness of Mr. Berman's claim is excused because he did not receive notice of the claim-filing deadline. Mr. Berman's claim, however, is for commissions allegedly due for policies sold in furtherance of the Ponzi scheme. The Receiver has initiated clawback litigation against Mr. Guess and other Credit Nation employees to recoup commission payments CNC made to them for their sales of policies. The Receiver alleges these payments were fraudulent transfers made through "illegal sales of unregistered securities," including because the commission payments were made by CNC "when it was insolvent and without ensuring that it received reasonably equivalent value." Hill v. Guess, et al., No. 1:16-cv-4770-WSD, Dkt. 1. Mr. Berman's claim for commission payments is not materially distinguishable from the commission payments made to Mr. Guess and other employees. The Court defers consideration of Mr. Berman's claim until the claims in Hill v. Guess are adjudicated.

Mr. Berman may file, on or before September 15, 2017, a brief in support of why, in light of <u>Hill v. Guess</u>, his claim for commission payments should be allowed.

## IV.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Receiver Al Hill's Motion to Approve Claims Process and Plan of Distribution [433] is **GRANTED**.

**IT IS FURTHER ORDERED** that the Receiver's Motion to Disallow Claims [475] is **GRANTED**.

**IT IS FURTHER ORDERED** that the Objections to the Distribution Plan [447], [449], [452], [453], [454], [455], [456], [457], [459], [460], [461], [463], [469] are **OVERRULED**.

**IT IS FURTHER ORDERED** that E. Lynn Schoenmann's opposition to the Receiver's Motion to Disallow Claims [489] is **OVERRULED**.

**IT IS FURTHER ORDERED** that Lee Berman's claim against the Receivership [490.1] is **DEFERRED**.  The Court will consider Mr. Berman's claim once the claims in <u>Hill v. Guess, et al.</u>, No. 1:16-cv-4770-WSD are adjudicated.  Mr. Berman may file, on or before September 15, 2017, a brief in support of why, in light of <u>Hill v. Guess</u>, his claim for commission payments should be allowed.

**SO ORDERED** this 7th day of August, 2017.

WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE